# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JANE DOE, individually and on behalf of
similarly situated individuals,

                   Plaintiff,

     v.

FENIX INTERNET, LLC, a Delaware
limited liability company,

                   Defendant.

Case No. 21-cv-6624

Hon. Gary S. Feinerman

## **APPENDIX OF U.K. LAW AUTHORITIES**

### Table of Contents

- **A-1 – A-16**: *Donohue v Armco Inc.* [2001] UKHL 64, 2001 WL 1479758

- **A-17 – A-34**: *BNP Paribas SA v Anchorage Capital Europe LLP* [2013] EWHC 3073 (Comm), 2013 WL 5336632

- **A-35 – A-53**: *Catlin Syndicate Ltd v Amec Foster Wheeler USA Corp* [2020] EWHC 2530 (Comm), 2020 WL 05713769

- **A-54 – A-70**: *Eastern Pacific Chartering Inc v Pola Maritime Ltd* [2021] EWHC 1707 (Comm)

Donohue v Armco Inc, 2001 WL 1479758 (2001)

# Donohue v Armco Inc and Others

 Positive/Neutral Judicial Consideration

**Court**
House of Lords

**Judgment Date**
13 December 2001

No. [2001] UKHL 64

House of Lords

**2001 WL 1479758**

Before: Lord Bingham of Cornhill Lord MacKay of Clashfern Lord Nicholls
of Birkenhead Lord Hobhouse of Wood-Borough Lord Scott of Foscott

Thursday 13th December, 2001

Opinions of the Lords of Appeal for Judgment in the Cause

JUDGMENT

LORD BINGHAM OF CORNHILL

My Lords,

1.. The issue in this appeal is whether an injunction should have been granted to restrain the prosecution of proceedings in New York and, if so, in whose favour it should have been granted.

2.. By a summons issued on 8 March 1999 Mr Donohue, the respondent to this appeal, sought such an injunction against the five companies, all of them in the Armco group, which are named as the appellants before the House. Aikens J at first instance declined to grant an injunction: *[1999] 2 Lloyd's Rep 649* . His decision was reversed by a majority of the Court of Appeal (Stuart-Smith and Sedley LJJ, Brooke LJ dissenting) *[2000] 1 Lloyd's Rep 579* , who granted an injunction. The facts giving rise to this appeal were helpfully summarised by the judge and Stuart-Smith LJ: see at pp 651–654 and 582–585 of the respective judgments. Stuart-Smith LJ also appended to his judgment, at p 601, an annex giving details of the companies and individuals involved in the proceedings and an explanation of the acronyms used in his judgment. Both the factual summary and the annex should be treated as incorporated in this opinion, which permits more economical reference to be made to the background history.

3.. The parties fall into two camps. One camp comprises Armco Inc, the parent company of the Armco group, a conglomerate based in the United States, and four other companies known by their initial letters (AFSC, AFSIL, APL and NNIC). These five companies are plaintiffs in the New York proceedings already mentioned and defendants (or potential defendants) in this English action and are named as appellants before the House. This camp also included Armco Financial Services Europe Ltd ("AFSEL"), a company which has now been dissolved.

4.. The second camp comprises, first of all, Mr Donohue, a defendant in the New York proceedings and the claimant here. It also comprises a number of potential co-claimants (PCCs), all of them defendants in the New York proceedings: Mr Rossi and his Ohio company known as ITRS; Mr Stinson and his Ohio company known as IROS; Wingfield Ltd, a Jersey company; and another Jersey company known as CISHL. Another defendant was sued in New York, Mr Atkins, but he settled the claim against him.

© 2022 Thomson Reuters.

A-1

5.. The Armco group formerly included several insurance companies together known as the British National Insurance Group (BNIG). The BNIG ceased to write new business and entered run-off status in 1984. It thus represented a liability to Armco, since claims under existing policies had to be met, and negotiations for the sale of the business were set in train. On the Armco side, the negotiations were conducted by Messrs Rossi and Stinson, two senior and long-serving Armco executives, both of them United States citizens and residents. The prospective buyers were Mr Donohue and Mr Atkins, also senior and long-serving Armco executives, but United Kingdom citizens resident in Singapore and England respectively.

6.. The shares in the BNIG were owned by AFSIL and AFSEL. To effect the sale of the business Armco sold its shares in the BNIG. To this end it incorporated CISHL. AFSC injected US$32.5m in cash and securities into CISHL. A further US$10m was transferred from AFSEL to CISHL. On 3 September 1991 AFSIL and AFSEL each executed an agreement (referred to as "the transfer agreements") transferring all their assets in the BNIG into CISHL. On the same day Wingfield acquired all the shares in CISHL under a sale and purchase agreement bearing the same date under which Wingfield was named as the purchaser. After the sale the BNIG was renamed the North Atlantic Insurance Group (NAG), the leading company of which was called the North Atlantic Insurance Company Ltd (NAIC).

7.. Many of the facts surrounding these transactions are the subject of acute controversy between the parties. But two points central to this appeal are not in doubt. First, the only parties to these three agreements were (on the Armco side) AFSIL, AFSEL and AFSC and (on what may be called the Donohue side) CISHL, Wingfield, Mr Donohue and Mr Atkins. It is now accepted that, on the dissolution of AFSEL, Armco Inc succeeded to the rights and obligations of that company, so it also is to be treated as a party to one of the transfer agreements and to the sale and purchase agreement. But the other companies in the Armco group (APL and NNIC) and several of the PCCs (Messrs Rossi and Stinson and their respective companies ITRS and IROS) were not parties to any of the three agreements. Secondly, each of the three agreements contained an express stipulation that the contract was governed by English law, made provision for service on a nominated agent of the vendor's solicitors in England and, most importantly, provided for the exclusive jurisdiction of the English court. In the sale and purchase agreement it was provided that "the parties hereby irrevocably submit themselves to the exclusive jurisdiction of the English Courts to settle any dispute which may arise out of or in connection with this Agreement". The exclusive jurisdiction clause in each of the transfer agreements was differently worded, but no point has been taken on the difference of wording.

8.. Several years passed before, in early 1997, NAIC went into provisional liquidation with other group companies and a winding up petition was presented to the High Court. From about this date, it appears that there were a series of discussions between a lawyer representing Armco and Mr Atkins, who had resigned from the NAG in 1995. Mr Atkins made a series of statements, the last of them in evidence dated September 1998. On this statement Armco strongly rely in support of their case.

9.. On 5 August 1998 proceedings were issued by the five Armco appellants in New York against NAIC, Mr Donohue, Mr Atkins, all the six PCCs (Messrs Rossi and Stinson and their respective companies, Wingfield and CISHL), and NPV Ltd (a Nevis company). The proceedings were based on what the amended complaint described as "an international fraud of immense proportions". The amended complaint is a substantial document, running to more than 70 pages and including 17 specific counts. It is not easily summarised, but the broad thrust of the *Armco companies'* case is clear enough. They contend that a secret agreement (recorded in writing) was made between Messrs Donohue, Atkins, Rossi and Stinson in New York in April 1991. Pursuant to this agreement Armco would be fraudulently induced to inject an extra-large sum into the BNIG and the four would then buy the BNIG, thus enriched, through Wingfield, a Jersey company which they (or some of them) owned. Since Messrs Rossi and Stinson were Armco executives negotiating on behalf of their employer their conduct was a flagrant breach of the duty they owed to their employer. The plan was implemented. Much of the money injected into the group has, it is alleged, been siphoned off by the four for their own ends. But the alleged fraud did not end there. Armco also contend that, as part of the secret plan, the group of four fraudulently induced Armco (by APL) to enter into debt collection contracts with NPV, the Nevis company which they owned: these contracts are said to have been unduly favourable to NPV and to have enabled the four to take exorbitant fees for themselves. It is further alleged that the four fraudulently obtained money from two trust funds set up earlier to give financial protection to NNIC against claims by policyholders of an insurer whose business NNIC had taken over. In this way, it is said, the four fraudulently depleted the trust funds by some US$16m after the 3 September 1991 agreements. A further complaint is that, between 1991 and 1997, the four diverted funds from the NAG to themselves by means of various commission, consultancy and dividend payments. The New York proceedings also included claims under the Federal Racketeer Influenced and Corrupt Organizations Act 18 USC §1962(c) (RICO), which enables a successful plaintiff to recover triple, punitive and exemplary damages.

10.. All the PCCs (Messrs Rossi and Stinson and their respective companies, Wingfield and CISHL) moved to dismiss the New York proceedings against them on various grounds, a motion denied by Judge Schwartz sitting in the District Court of the

A-2

Donohue v Armco Inc, 2001 WL 1479758 (2001)

Southern District of New York on 30 September 1999. Mr Donohue did not take part in that proceeding, but had instead issued the present summons applying for an injunction on 8 March 1999. Application was also made in the action to join the PCCs as claimants. APL and NNIC applied to set aside service upon them.

11..  These three applications came before Aikens J who gave his reserved judgment on 15 July 1999. On the third summons he ordered that service on APL and NNIC be set aside ( *[1999] 2 Lloyd's Rep 649* at 664, para 68). This decision was upheld by the *Court of Appeal ([2000] 1 Lloyd's Rep 579* at 591, para 46 and at 597, para 80). It has not been challenged before the House.

12..  On the second summons, the judge decided that the PCCs should not be joined as claimants in the English action (p 660, para 50; p 664, para 67). The majority in the Court of Appeal took a different view and held that they should be joined (p 593, para 52–53; p 600, para 98). Brooke LJ held that there were no grounds for allowing any of the American PCCs (Messrs Rossi and Stinson and their respective companies) to be joined as claimants: p 599, paras 89–92. The propriety of joining the PCCs as claimants in this action is one of the major issues before the House.

13..  On the first summons, the judge held that an injunction restraining proceedings in New York should not be granted to Mr Donohue. In reaching that conclusion he made two important findings. The first was expressed in paragraphs 42 and 43 at p 659 of his judgment:

> "42.  I have decided that the claims raised in the NY proceedings based on a pre-existing conspiracy to defraud Armco are not claims that 'arise out of' either the SPA [sale and purchase agreement] or the transfer agreements. They 'arise out of' the alleged agreement to conspire against Armco to defraud it. I have also concluded that the claims concerning the collection agreement did not arise out of or in connection with the SPA or the transfer agreements. I doubt the trust fund claims come within the EJCs too, but I am told that the trust fund claims may not be relevant now that the NNIC/NAIC disputes have been settled subject to ratification by the Court. Thus at least the issues raised in counts 1 to 8 and 9 to 12 [of the amended complaint in the New York proceedings] are not within the EJCs [exclusive jurisdiction clauses].

> 43.  This means that much of the disputes raised in the NY proceedings are outside the scope of the EJCs …"

The second important finding was that Armco Inc had never succeeded to the rights and obligations of AFSEL under the transfer agreement and the sale and purchase agreement to which AFSEL had been party and so had never become bound by the exclusive jurisdiction clause in those agreements (p 656, para 28). The judge accordingly approached Mr Donohue's application by considering whether the New York proceedings against him were vexatious and oppressive and concluded that they were not (pp 662–664, paras 65–66). All three members of the Court of Appeal disagreed with these two findings, although with some qualifications by Brooke LJ concerning the first: p 588, paras 30–31; p 587, para 27; p 596, para 67; p 600, para 97. The Court of Appeal held that these errors vitiated the judge's exercise of discretion and so entitled the Court of Appeal to exercise its discretion afresh (p 588, para 32; p 599, para 87).

14..  The Court of Appeal's conclusions on these two points have not been in issue before the House. Armco Inc accepts that as the successor to AFSEL it is bound by the exclusive jurisdiction clauses in the transfer agreement to which AFSEL was party and in the sale and purchase agreement to the extent that AFSEL would itself have been bound had it not been dissolved. Armco Inc also asserts that as the ultimate victim of the alleged conspiracy it has claims independent of those derived from AFSEL, an assertion challenged by Mr Donohue and the PCCs. On the scope of the clauses, the Armco companies accept that the clauses cover claims based on the conspiracy which preceded the making of the agreements as well as the misrepresentations and concealment which procured them to be made. The scope of the clauses was not the subject of argument before the House and I do not think it appropriate to give detailed consideration to this aspect of the case. The exclusive jurisdiction clause in the sale and purchase agreement, quoted above, was in wide terms. The practice of the English courts is to give such clauses, as between the parties to them, a generous interpretation.

15..  The Court of Appeal granted an injunction against the first three Armco defendants (Armco Inc, AFSC and AFSIL) restraining them from commencing or continuing proceedings against any of the claimants (Messrs Donohue, Rossi and Stinson, IROS, ITRS, Wingfield and CISHL) in any court other than those of England and Wales regarding any dispute arising out of the management buy-out, defined to mean the 1991 disposal of the BNIG. The injunction was expressed to apply in particular to the Armco companies' New York proceedings already referred to, and to the numbered counts which were held to cover the 1991 management buy-out. Thus the injunction did not apply to APL and NNIC, the joinder of which companies had been disallowed, and was limited to the causes of action held to fall within the exclusive jurisdiction clauses. But the benefit of the exclusive jurisdiction clauses was extended to the four PCCs who were not party to them (Messrs Rossi and Stinson and their

© 2022 Thomson Reuters.

3

**A-3**

**Donohue v Armco Inc, 2001 WL 1479758 (2001)**

---

respective companies). The object of the injunction was plainly to give effect to the exclusive jurisdiction clauses and to ensure trial in England of the issues arising out of or connected with the management buy-out between all the parties involved.

16.. The grant of an anti-suit injunction, as of any other injunction, involves an exercise of discretion by the court. To exercise its discretion reliably and rationally, the court must have the fullest possible knowledge and understanding of all the circumstances relevant to the litigation and the parties to it. This is particularly true of an anti-suit injunction because, as explained below, the likely effect of an injunction on proceedings in the foreign and the domestic forum and on parties not bound by the injunction may be matters very material to the decision whether an injunction should be granted or not. Thus although the two main issues before the House cannot be regarded entirely independently of each other, it is preferable to consider the issue of joinder of the PCCs before considering the grant of an anti-suit injunction more generally.

Joinder of the PCCs

17.. CISHL was party to each of the transfer agreements. Wingfield was party to the sale and purchase agreement. All three agreements contained an English exclusive jurisdiction clause. Both companies have been sued by Armco in New York. Both have claims falling within RSC Order 11, rule 1(1)(d)(iii) and (iv) (now CPR rule 6.20(5)(c) and (d) ) entitling them to seek leave to serve proceedings out of the jurisdiction. Under RSC Order 15, rule 6(2)(b)(ii) (now CPR rule 19.2(2) ) the court has power to add these companies as claimants if it considers it desirable to do so. Thus if the court should consider it desirable to do so there is no jurisdictional objection to the grant of leave to add CISHL and Wingfield as claimants in Mr Donohue's action and to give leave (if it were needed) to CISHL and Wingfield to serve AFSIL and Armco Inc (as the successor to AFSEL) out of the jurisdiction. The basis of their claim is in principle the same as that of Mr Donohue, but since they seek to be added to existing proceedings they must persuade the court that it is desirable to add them. The decision whether it is desirable to add them will be heavily influenced by the decision whether to join the other PCCs and whether Mr Donohue upholds his claim to the grant of an anti-suit injunction.

18.. The other four PCCs (Messrs Rossi and Stinson and their respective companies) are in a different position. None was a party to either transfer agreement or to the sale and purchase agreement and so none has the benefit of the English exclusive jurisdiction clause. It is common ground that none has any cause of action which would entitle the court to give leave to serve proceedings out of the jurisdiction under RSC Order 11, rule 1 or CPR rule 6.20 , and thus none could bring independent proceedings against any Armco company in England unless that company submitted to the jurisdiction. But these PCCs rely on the broad power of the court under RSC Order 15, rule 6 and CPR rule 19 , which is said to be unconstrained by the rules on service out of the jurisdiction, and it is said to be desirable to add them because they have a substantial cause of action entitling them to seek an anti-suit injunction. The Armco companies reply that a foreign party, even if already properly sued within the jurisdiction, may not be subjected to a claim for which leave to serve out could not be granted and further that, in the absence of any contractual right to rely on an exclusive jurisdiction clause, these PCCs have on the material before the House no cause of action entitling them to seek an anti-suit injunction. The first issue between the parties is whether these PCCs can show any cause of action which would entitle them to claim an injunction.

19.. The jurisdiction of the English court to grant injunctions, both generally and in relation to the conduct of foreign proceedings, has been the subject of consideration by the House of Lords and the Privy Council in a series of decisions in recent years which include *Siskina (Owners of cargo lately laden on board) and others v Distos Compania Naviera SA [1979] AC 210* ; *Castanho v Brown & Root (UK) Ltd [1981] AC 557* ; *British Airways Board v Laker Airways Ltd [1985] AC 58* ; *South Carolina Insurance Co v Assurantie Maatschappij "De Zeven Provincien" NV [1987] AC 24* ; *Société Nationale Industrielle Aérospatiale v Lee Kui Jak [1987] AC 871* ; and *Airbus Industrie GIE v Patel [1999] 1 AC 119* . Those decisions reveal some development of principle and there has in other decisions (for example, *Mercedes Benz AG v Leiduck [1996] AC 284* ) been some divergence of opinion. But certain principles governing the grant of an injunction to restrain a party from commencing or pursuing legal proceedings in a foreign jurisdiction, in cases such as the present, as between the Armco companies and these PCCs, are now beyond dispute. They were identified by Lord Goff of Chieveley giving the opinion of the *Judicial Committee of the Privy Council in Aérospatiale* (at p 892):

(1) The jurisdiction is to be exercised when the ends of justice require it.

(2) Where the court decides to grant an injunction restraining proceedings in a foreign court, its order is directed not against the foreign court but against the parties so proceeding or threatening to proceed.

(3) An injunction will only be issued restraining a party who is amenable to the jurisdiction of the court, against whom an injunction will be an effective remedy.

(4) Since such an order indirectly affects the foreign court, the jurisdiction is one which must be exercised with caution.

© 2022 Thomson Reuters.

**A-4**

In *Aérospatiale* the issue was whether proceedings in Texas should be restrained in favour of Brunei, and (at p 896) Lord Goff summarised the guiding principles:

> "In the opinion of their Lordships, in a case such as the present where a remedy for a particular wrong is available both in the English (or, as here, the Brunei) court and in a foreign court, the English or Brunei court will, generally speaking, only restrain the plaintiff from pursuing proceedings in the foreign court if such pursuit would be vexatious or oppressive. This presupposes that, as a general rule, the English or Brunei court must conclude that it provides the natural forum for the trial of the action; and further, since the court is concerned with the ends of justice, that account must be taken not only of injustice to the defendant if the plaintiff is allowed to pursue the foreign proceedings, but also of injustice to the plaintiff if he is not allowed to do so. So the court will not grant an injunction if, by doing so, it will deprive the plaintiff of advantages in the foreign forum of which it would be unjust to deprive him. Fortunately, however, as the present case shows, that problem can often be overcome by appropriate undertakings given by the defendant, or by granting an injunction upon appropriate terms; just as, in cases of stay of proceedings, the parallel problem of advantages to the plaintiff in the domestic forum which is, prima facie, inappropriate, can likewise often be solved by granting a stay upon terms."

20.. If these principles are applied to the present case it is in my opinion plain that an anti-suit injunction could not properly be granted in favour of these PCCs. The judge (considering the position of Mr Donohue and all the PCCs) concluded that England was not the natural forum for these proceedings, that the connections with England were slim and that the New York proceedings were not vexatious and oppressive ( *[1999] 2 Lloyd's Rep 649* at 662–664, paras 65–66). Stuart-Smith LJ observed that if this were an alternative forum case he would not necessarily disagree with the judge ( *[2000] 1 Lloyd's Rep 579* at 589, para 38). Brooke LJ considered that the convenient forum for the resolution of all disputes between Messrs Rossi and Stinson and their former employers was clearly situated on the other side of the Atlantic (p 599, para 92). Judge Schwartz concluded that:

> "Permitting this trial to proceed in New York would be neither oppressive nor vexatious to defendants"

and further said:

> "This Court concludes that this action, involving US plaintiffs, mostly US or non-English defendants, and a fraudulent scheme that allegedly arose in New York, is far removed from the facts of those cases where courts granted the extraordinary remedy of forum non conveniens."

The Armco companies are incorporated in Ohio, Delaware, Wisconsin and (in the case of *Apl* ) Singapore. Messrs Rossi and Stinson and their companies have no English links. The dispute between them and the Armco companies concerns the alleged breach of the fiduciary duty they owed to their employers. It is plain that England is not the natural forum for resolution of this dispute and that the New York proceedings by the Armco companies against these PCCs are neither vexatious or oppressive.

21.. There is another more technical objection to the joinder of these PCCs. In stating the third of his basic principles in *Aérospatiale* , above, Lord Goff made reference to "a party who is amenable to the jurisdiction of the court". This echoed the language of Lord Diplock in his important statement of principle in The *Siskina* , above, at p 256, which has been understood to mean that the court may only grant an injunction where it has personal jurisdiction over the defendant in the sense that he could be served personally or under RSC Order 11 (other than sub-rule (i)): see *Channel Tunnel Group Ltd v Balfour Beatty Construction Ltd [1993] AC 334* at 342, per Lord Browne-Wilkinson. These PCCs could not, as already noted, have obtained leave to serve out of the jurisdiction on any of the Armco companies in independent proceedings. Service on APL and NNIC has been set aside. Does the amenability of Armco Inc, AFSC and AFSIL to the jurisdiction of the English court by virtue of their contractual relationship with Mr Donohue enable these PCCs to take advantage of that relationship to effect service on the solicitors nominated by those companies pursuant to the transfer and sale and purchase agreements, and thus to prosecute a claim which could not otherwise have been prosecuted in this forum? In my opinion it does not. Since *Holland v Leslie [1894] 2 QB 450* the view has prevailed that the court should refuse to allow an amendment of proceedings which would introduce a new cause of action against a foreign defendant in respect of which the court would have refused leave for service out of the jurisdiction (see, for instance, *Beck v Value Capital Ltd (No 2) [1975] 1 WLR 6, affirmed* , although not on this point, *[1976] 1 WLR 572* ). This view seems to me to accord with principle. The jurisdiction of the English court is territorial. A party resident abroad may be subjected to the jurisdiction of the court to the extent (and only to the extent) that statute or rules made under statute permit. It would emasculate that salutary rule if such a party, properly served with notice of a claim falling within RSC

Order 11, CPR r 1 or r 6.20 were then to be exposed to claims falling outside the relevant rule. In exercising its discretion to give leave to serve out of the jurisdiction the court will have regard to the substance of a claimant's complaint and not permit jurisdiction to be obtained by a mere device: *Johnson v Taylor Bros & Co Ltd [1920] AC 144* . It would be wrong in principle to allow these PCCs to use Mr Donohue's action as a Trojan horse in which to enter the proceedings when they could have shown no possible ground for doing so in their own right.

22.. The majority of the Court of Appeal were in my opinion wrong to allow the joinder of these four PCCs, and I would accordingly set aside that order and refuse joinder.

The grant of an injunction to Mr Donohue

23.. My Lords, I turn to the question whether an anti-suit injunction should be granted to Mr Donohue, recognising that as between him and the first three Armco appellants (Armco Inc, AFSC and AFSIL) there is a contractual obligation to submit any dispute which may arise out of or in connection with the sale and purchase agreement to the exclusive jurisdiction of the English court. It is plain that while some of the claims made by the Armco companies in the New York proceedings fall outside the scope of this clause, some claims central to the Armco companies' complaint fall within it. In this situation, exercise of the broad discretion conferred on the court by section 37 of the Supreme Court Act 1981 to grant an injunction in all cases in which it appears to the court to be just and convenient to do so is controlled by principles to be derived from a substantial line of authority here and abroad.

*Judgments — Donohue v. Armco Inc and Others*

24.. If contracting parties agree to give a particular court exclusive jurisdiction to rule on claims between those parties, and a claim falling within the scope of the agreement is made in proceedings in a forum other than that which the parties have agreed, the English court will ordinarily exercise its discretion (whether by granting a stay of proceedings in England, or by restraining the prosecution of proceedings in the non-contractual forum abroad, or by such other procedural order as is appropriate in the circumstances) to secure compliance with the contractual bargain, unless the party suing in the non-contractual forum (the burden being on him) can show strong reasons for suing in that forum. I use the word "ordinarily" to recognise that where an exercise of discretion is called for there can be no absolute or inflexible rule governing that exercise, and also that a party may lose his claim to equitable relief by dilatoriness or other unconscionable conduct. But the general rule is clear: where parties have bound themselves by an exclusive jurisdiction clause effect should ordinarily be given to that obligation in the absence of strong reasons for departing from it. Whether a party can show strong reasons, sufficient to displace the other party's prima facie entitlement to enforce the contractual bargain, will depend on all the facts and circumstances of the particular case. In the course of his judgment in *The Eleftheria [1970] P 94* , 99–100, Brandon J helpfully listed some of the matters which might properly be regarded by the court when exercising its discretion, and his judgment has been repeatedly cited and applied. Brandon J did not intend his list to be comprehensive, but mentioned a number of matters, including the law governing the contract, which may in some cases be material. (I am mindful that the principles governing the grant of injunctions and stays are not the same: see *Aérospatiale* at p 896. Considerations of comity arise in the one case but not in the other. These differences need not, however, be explored in this case)

25.. Where the dispute is between two contracting parties, A and B, and A sues B in a non-contractual forum, and A's claims fall within the scope of the exclusive jurisdiction clause in their contract, and the interests of other parties are not involved, effect will in all probability be given to the clause. That was the result in *Mackender v Feldia AG [1967] 2 QB 590* ; *Unterweser Reederei GmbH v Zapata Off-Shore Co (The Chaparral) [1968] 2 Lloyd's Rep 158* ; *The Eleftheria [1970] P 94* ; *DSV Silo- und Verwaltungsgesellschaft mbH v Owners of the Sennar and 13 Other Ships (The Sennar (No 2)) [1985] 1 WLR 490* ; *British Aerospace Plc v Dee Howard Co [1993] 1 Lloyd's Rep 368* ; *Continental Bank NA v Aeakos Compania Naviera SA and Others [1994] 1 WLR 588* ; *Aggeliki Charis Compania Maritima SA v Pagnan SpA (The Angelic Grace) [1995] 1 Lloyd's Rep 87* ; and *Akai Pty Ltd v People's Insurance Co Ltd [1998] 1 Lloyd's Rep 90* . A similar approach has been followed by courts in the United States, Canada, Australia and New Zealand: see, for example, *M/S Bremen v Zapata Off-Shore Co (1972) 407 US 1* ; *Volkswagen Canada Inc v Auto Haus Frohlich Ltd [1986] 1 WWR 380* ; *FAI General Insurance Co Ltd v Ocean Marine Mutual Protection and Indemnity Association (1997) 41 NSWLR 559* ; and *Kidd v van Heeren [1998] 1 NZLR 324* .

26.. *Cargo Lately Laden on Board The Fehmarn (Owners) v Fehmarn (Owners) (The Fehmarn) [1958] 1 WLR 159* shows that this is not an invariable result. This was one of the earlier cases in the modern series. The Russian exclusive jurisdiction clause was a condition in a bill of lading, no doubt part of a standard form, and certainly not the subject of negotiation between the

parties to the eventual dispute. That was between English owners of the bill and German owners of the vessel. The dispute was held to have a much closer connection with England than with Russia, and it was thought that the German owners did not object to the dispute being decided in England if they could avoid giving security. On those grounds, the judge having declined to stay the proceedings in England, the Court of Appeal upheld his decision.

27..  The authorities show that the English court may well decline to grant an injunction or a stay, as the case may be, where the interests of parties other than the parties bound by the exclusive jurisdiction clause are involved or grounds of claim not the subject of the clause are part of the relevant dispute so that there is a risk of parallel proceedings and inconsistent decisions. These decisions are instructive. In *Evans Marshall and Co Ltd v Bertola SA and Another [1973] 1 WLR 349* there was a tripartite dispute but only two of the parties were bound by a clause conferring exclusive jurisdiction on the court in Barcelona. Kerr J at first instance was impressed by the undesirability of there being two actions, one in London and the other in Barcelona (pp 363–364). The Court of Appeal took a similar view (pp 377, 385). Sachs LJ thought separate trials particularly inappropriate where a conspiracy claim was in issue (p 377). In *Aratra Potato Co Ltd v Egyptian Navigation Co (The El Amria) [1981] 2 Lloyd's Rep 119* the primary dispute was between cargo interests and the owner of the vessel, both parties being bound by a clause in the bill of lading conferring exclusive jurisdiction on the courts of Egypt. But the cargo interests had also issued proceedings against the Mersey Docks and Harbour Co, which was not bound by the clause. The Court of Appeal upheld the judge's decision refusing a stay. In the course of his leading judgment in the Court of Appeal Brandon LJ said, at p 128: "I agree entirely with the learned Judge's view on that matter, but would go rather further than he did in the passage from his judgment quoted above. By that I mean that I do not regard it merely as convenient that the two actions, in which many of the same issues fall to be determined, should be tried together; rather that I regard it as a potential disaster from a legal point of view if they were not, because of the risk inherent in separate trials, one in Egypt and the other in England, that the same issues might be determined differently in the two countries. See as to this *Halifax Overseas Freighters Ltd v Rasno Export (The Pine Hill) [1958] 2 Lloyd's Rep 146* and *Taunton-Collins v Cromie [1964] 1 WLR 633* ." *Citi-March Ltd v Neptune Orient Lines Ltd [1996] 1 WLR 1367* also involved third party interests and raised the possibility of inconsistent decisions. Colman J regarded separate trials in England and Singapore as not only inconvenient but also a potential source of injustice and made an order intended to achieve a composite trial in London despite a Singaporean exclusive jurisdiction clause: see at pp 1375–1376. *Mahavir Minerals Ltd v Cho Yang Shipping Co Ltd (The M C Pearl) [1997] 1 Lloyd's Rep 566* again involved third parties and raised the possibility of inconsistent findings. Despite a clause conferring exclusive jurisdiction on the courts of Seoul, Rix J refused to stay proceedings in England. He regarded the case as on all fours with *Citi-March* (see p 575) and at p 569 observed: "It seems to me that so far the plaintiffs have shown strong cause why the jurisdiction clause should not be enforced. This is indeed a paradigm case for the concentration of all the relevant parties' disputes in a single jurisdiction. If in such a case a host of different jurisdiction clauses were to be observed, the casualty at the root of the action would become virtually untriable. The action would fragment and reduplicate, at vast cost …" A similar approach is discernible in *Bouygues Offshore SA v Caspian Shipping Co [1998] 2 Lloyd's Rep 461* , in which the disputes involved four parties only two of whom were bound by an English exclusive jurisdiction clause. Although the effect of the clause was described by Evans LJ as "near-conclusive" (p 467), an injunction to restrain proceedings in South Africa was refused. In paragraph 27 of his judgment (at p 466) Evans LJ said: "In my judgment, two questions arise, one a matter of principle. First, should the Court, when deciding whether or not to enforce the exclusive jurisdiction clause by means of an injunction which prevents Bouygues from continuing with its proceedings against Ultisol in South Africa, take into account the effects of such an injunction on persons who are not parties or entitled to enforce the contract containing the jurisdiction clause, Portnet and Caspian here, but who are both necessary and proper parties to the litigation wherever it is held? In my judgment, the clear answer to this question is 'yes'. Mr Justice Clarke did so in his judgment and the contrary has not been argued before us. The relevance of the potential effects on third parties has been recognised in other authorities …" Sir John Knox also held that proceedings should be allowed to continue in South Africa because, among other reasons (see p 470), "this is the only way in which to minimize, if not avoid altogether, the risk of inconsistent decisions in different jurisdictions."

28..  Not all cases can be so neatly categorised. In *Crédit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd [1999] 1 All ER (Comm) 237* Rix J dealt with a case in which there were four potential parties and three different agreements (or classes of agreement) but only two of the parties were bound by an English exclusive jurisdiction clause under one of the agreements. There were proceedings by C against A (the two parties to the clause) in England and proceedings by A against C, B and D in New York alleging statutory breaches relating to the agreement containing the clause and also under an agreement not containing an exclusive jurisdiction clause, and including other claims such as a claim for conversion. The judge gave leave, on their application, for B and D to be joined to C's action against A in England (p 248). A's application to stay the proceedings by C in England was not pursued, but if it had been it would have failed (p 257). On an application by C, B and D for an injunction to restrain A suing them in New York, the judge granted an injunction but only to restrain the prosecution of claims covered by the exclusive jurisdiction clause (p 259). The judge was confronted in this case with a difficult procedural and jurisdictional

**A-7**

**Donohue v Armco Inc, 2001 WL 1479758 (2001)**

tangle which permitted no wholly satisfactory solution. It was however important to his decision that he did not judge it possible to make an order which would ensure trial of all proceedings arising out of all the agreements in one forum. At p 257 he said (interpolating schematic references for the references he made to named parties): "(5) An important fact in this case, as it seems to me, is that, whether I enforce [the exclusive jurisdiction clause] or not, I cannot ensure that all litigation between [A] and [B, C and D] is carried forward in one jurisdiction unless I would be prepared to extend my injunction to all the claims against [B, C and D] in New York. That is because [the exclusive jurisdiction clause] does not bind [B and D]. That remains the case even if I assume that all the claims against [C] come within [the exclusive jurisdiction clause], but I have already stated that in my judgment that is not the case. It follows that unless I am prepared not only to enforce [the exclusive jurisdiction clause] but also to injunct [A's] claims against [B and D] and [A's] claims against [C] outside [the exclusive jurisdiction clause], [A's] complaint in New York will continue in any event. On the other hand [counsel] has not pursued [A's] application for a stay of [C's] action, but if he had, it would fail for the reasons for which [counsel] cited *British Aerospace Plc v Dee Howard Co [1993] 1 Lloyd's Rep 368* . Thus the continuation of the proceedings in England is inevitable too. "(6) I would not, however, injunct the claims against [B and D] because, however undesirable it is in principle to have parallel litigation in two jurisdictions, it seems to me the duplication of litigation does not in itself make it in the interests of justice to injunct the New York proceedings in so far as claims against [B] and [D] are concerned …".

29.. In seeking to apply this body of authority to the present case the first point to be made is that Mr Donohue has as against the first three Armco appellants a strong prima facie right not to be the subject elsewhere than in England of claims by those companies falling within the scope of the clause. Some of the claims made against him by those companies in New York do fall within the clause. This is an important and substantial, and not a formal or technical, right. At an earlier stage of this English litigation Armco sought to impeach the exclusive jurisdiction clauses on the ground that they had been induced by the fraud of the four conspirators. The judge not only rejected the contention that Armco executives had been misled but also found that Armco's English and US lawyers had known all about the clauses and their consequences and that Armco had had its own good reasons for inserting English law and jurisdiction clauses in the contracts (*[1999] 2 Lloyd's Rep 649* at pp 657–659, paras 35–40). There was no appeal against these conclusions. Thus Armco, having agreed to these clauses to serve their own ends, are now seeking to be released from their bargain. To permit them to do so exposes Mr Donohue to an obvious risk of injustice. This risk does not derive from the venue alone: Mr Donohue might, as a United Kingdom citizen, prefer to be sued in London rather than New York if he has to be sued anywhere, but to him, as a resident of Singapore, New York is not in itself an obviously more inconvenient forum than London. A more substantial objection may be founded on the perceived procedural disadvantages to him of being sued in New York: as the evidence suggests, the cost would be greater, trial would be by jury and costs would be very largely irrecoverable even if he were to succeed. But there are always points of this kind to be made when comparing one forum with another, and the standing, authority and expertise of the forum in which the New York proceedings are being pursued cannot be questioned. Much more significant, from Mr Donohue's viewpoint, are the RICO claims made against him. They could not be pursued against him in England. They could, if established in New York, lead to the award of swingeing damages against him. On agreement of the exclusive jurisdiction clause he could reasonably have felt confident that no RICO claim arising out of or in connection with the agreements could be pursued against him and it would represent an obvious injustice if he were now to be exposed to those claims.

30.. There is, as always, another side to the coin. All five Armco appellants have a clear prima facie right to pursue against Messrs Rossi, and Stinson and their respective companies any claim they choose in any convenient forum where they can found jurisdiction. They have successfully founded jurisdiction in New York. There is, as I have already concluded, no ground upon which this court could properly seek to restrain those proceedings. It would not be appropriate for the English courts to form any judgment, however tentative, on the merits of the Armco companies' claims, beyond noting that lack of merit was not one of the grounds on which the PCCs invited Judge Schwartz to dismiss the proceedings in New York. It must be assumed that the claims made by the Armco companies against their former employees Messrs Rossi and Stinson, including the RICO claims, are serious and substantial claims. There is nothing whatever to suggest that these claims will not proceed in New York whether or not an injunction is granted to Mr Donohue.

31.. It must further be noted that APL and NNIC have a clear prima facie right to pursue against Mr Donohue, Wingfield and CISHL also any claim they choose in any convenient forum where they can found jurisdiction. They have successfully founded jurisdiction in New York. I have already recorded that service of the English proceedings on APL and NNIC has been set aside. There is no ground upon which the English court could properly restrain their proceedings in New York. It appears, as Stuart-Smith LJ held ( *[2000] 1 Lloyd's Rep 579* at 593, para 54(3)) that the claims of APL and NNIC relate to the collection agreement and the trust fund withdrawals rather than the allegedly fraudulent management buy-out, but these claims also cannot be treated as lacking merit. They are proceeding in New York, and everything suggests that they will continue in New York whether or not the English court grants an injunction to Mr Donohue.

© 2022 Thomson Reuters.

**A-8**

Donohue v Armco Inc, 2001 WL 1479758 (2001)

32.. Similarly, the first three Armco appellants have a clear prima facie right to pursue against Mr Donohue, Wingfield and CISHL any claim not covered by the exclusive jurisdiction clauses in any convenient forum where they can found jurisdiction. They have successfully founded jurisdiction in New York. To the extent that the claims of these Armco companies do not arise out of or in connection with the transfer agreements and the sale and purchase agreement, they fall outside the exclusive jurisdiction clauses, and there is no ground upon which the English court could properly restrain these proceedings. Everything suggests that they will continue in New York whether or not the English court grants an injunction to Mr Donohue.

33.. Thus Mr Donohue's strong prima facie right to be sued here on claims made by the other parties to the exclusive jurisdiction clause so far as the claims made fall within that clause is matched by the clear prima facie right of the Armco companies to pursue in New York the claims mentioned in the last three paragraphs. The crucial question is whether, on the fact of this case, the Armco companies can show strong reasons why the court should displace Mr Donohue's clear prima facie entitlement. If strong reasons are to be found (and the need for strong reasons is underlined in this case by the potential injustice to Mr Donohue, already noted, if effect is not given to the exclusive jurisdiction clauses) they must lie in the prospect, if an injunction is granted, of litigation between the Armco companies on one side and Mr Donohue and the PCCs on the other continuing partly in England and partly in New York. What weight should be given to that consideration in the circumstances of this case?

34.. I am driven to conclude that great weight should be given to it. The Armco companies contend that they were the victims of a fraudulent conspiracy perpetrated by Messrs Donohue, Atkins, Rossi and Stinson. Determination of the truth or falsity of that allegation lies at the heart of the dispute concerning the transfer agreements and the sale and purchase agreement. It will of course be necessary for any court making that determination to consider any contemporary documentation and any undisputed evidence of what was said, done or known. But also, and crucially, it will be necessary for any such court to form a judgment on the honesty and motives of the four alleged conspirators. It would not seem conceivable, on the *Armco* case, that some of the four were guilty of the nefarious conduct alleged against them and others not. It seems to me plain that in a situation of this kind the interests of justice are best served by the submission of the whole dispute to a single tribunal which is best fitted to make a reliable, comprehensive judgment on all the matters in issue. A procedure which permitted the possibility of different conclusions by different tribunals, perhaps made on different evidence, would in my view run directly counter to the interests of justice.

35.. Stuart-Smith LJ (at pp 590–591, paras 42–44) regarded the subject matter of the collection agreement complaints as "quite different" from that involving the first three Armco appellants in relation to the transfer agreements and the sale and purchase agreement. He discounted the significance of the trust fund withdrawal claims on the ground that they had almost certainly been settled (p 591, para 45), although it is noteworthy that the settlement agreement made with NAIC expressly preserved the right of NNIC to pursue claims against Messrs Rossi, Stinson, Donohue and Atkins, ITRS, IROS, Wingfield, NPV and CISHL in the New York proceedings. It is true that the collection agreement and the trust fund withdrawals give rise to different grounds of claim. But the principal actors are the same, and Armco contends, rightly or wrongly, that these were further manifestations of the plot made by the four conspirators to enrich themselves at the expense of Armco. I cannot for my part accept that the ends of justice would be well served if Armco's allegations concerning the transfer and sale and purchase agreements were determined in England and its allegations concerning the collection agreement and trust fund withdrawals were determined in separate proceedings in New York. The judgment made of the motives and honesty of the four alleged conspirators in the one context would plainly have an important bearing on the judgment made in the other.

36.. In my opinion, and subject to an important qualification, the ends of justice would be best served by a single composite trial in the only forum in which a single composite trial can be procured, which is New York, and accordingly I find strong reasons for not giving effect to the exclusive jurisdiction clause in favour of Mr Donohue. In New York proceedings Mr Donohue will be entitled to claim that the sale and purchase agreement is governed by English law. And Lord Grabiner, representing Armco, has accepted that Armco's breach of contract in suing elsewhere than in the contractual forum could found a claim by Mr Donohue for any damage he has suffered as a result. The qualification is that he should be protected against liability under the RICO claims made against him because of the obvious injustice to him which such liability would in the circumstances involve. But before considering whether such a protection can and should be afforded to Mr Donohue it is necessary to address an important preliminary question.

37.. The discretion whether or not to grant an injunction was in the first instance that of the judge. His exercise of discretion was entitled to be respected unless, on grounds of his error or misdirection, the Court of Appeal was entitled to exercise its discretion afresh. The Court of Appeal held, rightly, that such grounds existed, and did exercise its discretion afresh. But the exercise of discretion is not at large in this House: the Court of Appeal's exercise of discretion must in its turn be respected

© 2022 Thomson Reuters.

A-9

Donohue v Armco Inc, 2001 WL 1479758 (2001)

unless on grounds of error or misdirection the House is entitled to exercise its own discretion. Having regard to the long and closely reasoned leading judgment of Stuart-Smith LJ, I would not lightly disregard the majority's conclusion.

38.. I am however persuaded that the discretionary judgment made by the Court of Appeal is fundamentally vitiated by an incorrect view of the future shape of this litigation. In his judgment, Stuart-Smith LJ considered the grant of an injunction to Mr Donohue before considering whether Messrs Rossi and Stinson and their respective companies should be joined as claimants, and this enabled Mr Donohue to contend in argument that the Court of Appeal's decision on grant of an injunction should stand despite its conclusion, incorrect as I have held it to be, on joinder. But this reading of Stuart-Smith LJ's judgment cannot in my opinion be sustained. I think it is plain, in particular from paragraph 42 of his judgment (at p 590), that Stuart-Smith LJ contemplated that all disputes between the Armco companies and Messrs Donohue, Rossi and Stinson relating to the transfer and sale and purchase agreements would be resolved in the English forum. This enabled him to say: "The issues in the claim of AFSC, AFSIL and the derivative claim of Armco Inc in relation to the MBO [management buy-out] are whether there was the secret agreement alleged, whether Mr Rossi and Mr Stinson were beneficially interested in Wingfield at the time, whether US $30m was an excessive sum and whether US$10m worth of AFSEL's assets were secretly and fraudulently transferred. If these allegations are made out, Mr Donohue, Mr Rossi, Mr Stinson and Wingfield will be liable …" He was not there recognising the possibility that different conclusions might be reached in the cases of *Mr Rossi* and *Mr Stinson* on the one hand and Mr Donohue and Wingfield on the other, a very unlikely event in the case of a single composite trial but an entirely possible outcome if parallel trials relating to the management buy-out took place in both England and New York. This incorrect view was in my opinion compounded by his treatment of the collection and trust fund withdrawal claims as different and separate from the management buy-out claims. For reasons already given I cannot accept this view. Had Stuart-Smith LJ reached the view which I have reached on the joinder of Messrs Rossi and Stinson and their companies, I feel sure that he would have been gravely concerned at the prospect of the same issue being determined in different tribunals, with the obvious and highly undesirable risk of inconsistent findings and decisions. For these reasons I am of the opinion that members of the House are entitled and bound to exercise their discretion afresh.

39.. The interests of justice are in my judgment best served if an anti-suit injunction is denied to Mr Donohue but an undertaking proffered on behalf of the Armco companies (defined to include the five Armco appellants) is accepted in the following terms: "The Armco companies … confirm that they undertake not to enforce against Mr Donohue, Wingfield or CISHL any multiple or punitive damages awarded in the New York proceedings whether awarded pursuant to the RICO statute or common law. For the avoidance of doubt, the above undertaking (i) shall not restrict the Armco companies from seeking to enforce any award made in the New York proceedings for damages which are not multiple or punitive; (ii) shall relate only to enforcement; and (iii) as against any defendant in the New York proceedings other than Mr Donohue, Wingfield or CISHL, shall have no effect whatsoever in respect of the Armco companies pursuing or enforcing any claim or award in the New York proceedings whether for multiple or punitive damages or otherwise." If there were any doubt about the efficacy of this proffered undertaking in relation not only to Mr Donohue but also Wingfield and CISHL, I would order the joinder of those companies. But I am satisfied that this is an unnecessary step which would serve no useful purpose. I would accordingly refuse the application of these parties to be joined as claimants in the present action. In the result, I would allow the appeal, on the undertaking just recited, and set aside the orders of the Court of Appeal joining the PCCs as claimants and granting an injunction to Mr Donohue.


LORD MACKAY OF CLASHFERN

My Lords,

40.. I have had the advantage of reading in draft the speech delivered by my noble and learned friend Lord Bingham of Cornhill. For the reasons he gives with which I agree, I also would allow the appeal on the terms he has proposed.


LORD NICHOLLS OF BIRKENHEAD

My Lords,

41.. I have had the advantage of reading in draft the speech of my noble and learned friend Lord Bingham of Cornhill. For the reasons he gives, and with which I agree, I too would allow this appeal.

© 2022 Thomson Reuters.

**A-10**

Donohue v Armco Inc, 2001 WL 1479758 (2001)

LORD HOBHOUSE OF WOODBOROUGH

My Lords,

42..  I agree that the appeal should be allowed on the terms stated in the speech of my noble and learned friend Lord Bingham of Cornhill with which I agree. This appeal has not involved any disputed question of principle but has turned upon the application of established principles to the factual complexities of international multi-party disputes as exemplified by the facts of this particular case. It is because we are exceptionally differing from the Court of Appeal on a question of discretion that I will briefly add my own reasons for doing so.

43..  The case has two aspects. The primary aspect is whether Mr Donohue should be granted the 'anti-suit' injunction for which he has asked the court to restrain proceedings in New York or anywhere else other than in London. This ultimately turns upon the exercise of the court's discretion. The Court of Appeal were undoubtedly right to conclude (at p.588) that, as the judge had made an error in holding that Armco Inc was not bound by the exclusive jurisdiction clause and had construed the clause as not having a wide enough scope to cover the disputes being raised in New York against Mr Donohue, this meant that his exercise of the discretion was wrongly based and the Court of Appeal were obliged to address the exercise of the discretion afresh. By a majority, the Court of Appeal decided to grant the injunction in a limited form, limited to the first three defendants and excluding claims in relation to the 'collection agreement' and the trust funds.

44..  The second aspect involves the subsidiary question whether Mr Rossi and Mr Stinson and their two companies, the four of the so-called 'PCCs', should be joined as plaintiffs in Mr Donohue's English action and, if so, likewise granted an injunction. Formally, I agree that the question of joinder was dealt with by the majority of the Court of Appeal only after they had decided the primary question of whether Mr Donohue should be granted an injunction and that therefore it could be said, and the respondents so argued before this House, that the reversal of the Court of Appeal's decision on the second aspect would not invalidate their decision on the primary question. This however faces the respondents and the Court of Appeal with a dilemma. A central factor in the exercise of the discretion whether or not to grant any injunction was an assessment of what will be the position in New York and London if an injunction is granted. (If no injunction is granted the position is simple: the proceedings in New York will continue and there will be no proceedings, anyway at this stage, in London.) If the Court of Appeal have arrived at their decision of the primary question without fully carrying out that assessment they have been in error; they have left out of account a material factor. On the other hand, if they did carry out that assessment but made an error in doing so, proceeding on the basis that the four PCCs on would have to be sued in London and not in New York, their exercise of the discretion is likewise open to attack. I will therefore take the joinder issue first.

45..  The London action was an action brought by Mr Donohue. It was an action based upon the contractual right given by that clause to hold the other parties to that contract, and those claiming through them, to their promise only to sue Mr Donohue in England. Mr Donohue was entitled to sue and serve the first three defendants in accordance with that clause. Those defendants as they were bound to do acknowledged service and placed solicitors on the record to act on their behalf in the action. The four PCCs (and CISHL and Wingfield, who are not relevant for this purpose) then applied to be joined in the action. They simply relied upon the ground: "The basis of the application is that England is the most appropriate forum for the resolution of the disputes between the applicants and the defendants." Such an application is made by issuing and serving a summons or "Application Notice" asking the court to order such joinder. The summons/notice had to be served on the existing parties by sending the summons to their solicitors on the record. No problem of service arises at that stage. But in order to obtain an order (save by the consent of all parties) for their joinder the applicants have to make out a case for their joinder. If they say, as did the four PCCs, that they should be joined because they too wish to claim 'anti-suit' injunctions against the existing defendants, they must be able to show that they could properly have brought proceedings against the defendants claiming that relief. It is at this stage that their application became unsustainable. The four PCCs had no procedural or contractual right to sue the defendants in the English jurisdiction; the English courts had no natural jurisdiction over the defendants. The applicants could not satisfy the tests laid down in *Spiliada v Cansulex [1987] AC 460* . They could not show that London was clearly *the* appropriate forum (in contrast to New York) so as to justify them in commencing proceedings against the defendants in London ( *Spiliada* at p.481). Further, by the same token, they could not show that they had any viable claim to an anti-suit injunction against the defendants based upon the contention that the defendants' chosen forum, New York, was a *forum non conveniens* to such a degree that it was vexatious for them to have sued the PCC parties there ( *SNI Aerospatiale v Lee [1987] AC 871* ). New York was not an inappropriate forum (cf. *Spiliada* , p.477) nor could they show that they needed an injunction to protect proceedings in this country: *Airbus Industrie v Patel [1999] 1 AC 119* . The application by these parties to be joined in the action was misconceived and should have been refused. The majority of the Court of Appeal seem to have considered that the joinder and the grant of an anti-suit injunction to them followed from their decision to grant Mr Donohue an injunction. This was not correct. The position

© 2022 Thomson Reuters.

A-11

of a party who has an exclusive English jurisdiction clause is very different from one who does not. The former has a contractual right to have the contract enforced. The latter has no such right. The former's right specifically to enforce his contract can only be displaced by strong reasons being shown by the opposite party why an injunction should *not* be granted. The latter has to show that justice requires that he should be granted an injunction. The Court of Appeal should have refused the application of the four PCCs to be joined and should likewise have refused their application for an injunction.

46.. The Court of Appeal clearly had in mind that some proceedings would continue in New York, including some involving Mr Donohue himself. The limitations which they included in the injunction both as regards parties and as regards subject matter demonstrate this. The correct decision on the application of the four PCCs — that it should be dismissed — would have added to this prospect. The true balance between New York and London, therefore, was not that which must have been visualised by the majority of the Court of Appeal. The arguments in favour of refusing Mr Donohue the injunction for which he was applying would have been very materially strengthened.

47.. The Court of Appeal rightly attached importance to the fact that in New York Mr Donohue would be subject to 'RICO' claims and a liability in triple damages. To be protected against such a possibility was a legitimate concern of Mr Donohue to which a court should give weight in considering how to exercise its discretion. Lord Grabiner QC for the defendants recognised this and met it by offering the undertaking to which my noble and learned friend Lord Bingham has already referred. The offer of this undertaking does alter the position and indeed a court could have met the point by imposing equivalent terms upon the defendants as a condition of refusing to grant Mr Donohue an unqualified injunction. This too has changed the balance between the two jurisdictions and should be taken into account.

48.. Lord Grabiner took his argument one step further. He acknowledged that some breaches of the exclusive jurisdiction clause have taken place and will continue, if the appeal is allowed and the injunction refused, and he likewise recognised that, if this leads to Mr Donohue incurring a greater liability or being put to a greater expense ( *eg* , for unrecovered costs) in New York than would have been the case in London, Mr Donohue may have a claim in damages against the defendants for breach of contract — breach of the exclusive jurisdiction clause. This does not appear to have been a point put to the Court of Appeal and it was only raised by Lord Grabiner in this House during his reply, no doubt as a result of his further consideration of the RICO point. I am prepared to accept this submission and proceed on the basis that, if Mr Donohue can hereafter show that he has suffered loss as a result of the breach of the clause, the ordinary remedy in damages for breach of contract would be open to him. I say no more than this since the position is complex. The litigation in New York includes parties who are not parties to the jurisdiction agreement and against whom, and in relation to whom, Mr Donohue is not entitled to rely upon the clause. Further, when the issues of fact have been fully tried in New York, a situation may be established whereby Mr Donohue's right to rely upon the contract as against the defendants may be affected or situations of circuity of action may arise. That is not presently the position but Lord Grabiner's point has merit and relevance in this exceptional and finely balanced case.

49.. The basis on which the exercise of the discretion has to be exercised is different from that before the Court of Appeal. In part this is because of a wrong decision on the joinder question and in part because of further arguments advanced by the defendants before this House. In my judgment in this case they exceptionally suffice to justify the House in deciding that the discretion should be exercised afresh by your Lordships and against the grant of the injunction.

50.. I therefore agree that the appeal should be allowed on the terms proposed.


LORD SCOTT OF FOSCOTE

My Lords,

51.. I have had the advantage of reading in draft the opinion of my noble and learned friend, Lord Bingham of Cornhill, and gratefully adopt his recital of the relevant facts.

52.. There seem to me to be two main issues that must be decided in the present case. They to some extent overlap one another. They are (i) whether the contractual exclusive jurisdiction clauses, contained in the transfer agreements dated 3 September 1991 under which AFSIL and AFSEL transferred their respective shares in the BNIG to CISHL and in the sale and purchase agreement of the same date under which AFSIL and AFSEL transferred their shares in CISHL to Wingfield, should be enforced by injunction so as to bar proceedings in New York that fall within the scope of those clauses, properly construed; and (ii) if

A-12

the answer to issue (i) is "yes", whether an injunction should be granted in order to bar also the prosecution in New York of proceedings that are not themselves caught by the exclusive jurisdiction clauses but are closely associated with those that are.

53.. The principles to be applied in order to decide on the one hand whether an exclusive jurisdiction clause should be enforced by an injunction and on the other hand whether the commencement or continuation of foreign proceedings which are not caught by an exclusive jurisdiction clause should be barred by an injunction seem now well settled and have not been the subject of any real disagreement before your Lordships. It is accepted that a contractual exclusive jurisdiction clause ought to be enforced as between the parties to the contract unless there are strong reasons not to do so. Prima facie parties should be held to their contractual bargain: see *The Fehmarn [1958] 1 WLR 159* ; *The Chaparral [1968] 2 Lloyd's Rep 158* ; *The El Amria [1981] 2 Lloyd's Rep 119* ; *The Sennar (No 2) [1985] 1 WLR 490* ; *The Angelic Grace [1995] 1 Lloyd's Rep 87* . If, on the other hand, there is no contractual bargain standing in the way of the foreign proceedings, "the … court will, generally speaking, only restrain the plaintiff from pursuing proceedings in the foreign court if such pursuit would be vexatious or oppressive": per Lord Goff of Chieveley in *Société Nationale Industrielle Aérospatiale v Lee Kui Jak [1987] AC 871* , 896.

54.. There has been some debate before your Lordships as to the order in which the two issues referred to above should be considered but it seems to me convenient to start with the exclusive jurisdiction clauses and to try and decide what part, if any, of the New York proceedings the clauses cover, who is and who is not entitled to their benefit and who is and who is not bound by them.

The exclusive jurisdiction clauses

55.. In the transfer agreements, the parties to which were AFSIL and AFSEL, as transferors, and CISHL, as transferee, the exclusive jurisdiction clause said, simply, that "each party submits to the exclusive jurisdiction of the Supreme Court of Judicature of England" (para 15.2).

56.. In the sale and purchase agreement the exclusive jurisdiction clause said that: "the parties hereby irrevocably submit themselves to the exclusive jurisdiction of the English courts to settle any dispute which may arise out of or in connection with this agreement."

57.. The parties to the sale and purchase agreement, in addition to AFSIL, AFSEL and Wingfield, included AFSC, Mr Atkins and Mr Donohue.

58.. The terms of the sale and purchase agreement clause are very wide, "any dispute which may arise out of or in connection with this agreement," but it has not been suggested that the terms of the clauses in the transfer agreements should be given any lesser scope. So I propose to concentrate on the sale and purchase agreement clause and treat it as applicable also to any dispute arising out of or in connection with the transfer agreements.

59.. Armco Inc. was not a party to any of these agreements but, on the dissolution of AFSEL, the assets of AFSEL, including its assignable choses in action, became vested, as I understand it, in Armco. It is accepted, rightly in my opinion, that, in respect of any causes of action vested in Armco as successor of AFSEL, Armco is subject to the same contractual inhibitions under the exclusive jurisdiction clause as AFSEL was subject to. But in respect of causes of action to which Armco is entitled in its own right, i e, otherwise than as successor to AFSEL, Armco is not bound by the exclusive jurisdiction clause, whether or not the causes of action relate to a dispute arising out of or in connection with one or other of the agreements.

60.. There is a point of construction of the exclusive jurisdiction clause that it is convenient to deal with at this point. It is accepted that the clause is not restricted to contractual claims. A claim for damages for, for example, fraudulent misrepresentation inducing an agreement containing an exclusive jurisdiction clause in the same form as that with which this case is concerned would, as a matter of ordinary language, be a claim in tort that arose "out of or in connection with" the agreement. If the alleged fraudulent misrepresentation had been made by two individuals jointly, of whom one was and the other was not a party to the agreement, the claim would still be of the same character, although only the party to the agreement would be entitled to the benefit of the exclusive jurisdiction clause. The commencement of the claim against the two alleged tortfeasors elsewhere than in England would represent a breach of the clause. The defendant tortfeasor who was a party to the agreement would, absent strong reasons to the contrary, be entitled to an injunction restraining the continuance of the foreign proceedings. He would be entitled to an injunction restraining the continuance of the proceedings not only against himself but also against his co-defendant. The exclusive jurisdiction clause is expressed to cover " *any dispute* which may arise out of or in connection with" the agreement. It is not limited to "any claim against" the party to the agreement. To give the clause that limited construction

Donohue v Armco Inc, 2001 WL 1479758 (2001)

would very substantially reduce the protection afforded by the clause to the party to the agreement. The non-party, if he remained alone as a defendant in the foreign proceedings, would be entitled to claim from his co-tortfeasor a contribution to any damages awarded. He could join the co-tortfeasor, the party entitled to the protection of the exclusive jurisdiction clause, in third party proceedings for that purpose. The position would be no different if the claim were to be commenced in the foreign court with only the tortfeasor who was not a party to the exclusive jurisdiction clause as a defendant. He would be able, and well advised, to commence third party proceedings against his co-tortfeasor, the party to the exclusive jurisdiction clause.

61.. In my opinion, an exclusive jurisdiction clause in the wide terms of that with which this case is concerned is broken if any proceedings within the scope of the clause are commenced in a foreign jurisdiction, whether or not the person entitled to the protection of the clause is joined as defendant to the proceedings. An injunction restraining the continuance of the proceedings would not, of course, be granted unless the party seeking the injunction, being someone entitled to the benefit of the clause, had a sufficient interest in obtaining the injunction. It would, I think, be necessary for him to show that the claim being prosecuted in the foreign jurisdiction was one which, if it succeeded, would involve him in some consequential liability. It would certainly, in my opinion, suffice to show that if the claim succeeded he would incur a liability as a joint tortfeasor to contribute to the damages awarded by the foreign court.

62.. This point is of direct relevance in the present case. In the New York proceedings, which I must analyse more fully in a moment, several claims are made but most of them are based upon the allegation that Mr Donohue, Mr Atkins, Mr Rossi and Mr Stinson conspired together fraudulently to extract in various ways substantial sums of money from the Armco group of companies. If the allegations can be made good, the liability of the conspirators would be a joint and several liability. There are substantial issues as to which of the claims fall within the language of the exclusive jurisdiction clause but I think it is clear that some of them do. Of the four alleged conspirators only Mr Donohue and Mr Atkins are contractually entitled to the benefit of the exclusive jurisdiction clause. Mr Atkins has settled with Armco, so it was Mr Donohue alone who commenced an action in this country for an injunction enforcing the clause. If Mr Donohue is entitled to an injunction enforcing the clause he is entitled, in my opinion, to an injunction that bars the continuance of the claims in question not only against himself but also against Mr Rossi and Mr Stinson with whom he is jointly and severally liable. If claims against Mr Donohue are within the clause, then so too are the corresponding claims against Mr Rossi and Mr Stinson. Mr Rossi and Mr Stinson are not contractually entitled to enforce the clause, but Mr Donohue is, in my opinion, entitled to ask the court to enforce it by restraining the prosecution in New York of all claims within its scope in respect of which Mr Donohue would be jointly and severally liable.


The New York proceedings

63.. It is necessary to analyse with some care the nature of the claims made in the New York proceedings in order to decide which of them are caught by the exclusive jurisdiction clause and which are not.

64.. The amended complaint filed in New York describes the parties and then, in paragraphs 25 to 63 sets out the "Facts". Under the sub-heading "The Secret Agreement" it is alleged that the four individual defendants entered into a secret agreement under which Mr Rossi and Mr Stinson, who owed Armco fiduciary duties as directors and were responsible on behalf of Armco for negotiating with Mr Donohue and Mr Atkins the terms under which the latter would purchase from Armco the BNIG, became secret partners with them in that purchase. It is alleged that pursuant to the secret agreement Mr Rossi and Mr Stinson agreed on behalf of Armco to excessive sums being injected into CISHL before its shares were sold to Wingfield. Recovery of the sums is sought. This claim seems to me a fairly clear example of a "dispute arising out of or in connection with" the sale and purchase agreement.

65.. The amended complaint goes on to allege that "other aspects of the sale were similarly tainted by the fraud" (para 41). Reference is made, as an example, to the extraction of sums of money from two trust funds that had been established in the United States to support insurance liabilities of NAIC. I find it difficult to follow how this dispute could be brought within the exclusive jurisdiction clause. The only "connection" seems to me to be that if the BNIG had not been purchased the scheme for milking the trust funds would not have been implemented. It is a causa sine qua non, a "but for", connection and I doubt whether that is enough.

66.. The amended complaint alleges, also, that "as part of their secret agreement" the four conspirators extracted funds from APL via a debt collection agreement between APL, acting by Mr Rossi, and NPV, acting by Mr Donohue and Mr Stinson, under which NPV obtained unjustifiably inflated rates of commission. I cannot see any basis on which the claims based on this debt collection agreement can be regarded as falling within the exclusive jurisdiction clause.

© 2022 Thomson Reuters.

A-14

Donohue v Armco Inc, 2001 WL 1479758 (2001)

67.. In respect of each of the claims to which I have referred the plaintiffs in the New York proceedings claim punitive as well as compensatory damages.

68.. In addition it is alleged that the defendants' conduct constituted racketeering, wire fraud and mail fraud for the purpose of the RICO Act (Federal Racketeer Influenced and Corrupt Organisations Act 18 USC §1962(c)). Under the RICO Act claims triple damages are sought. In so far as the RICO Act claims are based on conduct in connection with the transfer agreements or the sale and purchase agreement, it might seem that they, too, fall within the language of the exclusive jurisdiction clause. But it is common ground that a RICO Act claim could not be brought in an English court. It cannot, in my opinion, be supposed that in submitting to the exclusive jurisdiction of the English courts the parties had in mind claims which an English court would have no jurisdiction to entertain. The contractually expressed purpose of the submission to the English courts was "to settle any dispute which may arise", etc. How can this language be sensibly thought apt to cover a dispute that the English courts would be jurisdictionally unable to settle? The choice of law provision that, in the sale and purchase agreement, immediately preceded the exclusive jurisdiction clause, in my opinion, underlines the point: "this agreement shall be governed by and construed in accordance with" English law. The parties could not have intended that RICO Act claims would be governed by English law. English law does not recognise such claims. Nor can it be supposed that the parties, by the use of a fairly commonplace choice of law provision and exclusive jurisdiction clause, were intending to contract out of any RICO Act liability that might be connected with the agreement. In my opinion, any such contractual intention would need to be clearly expressed. Accordingly, in my opinion, as a matter of construction of the exclusive jurisdiction clause, the RICO Act claims are not caught.

69.. The amended complaint included also breach of fiduciary duty claims against Mr Rossi and Mr Stinson. These claims arise in part out of conduct of Mr Rossi and Mr Stinson in negotiating the terms of the sale by Armco of its BNIG. But I do not think a claim by Armco against its own officers for breach of fiduciary duty represents a "dispute" caught by the exclusive jurisdiction clause. "Dispute" in the clause means, in my opinion, a dispute in respect of which there is, on each side, a party, or a person claiming through a party, to the agreement. A claim by Armco for breach of fiduciary duty by its directors is, in my opinion, no more caught than would be a claim by Armco for negligence by its lawyers whether or not the conduct complained of related to the transfer agreements or the sale and purchase agreement.

70.. There are, in addition, other claims made in the New York proceedings but most of them are different formulations of the claims to which I have already referred. I think I have mentioned all those that bear upon the issues that arise on this appeal.


Should injunctions be granted?

71.. Virtually all the claims in the New York proceedings are based upon the alleged secret agreement between the four individual defendants. Some of the claims, those made against Mr Donohue and those relating to the allegedly excessive funds injected into CISHL, are within the scope of the exclusive jurisdiction clause. Others seem to me to be plainly outside the scope of the clause.

72.. The Court of Appeal granted injunctions restraining the continuance of claims "to the extent that the claims arise out of or are connected with the management buy-out". The injuncted claims included the RICO Act claims in so far as so arising or so connected. They included the breach of fiduciary duty claims against Mr Rossi and Mr Stinson in so far as so arising or so connected. For the reasons I have given I do not think that any of these claims were within the scope of the exclusive jurisdiction clause on its true construction. But the injuncted claims did not include the claims relating to the alleged milking of the trust funds nor those relating to the APL/NPV debt collection agreement. The Court of Appeal's refusal to extend the injunction so as to bar these claims is not the subject of any cross-appeal and it is accepted by Mr Donohue that the prosecution in New York of these claims against him and the other defendants will continue.

73.. So the injunction as granted by the Court of Appeal has left the alleged secret agreement to be litigated both in the New York courts and in England. The possibility of inconsistent conclusions on the facts is plain. The injunction has barred the prosecution in New York of a part of the RICO Act claim. The claim cannot be litigated in England and it follows that the part of the RICO Act claim that arises out of or in connection with the "management buy-out" cannot be litigated anywhere. The injunction has required Armco, an American company, to prosecute in England a claim against its officers, Mr Rossi and Mr Stinson, for breach of the fiduciary duty that they owe under Armco's domestic law.

74.. Many of the claims made in the New York proceedings, including the RICO Act claims and the breach of fiduciary claims in so far as they do not arise out of or in connection with the management buy-out as well as all the trust fund claims and the debt-collection agreement claims, will be proceedings in New York in any event. The common sense in all the claims based on the alleged secret agreement being dealt with in the same court and at the same time seems to me overwhelming. There are

Donohue v Armco Inc, 2001 WL 1479758 (2001)

undoubted disadvantages to Mr Donohue in being sued in New York instead of in England. These have been referred to by Lord Bingham. And the prosecution in New York of the claims, not only against Mr Donohue but against Mr Rossi and Mr Stinson as well, that fall within the exclusive jurisdiction clause constitutes a breach of a contractual term that Mr Donohue is prima facie entitled to require to be observed. It is relevant to take into account, however, that the New York claims that do fall within the exclusive jurisdiction clause on its true construction are somewhat peripheral, if measured against the sort of contractual and tortious claims that the parties might reasonably be supposed to have had in mind when agreeing to that clause. The conspiracy constituted by the alleged secret agreement was aimed at extracting money from the Armco group by using, or misusing, the authority of two of Armco's own officers who had become co-conspirators. It is one thing to conclude that those claims based upon the conspiracy that arise out of or in connection with the management buy-out are caught by the exclusive jurisdiction clause properly construed; it is quite another to suppose that the parties would have had claims of that sort in mind when agreeing to the clause.

75.. In my opinion, however, it is the evident absurdity of requiring some claims resulting from the alleged secret agreement to be litigated in England notwithstanding that the rest will be litigated in New York that is the overriding factor. There are, in my estimation, very strong reasons indeed for the normal injunctive protection that the exclusive jurisdiction clause would warrant to be withheld in this case. I would have come to this conclusion in any event but the undertaking offered by Armco to which Lord Bingham has referred confirms it. If it should transpire that Mr Donohue is successful in the New York proceedings but is unable to recover his costs, being costs that he would have expected to have been awarded if he had successfully defended in England, I can see no reason in principle why he should not recover, as damages for breach of the exclusive jurisdiction clause, such part of those costs as he incurred in his successful defence of the claims that fall within that clause.

76.. For these reasons I would allow the appeal and make the orders that Lord Bingham has suggested. As I have endeavoured to explain, I regard the exclusive jurisdiction clause, correctly construed, to the benefit of which Mr Donohue is but Mr Rossi and Mr Stinson are not contractually entitled, as covering some of the claims made against Mr Rossi and Mr Stinson whether or not Mr Donohue is a co-defendant and as not covering any of the RICO Act claims. Subject to that, I am in respectful and complete agreement with the reasons given by Lord Bingham for allowing the appeal.

Crown copyright

© 2022 Thomson Reuters.

**A-16**

# BNP Paribas S.A. v Anchorage Capital Europe LLP, Anchorage Capital Group LLC, ACMO S.A.R.L., AIO III S.A.R.L.

 **Positive/Neutral Judicial Consideration**

**Court**
Queen's Bench Division (Commercial Court)

**Judgment Date**
11 October 2013

Case No: 2013 Folio 235

High Court of Justice Queen's Bench Division Commercial Court

**[2013] EWHC 3073 (Comm), 2013 WL 5336632**

Before: The Honourable Mr Justice Males

Date: 11/10/2013

Hearing dates: 25th & 26th September 2013

**Representation**

Mr Bankim Thanki QC and Mr Patrick Goodall (instructed by Cleary Gottlieb Steen & Hamilton LLP ) for the Claimant.
Mr Paul Greenwood (instructed by Stewarts Law LLP ) for the Defendants.

Approved Judgment

Mr Justice Males:

Introduction

1. This case is a dispute between a bank and a hedge fund about whether a handful of instant message communications resulted in a binding contract or contracts and, if so, between which parties and on what terms. But the issue presently for decision is whether these issues should be determined in London or New York (or possibly Luxembourg). As is often the case in commercial disputes, particularly in cases where tens of millions of dollars are at stake and it is thought that where the case is fought may well determine the eventual outcome, the parties and their lawyers have left no stone unturned in seeking respectively to establish or to challenge the jurisdiction of the English court over this dispute.

2. There are two applications to be determined. The first is a challenge by the second to fourth defendants (but not the first defendant, an English LLP) to the jurisdiction of the English court. Those defendants contend that the English court has no jurisdiction over them, or alternatively that any jurisdiction which it may have should not be exercised. The second is an application by the claimant to restrain the second defendant from pursuing proceedings which it has commenced in New York which (as is common ground) raise essentially the same issues as those arising in this action.

The parties

© 2022 Thomson Reuters.

3. The claimant, BNP Paribas SA ("BNPP"), is a French public limited company (société anonyme) with its headquarters in Paris. It operates globally, providing banking and financial services across 78 countries. However, this dispute concerns the corporate and investment banking activities of the Financial Credits Trading Desk of its registered London branch and has no connection with Paris (where the Desk has no traders). BNPP engages in banking and specialised financial trading business in London, including the buying and selling of high yield distressed debt securities.

4. The Anchorage group is an investment management group with its principal centre of operations in New York. It provides investment management and trading services, operating through a structure of affiliated companies that provide investment management services or act as portfolio holding companies (ie funds) incorporated across a number of jurisdictions. Its legal, compliance, tax and accountancy functions are located centrally in New York, with the same individuals performing those functions for all group entities.

5. Four entities within the Anchorage group are defendants to this action. The first defendant, Anchorage Capital Europe LLP ("Anchorage London"), is an English LLP with an office in London. It provides investment management services to funds within the group. It was granted authorisation by the FSA (now the FCA) to act as an investment management business on 22 December 2009. The second defendant, Anchorage Capital Group LLC ("Anchorage New York"), is a Delaware company with its headquarters in New York which acts as an investment manager and adviser to the funds within the group. It is registered with the U.S. Securities and Exchange Commission as an investment adviser. The third and fourth defendants, respectively ACMO Sàrl ("ACMO") and AIO III Sàrl ("AIO"), both Luxembourg companies, are two of the investment funds within the group. I shall refer to "Anchorage" when there is no need to distinguish between the different defendants and to the second to fourth defendants together as "the overseas defendants".

The AIB Notes

6. This action is concerned with subordinated private placement notes issued by Anglo Irish Bank ("AIB") with a face value of US $95 million ("the Notes"). The Notes were issued pursuant to a Note Purchase Agreement dated 28 September 2005 . Under the Note Purchase Agreement , AIB issued a principal amount of US $165 million Subordinated Notes, Series A, due 29 September 2015 (the "A Notes") and US $35 million Subordinated Notes, Series B, due 29 September 2017 (the "B Notes"). The Notes the subject of this action are A Notes. They are not listed on any exchange and are physically certificated.

7. AIB is a bank incorporated in the Republic of Ireland, which was nationalised by the Irish Government in 2009. On 1 July 2011 it was merged with the Irish Nationwide Building Society, which had also been nationalised, to form the Irish Bank Resolution Corporation Limited ("IBRC"). On 7 February 2013, it was announced that IBRC would be liquidated, rendering the Notes virtually worthless.

The rival cases

8. It is BNPP's case that two binding English law contracts were concluded. The first is said to have been concluded on Friday 7 December 2012, when BNPP sold Notes with a face value of US $50 million. I shall refer to this as "the Friday trade" or "the Friday contract". The second was on the following Monday, 10 December 2012, when BNPP says that a contract for the sale of Notes with a face value of a further US $45 million was concluded ("the Monday trade" or "the Monday contract"). BNPP's primary case is that the Friday contract was concluded with Anchorage New York, while the Monday contract was concluded with Anchorage London, although it says also that both Anchorage companies were acting as agents for undisclosed principals, namely ACMO and AIO, the funds to which it is said that Anchorage had decided to allocate the Notes. However, BNPP has yet to plead its case in detail and Mr Bankim Thanki QC for BNPP reserved the right to plead the case in alternative ways as there is scope for more than one analysis of which Anchorage entity was BNPP's counterparty.

9.   In contrast, Anchorage's case in very brief summary is that no binding contract was concluded on either day because material terms remained to be agreed; that the parties' dealings were governed by New York law and that any agreement reached at that stage was what is known as a "Type II preliminary agreement" under New York law whereby the parties' only obligation is to negotiate final terms in good faith; that as a result of the parties' subsequent conduct they either concluded a binding contract on 14 February 2013 for the first time or varied any existing contract, in either case so as to provide expressly for New York law and for BNPP to give certain representations, of which BNPP is in breach; or if no such binding contract was then concluded, that is because BNPP was in breach of its obligation to negotiate in good faith. However, if (contrary to Anchorage's case), binding commitments for the purchase of the Notes were undertaken as a result of the parties' dealings on 7 and 10 December, it says that there was a single contract concluded on 7 December 2012 between BNPP and Anchorage New York, to which the other defendants were not parties.

### The trades

10.   The circumstances in which these issues (and the related issue of where they should be determined) arise were as follows.

11.   In October 2012, a New York investment firm called Fir Tree Partners ("Fir Tree") approached Jonathan Lett, a trader with BNPP in London, with a view to seeing whether it wished to purchase the Notes. BNPP was interested, and explored with a number of market participants, including Matt Hartnett of Anchorage London, the possibility of an on-sale. Although Anchorage's evidence suggested that BNPP's role was merely as a broker to conclude a prospective contract between Fir Tree and Anchorage, before me Anchorage's counsel Mr Paul Greenwood expressly accepted that BNPP was acting as a principal in purchasing the Notes from Fir Tree and was likewise acting as a principal in any contract concluded with any Anchorage entity for the onward sale of the Notes. It was at all times made clear to Anchorage that BNPP was purchasing the Notes from Fir Tree, and that its ability to sell to Anchorage was dependent on lining up a purchase of the Notes from Fir Tree with a sale to Anchorage, on which no doubt BNPP would make its own turn.

12.   Anchorage was interested in purchasing the Notes and carried out due diligence upon them. BNPP was aware that Anchorage was doing this, and there was some discussion about the Notes between analysts employed by the respective parties. Although Anchorage (not surprisingly) did not share with BNPP the results of its due diligence, this was a prospective sale of Irish distressed debt. BNPP would reasonably have concluded, therefore, that Anchorage would identify the major risk associated with the Notes as being a default brought about by the conduct of the Irish government, as in fact it did.

13.   Although the initial contact had been with Matt Hartnett of Anchorage London, negotiations were taken up by Anchorage's New York office. On 5 December 2012 Scott Goodwin of Anchorage New York provided Anchorage's initial offer, saying in an e-mail of that date that "we are good for 60mm face on this at 65" — or in other words, offering to buy Notes with a face value of US $60 million at a price of 65 cents on the dollar.

14.   Further negotiations took place over the next two days, not only on the price, but also on the quantity of Notes to be sold. By 18:26 London time on Friday 7 December 2012 Mr Goodwin's proposal was that Anchorage would "buy 50mm right now … and then we have an option to buy the remaining 45mm until noon US time on Monday barring any news." By this stage, the proposed price had been negotiated down to 62.5 cents. He also indicated that "I'm going to need u to mark this for us every month", or in other words, to provide a valuation of the illiquid Notes each month up to their maturity date so that Anchorage could ensure that they were correctly valued in its books for internal accounting and reporting purposes, which BNPP agreed to do.

© 2022 Thomson Reuters.

15.  At 20:36 London time the following exchange took place between Mr Goodwin and Mr Lett via Bloomberg Instant Message, which BNPP contends resulted in a binding contract for the purchase by Anchorage New York of US $50 million of Notes, at a price of 62.5 cents on the dollar:

"20:36:45 JONATHAN LETT, BNP PARIBAS Says Scott – pls can you confirm that Anchorage will buy USD50m BBG001MFY449 @ 62½ plus USD25m Ireland 5yr at 215bps. You have the exclusive on the balance until noon Monday at the same level subject to news from the seller.

20:36:59 SCOTT GOODWIN, ANCHORAGE GROUP GR Says done thank you

20:37:17 JONATHAN LETT, BNP PARIBAS Says this is done – thanks for the trade"

16.  This was followed at 21:50 London time (by which time trading had ceased in London and those working at BNPP in London had gone home) by a voice confirmation recording this trade which was sent to Mr Goodwin by a credit sales representative at BNP Paribas Securities Corp, an affiliate of BNPP in New York. This described the customer as "Scott Goodwin @ Anchorage" and set out the terms of the trade, including the quantity, price, accrued interest and settlement date. Mr Goodwin replied with the subject line "VCON TRADE CONFIRMED".

17.  Two aspects of these exchanges call for explanation. First, as indicated in the Bloomberg messages set out above, in addition to purchasing Notes with a face value of US $50 million, at the same time Anchorage also purchased "USD25m Ireland 5yr at 215bps". This was a credit default swap providing protection against a specified credit event involving the Republic of Ireland and required payment by Anchorage of an upfront fee of almost US $1.3 million. It represented a partial hedge against the risk of default on the Notes. Second, the parties had also been discussing the sale and purchase of further Notes with a face value of US $45 million. These were referred to as being subject to an "option" in Mr Goodwin's message at 18:26 and were what was referred to as "the balance" in Mr Lett's message at 20:36, on which Anchorage was to have "the exclusive". However, this was "subject to news from the seller", that is to say from Fir Tree, which reflected the fact that (as both parties understood) BNPP did not own these Notes and would only be in a position to sell them if it was able to purchase them from Fir Tree once Anchorage had made up its mind that it wanted them.

18.  Shortly after noon London time on the following Monday, 10 December 2012, David Bodenstein of BNPP contacted Mr Hartnett of Anchorage London by Bloomberg Instant Message to see whether Anchorage did want these further Notes, as BNPP was also discussing a possible sale of them to others and wanted "to make sure that I give you guys a last look". Mr Bodenstein offered to call Mr Goodwin in New York, but Mr Hartnett responded that "either of us is fine". Mr Hartnett indicated that he thought that Anchorage did want to buy the remaining Notes, but was "just figuring out what funds to put it in". Later in the day he confirmed that Anchorage did want to buy, in response to which Mr Bodenstein indicated, after checking with Fir Tree, that BNPP was in a position to sell. The following exchange then took place via Bloomberg Instant Message:

"16:05:45 DAVID BODENSTEIN: 45mm

16:05:49 MATT HARTNETT: done?

16:06:22 DAVID BODENSTEIN: @62.5 we sell

16:06:44 MATT HARTNETT: perfect

16:06:49 MATT HARTNETT: thx again for the trade

16:06:58 DAVID BODENSTEIN: ANGIR

© 2022 Thomson Reuters.

**A-20**

We sell $45mm 09/15 to Anchorage at 62½."

19.  BNPP's case is that this exchange resulted in a further binding contract, for the purchase by Anchorage London of US $45m of Notes, again at 62.5 cents on the dollar.

Subsequent events

20.  On 11 December 2012, Melissa Griffiths of Anchorage sent an email to BNPP which referred to the "BNP sale to Anchorage" and advised that she would be responsible at Anchorage for settling the purchase. Her email referred to two distinct trades, on 7 and 10 December respectively. She indicated that the US $50 million of Notes traded on the Friday were to be allocated to ACMO, while the US $45 million of Notes traded on the Monday were to be split, with US $29 million allocated to ACMO and US $16 million to AIO. This was the first occasion on which BNPP was told of this allocation although it had been told, shortly before the Monday trade, that Anchorage was "just figuring out what funds to put it in".

21.  The trades could not be settled immediately, because the physical Notes had (it transpired) been destroyed by flood damage resulting from Hurricane Sandy in October 2012. In order for the trades to be settled, it was necessary for Fir Tree to get the Notes re-issued. They would then have to be re-registered and physically transferred from Fir Tree to BNPP, and then from BNPP to Anchorage. Although it appears that Anchorage was not told the detail of what would be required, it was told on 12 December 2012 that it would take some time and perhaps as much as four weeks to re-register the Notes. In the event it appears to have taken longer than this.

22.  On 14 December 2012 Ms Griffiths sent a further e-mail attaching what was described as a "sample draft trade acknowledgement". This acknowledgment was a draft contract between BNPP and ACMO relating to the Friday trade (although with an indication that, once finalised, a similar contract could be prepared for the Notes to be allocated to ACMO and AIO as a result of the Monday trade) which was stated to be subject to New York law and contained (among other things) a proposed representation and warranty by BNPP that there were no defaults pursuant to the Notes either at the date of the contract or the Settlement Date (the date when rights to the Notes were to be transferred to ACMO and BNPP would be paid). BNPP responded that it would pass the draft onto its Compliance/Legal department and reply in due course, but in the event it never did so.

23.  On 11 January 2013 Max Lipkin of Anchorage asked BNPP for a confirmation that "we hold this position at 12/31" (ie by the 31 December 2012 year end), the stated purpose of the request being "to get our administrator comfortable" that the Notes were held by Anchorage. In response BNPP confirmed that "the below trades are agreed, and still awaiting settlement". The "below trades" referred to were the Friday trade, allocated in its entirety to ACMO, and the Monday trade, split between ACMO and AIO as Anchorage had requested.

24.  On 16 January 2013, in a conversation between Mr Lett of BNPP and Vladimir Bermant, an analyst at Anchorage London, the latter agreed with the former's observation that "this was an excellent trade for you guys", the point being that the value of the Notes had risen substantially since the trades had been agreed.

25.  On 18 January 2013, Eric Sacks, the Chief Financial Officer of Anchorage New York, requested BNPP to confirm to Anchorage's auditors, Ernst & Young, the purchase of the Notes by ACMO and AIO.

A-21

26.  On 7 February 2013, however, the position changed dramatically. AIB (in the form of IBRC) was placed into special liquidation in Ireland by emergency legislation passed in an overnight session of the Dáil. The effect of this liquidation was to render the Notes worthless or virtually so.

27.  Also on 7 February 2013, Fir Tree tendered physical Notes to BNPP. BNPP was therefore in a position to settle the trades with Anchorage, and attempted to contact Anchorage to arrange settlement. Anchorage did not respond. Accordingly BNPP re-registered the Notes in ACMO and AIO's names and confirmed that the physical Notes would be delivered upon payment. The total sum demanded was US $59.375 million. Payment was requested at an account in New York. It is this conduct which is said by Anchorage to amount to acceptance of the terms proposed in Ms Griffiths' draft trade acknowledgment of 14 December 2012, thus resulting in a concluded or varied contract or contracts containing representations by BNPP and expressly subject to New York law.

28.  Having demanded payment for the Notes on 15 February 2013, BNPP issued these proceedings on 19 February 2013, initially against the overseas defendants only. On 11 March 2013 Anchorage New York commenced an action against BNPP in New York seeking declarations that Anchorage New York was not obliged to purchase the Notes (i) because what I have called the Friday and the Monday trades did not create any binding contract as the parties had not reached agreement on all the material terms or on formal documentation necessary to consummate the contemplated transaction, and (ii) because BNPP's delay in tendering the Notes prior to IBRC's liquidation had the effect of frustrating any contract which had been concluded. Anchorage New York also sought damages for breach by BNPP of a duty to negotiate in good faith said to arise under New York law.

29.  BNPP was not aware of those proceedings until after 12 March 2013, on which date the claim form in the English proceedings was re-issued on amendment, the amendment being to join Anchorage London as a defendant.

30.  In order to avoid the time and expense involved in serving these proceedings on the various overseas defendants out of the jurisdiction, the parties reached a sensible agreement whereby Anchorage's solicitors would accept service while reserving the right to challenge the jurisdiction of this court. Although at an earlier stage there was some disagreement as to the effect of this agreement, by the time of the hearing before me it was common ground that this service agreement had no effect on the right of the overseas defendants to challenge jurisdiction and that the burden remained on BNPP to justify the exercise of jurisdiction just as it would have done if BNPP had been required to serve the overseas defendants in the United States and Luxembourg respectively.

The parties' prior dealings and the jurisdiction clause

31.  This was not the first occasion on which BNPP and Anchorage had dealt together. Although there may be some dispute as to the extent of those dealings, there have been at least a number of prior contracts between BNPP's London branch and Anchorage entities, as well as other transactions in which BNPP's branches in other jurisdictions had dealt with Anchorage.

32.  Like many large financial institutions, BNPP's London branch trades on standard terms of business. BNPP has sent Anchorage several versions of these terms over the years. These terms, headed "London Terms of Business for Professional Clients or Eligible Counterparties" and to which I shall refer as BNPP's London terms, are stated by clause 2.1 to apply

"where either BNP Paribas London Branch or BNP Paribas UK Limited (or any other UK Affiliate of BNP Paribas from time to time) is the contractual counterparty for any transaction you enter into with us, or where the business relationship between you and us is conducted through either entity."

33. Clause 34 of the terms applicable at the time of the Friday and Monday trades (and at all previous material times) provided for English law and jurisdiction in the following terms:

"This Agreement shall be governed by, and construed in accordance with, English Law and you irrevocably submit to the jurisdiction of the English courts in respect of any matter arising out of this Agreement, or our services to or Transactions with you under this Agreement."

34. On 27 February 2008 BNPP informed Anchorage's central compliance manager that Anchorage New York had been classified as an eligible counterparty for the purpose of the Markets in Financial Instruments Directive (2004/39/EC) and its implementing regulations and sent him a MIFID pack (a pack of paperwork sent by BNPP to clients for the purposes of complying with this directive), requesting consent to this classification. This was given on 4 March 2008. At that stage BNPP's London terms were not sent, but they were sent in August 2008 as part of a MIFID pack sent to Anchorage New York and another Anchorage entity, Anchorage Capital Partners LP. In response Anchorage's compliance officer confirmed that the consent to classification as an eligible counterparty given earlier by Anchorage New York was also valid for this further entity. There was no objection to the BNPP London terms.

35. BNPP's London terms were also sent to Ms Griffiths and Sara Tin (both of Anchorage New York) in connection with a transaction involving Anchorage Capital Master Offshore Ltd, a Cayman Islands company within the Anchorage group, in July 2011. In response to that, Kathryn Pruess, who was (and who in her email was described as) Anchorage New York's Associate General Counsel, responded by email on 28 July 2011:

"We have reviewed and are comfortable with these terms".

BNPP's case on jurisdiction

36. In summary, BNPP's case for jurisdiction over each defendant is as follows.

*Anchorage London.*

37. No question of jurisdiction arises. Anchorage London is an English LLP which was served here, and which does not challenge the court's jurisdiction over it.

*Anchorage New York.*

38. BNPP seeks to found jurisdiction over Anchorage New York for its claim under the Friday contract (and if necessary the Monday contract, although BNPP's primary case is that the Monday contract was concluded with Anchorage London) by any of the following routes:

38.1 first, pursuant to Article 23 of the Brussels Regulation (because Anchorage New York accepted an English jurisdiction clause in BNPP's London terms);

38.2 second, pursuant to CPR PD6B para 3.1(6)(a) because the contract was made within the jurisdiction;

38.3 third, pursuant to CPR PD6B para 3.1(6)(c), because the contract was governed by English law, either because of the express choice of English law in BNPP's London terms or as a result of applying Article 4 of the Rome I Regulation;

A-23

38.4  fourth, pursuant to CPR PD6B para 3.1(6)(d), because the contract contains a term (again, in BNPP's London terms) to the effect that the English court shall have jurisdiction;

38.5  fifth, pursuant to CPR PD6B para 3.1(7) because a breach of the contract was committed within the jurisdiction; and

38.6  sixth, pursuant to CPR PD6B para 3.1(3), because Anchorage New York is a necessary or proper party to the claims made against Anchorage London, ACMO and/or AIO.

*ACMO and AIO.*

39.  BNPP seeks to found jurisdiction over ACMO and AIO under the following provisions of the Brussels Regulation:

39.1  Article 23, because they are bound by the English jurisdiction clause in BNPP's London terms;

39.2  Article 5(1)(a), because the place of performance of the obligation in question under the contracts is England;

39.3  in relation to the Monday contract, Article 5(5), because the dispute arises out of the operations of ACMO and AIO's agent, Anchorage London, situated in England; and

39.4  Article 6(1), because the claim against ACMO and AIO is so closely connected to the claim against Anchorage London, which is sued in the court of its place of domicile, that it is expedient to hear and determine them together.

Jurisdiction — the tests to be applied

*Under the Brussels I Regulation*

40.  Where jurisdiction is founded under the Brussels Regulation, it is for the claimant to show a good arguable case that jurisdiction is available under the Regulation. This means that, on the material available at this preliminary stage, the claimant must have "much the better of the argument" ( *Canada Trust Co v Stolzenberg (No 2) [1998] 1 WLR 547)* . There has been detailed analysis in many cases of what is meant by this formulation, including such issues as what if anything is added by the word "much", but as the question of jurisdiction in this case does not depend upon such precise nuances, I need not rehearse those cases or enter into that debate.

*Under CPR PD6B*

41.  By contrast, where jurisdiction is sought to be established under the provisions of CPR PD6B, a three-stage test applies.

41.1  First, the claimant must satisfy the court that in relation to the foreign defendant there is a serious issue to be tried on the merits. This is the same test as for summary judgment, namely whether there is a real (as opposed to fanciful) prospect of success.

41.2  Second, the claimant must satisfy the court that there is a good arguable case that the claim falls within one or more of the jurisdictional gateways set out in CPR PD6B. Again, this means that the claimant must have much the better argument on this point.

41.3  Third, the claimant must satisfy the court that in all the circumstances England is clearly or distinctly the appropriate forum for the trial of the dispute, and that in all the circumstances the court ought to exercise its discretion to permit service of the proceedings out of the jurisdiction.

Article 23 of the Brussels Regulation

42.  As will have been observed, although there are various routes by which BNPP seeks to found jurisdiction against the different overseas defendants, in the case of all of them BNPP relies on the jurisdiction clause in its London terms of business as a clause falling within Article 23 of the Brussels Regulation.

43.  It is common ground that jurisdiction can only be established against ACMO and AIO pursuant to the terms of the Brussels Regulation as they are companies domiciled in an EU member state. Anchorage New York is not so domiciled and contends that it is not subject to the Regulation. However, it is well established that the Regulation is part of English law and that jurisdiction may be established under Article 23 by reason of a jurisdiction clause fulfilling the requirements of that Article between an English domiciled claimant and a defendant domiciled outside the EU: *Antec International Ltd v Biosafety USA Inc* [2006] EWHC 47 (Comm); *Thomas Cook Tour Operations Ltd v Kaya Turistic Tesisleri Otelcilik* [2009] EWHC 720 (QB).

44.  Under Article 23(1), a jurisdiction agreement is effective if it is: (a) in writing or evidenced in writing; (b) in a form which accords with practices which the parties have established between themselves; or (c) in international trade or commerce, in a form which accords with a usage of which the parties are or ought to have been aware and which in such trade or commerce is widely known to, and regularly observed by, parties to contracts of the type involved in the particular trade or commerce concerned. The purpose of these requirements is to ensure that there is consensus between the parties to the jurisdiction clause, and to this end for the purposes of Article 23(1)(a) it is the agreement to the jurisdiction clause (and not merely the clause itself) which must be in writing: *Estasis Salotti di Colzani Aimo e Gianmario Colzani v RUWA Polstereimaschinen GmbH (Case 24/76) [1976] ECR 1831* ; and *Galeries Segoura v Rahim Bonakdarian (Case 25/76) [1976] ECR 1851* .

45.  In the present case the jurisdiction clause applies, by its own terms, when a contract is concluded with BNPP's London branch. In order to establish jurisdiction under Article 23 it is therefore necessary for BNPP to show a good arguable case that it did conclude a binding contract with the defendant which it is sought to bring before the court and that the defendant agreed to the jurisdiction clause. I consider these questions in turn. However, although the question whether the Friday and/ or the Monday trade resulted in a binding contract or contracts for the sale of the Notes and, if so, with whom and on what terms, seems likely to be determinative of liability in this action, at this stage I am concerned only with the question of jurisdiction, applying the test of good arguable case. It is unnecessary and would not be appropriate to attempt finally to determine these matters.

*Was there a binding contract or contracts for the sale of the Notes?*

46.  I summarised the relevant principles (which are well established) for determining whether a contract has been concluded in *Air Studios (Lyndhurst) Ltd v Lombard North Central Plc* [2012] EWHC 3162 (QB), [2013] 1 Lloyd's Rep 63 at [5] to [9] and need not repeat that summary here. It is clear, applying these principles, that BNPP has a good arguable case, at any rate if English law applies, that the Friday and the Monday trades were intended to result in immediately binding contracts for the sale and purchase of the Notes at the agreed price and were not subject to later negotiation of detailed contractual terms. My reasons for this conclusion are as follows.

47.  First, on both occasions the traders used the language of binding contract ("done", "thanks for the trade"), with no suggestion that either the Friday or the Monday trade was subject to further negotiation of detailed terms and conditions. Nor was there any such suggestion in Mr Goodwin's unqualified approval of the voice confirmation on the Friday evening. Second, the US $25m credit default swap purchased on the Friday demonstrated an intention by Anchorage to hedge the Notes purchased under the Friday trade, which only made sense if a binding contract to purchase those Notes had been concluded. Third, the background against which the trades were negotiated on both the Friday and the Monday was one in which it was known that BNPP would need to align its purchase from Fir Tree with its sale to Anchorage, that the price at which Fir Tree was willing to sell was liable to change, and that BNPP was also known to be negotiating with other prospective buyers who were interested in purchasing the Notes. In such circumstances it was essential to strike a deal which would be immediately binding on both parties. Fourth, even Ms Griffiths' e-mail of 14 December 2012 attaching the draft trade acknowledgment did

not suggest that agreement on these terms was necessary before the parties would be contractually bound. Fifth, in numerous ways between the conclusion of the trades and the liquidation of AIB on 7 February 2013, the parties' dealings with each other set out above suggested a mutual understanding that the trades had resulted in binding contracts.

48.  There was some debate about whether, if the Friday and the Monday trades resulted in binding agreements, there was (as Anchorage contended) a single contract concluded on Friday for the sale and purchase of Notes with a face value of US $50 million together with a binding option for the purchase of further Notes with a face value of US $45 million or (as BNPP contended) two separate contracts. Again, it is unnecessary and would not be appropriate to reach a final conclusion on this question, and ultimately I doubt if it makes much difference, at any rate so far as the question of jurisdiction is concerned. The question of one contract or two depends in part on whether the provision in the Friday trade that "You have the exclusive on the balance until noon Monday at the same level subject to news from the seller" created a legally binding option unilaterally exercisable by Anchorage. BNPP contends that the subject ("news from the seller") was too vague to give rise to a binding obligation and that the "exclusive" was merely a moral rather than a legal commitment undertaken by BNPP. However, even if this was a legally binding option, its exercise was clearly dependent on BNPP being able to conclude a purchase with Fir Tree on the Monday at the same price as the purchase it was concluding on the Friday. Thus the option could not be exercised by a unilateral notice without more and a process of negotiation or at any rate investigation would be required before the parties could know whether it had been exercised successfully. The judgment of Hoffmann J in *Spiro v Glencrown Properties Ltd [1991] Ch 537* demonstrates that an option is not strictly speaking either a conditional contract or an irrevocable offer, although there are some ways in which it resembles each of them, and that how it is to be characterised depends upon the context. In my judgment, for the purposes of a dispute about jurisdiction in the circumstances of this case, the Monday trade is best regarded as a distinct contract, which is in fact how the parties treated it. I consider that BNPP has at any rate a good arguable case to this effect.

*With whom were the contracts made?*

49.  Identification of the Anchorage entity or entities which concluded the contracts is more complex. It may well be that no real thought was given to this by the traders who concluded them. They may well have regarded the substance of the matter as a deal between BNPP and Anchorage, in which identification of the particular purchaser was no more than an unimportant detail which could be sorted out when the paperwork was written up. From the viewpoint of traders who knew and trusted each other and who had often dealt with each other in the past, that would not be surprising. Nevertheless, as there can in law be no contract without a contracting party or parties, it is necessary to analyse the parties' dealings in order to identify the parties to the contracts. However, in circumstances where there was an evident intention to be bound, the law should seek to give effect to the commercial parties' intentions and it would be wrong to approach this issue in an unduly technical way.

50.  As already indicated, BNPP's primary case is that the Friday contract was concluded by Anchorage New York acting as an agent for ACMO as an undisclosed principal, and that the Monday contract was concluded by Anchorage London acting as an agent for ACMO and AIO as its undisclosed principals. On that basis BNPP contends that it is entitled to sue both the agent and the principal (see the summary of the law on undisclosed principals by Lord Lloyd of Berwick in *Siu Yin Kwan v. Eastern Insurance Co Ltd [1994] 2 AC 199* at 207). Anchorage, however, contend that if any binding contract was concluded, it was concluded with Anchorage New York; that no decision was made until after the conclusion of the trades about the fund or funds to which the Notes would be allocated; and that there can be no question of an agent acting for an undisclosed principal whose identity has not been determined at the time of conclusion of the contract. The result, according to Anchorage, is that there is no arguable case against Anchorage London (which therefore cannot be used as an "anchor" defendant for the purpose of founding jurisdiction against the overseas defendants) and no basis on which jurisdiction can be established against ACMO or AIO as there is no good arguable case that they were parties to any contract. Anchorage accepts that there is a serious issue to be tried against Anchorage New York, but contends that Anchorage New York did not agree to the jurisdiction clause in BNPP's London terms and that BNPP is unable to found jurisdiction against it by means of any of the gateways in CPR 6PD.

51.  In response BNPP invites me to infer, contrary to Anchorage's evidence, that decisions to allocate the funds to ACMO and AIO had been made before the conclusion of the trades. It contends that Anchorage New York and Anchorage London must have intended to contract on behalf of one or more of the funds rather than on their own behalf, that a decision about allocation must have been made before concluding the trades as Anchorage would need to know where the money to pay for the Notes was to come from, and that the fact that decisions appear already to have been made very shortly after conclusion of the trades is an indication that they had in fact been made beforehand. In the alternative it contends that there is no conceptual difficulty with holding a party liable as an undisclosed principal notwithstanding that its identity has not been determined at the time of concluding that contract, provided that at the time of contracting the agent intends to contract for one of a range

of principals and is authorised to do so, at any rate in circumstances such as the present where the identity of a contracting party within a group of companies is a matter of no significance to the counterparty.

52. I must bear in mind that at this stage the question is only whether there is a good arguable case and that I am not deciding these issues. It seems to me that the question whether a decision on allocation had been made before the trades were concluded is a factual question which may be determined either way, and which may have a significant bearing as a matter of law on the identity of the contracting Anchorage party, even though it would appear to be a point of little commercial significance. There is force in the points made by BNPP suggesting that the decision had already been made, but Anchorage's evidence that no decision had been made is unequivocal and cannot at this stage be regarded as wrong.

53. If a decision had been made to allocate the Notes to ACMO and AIO respectively, there would appear to be a compelling case that ACMO and AIO were BNPP's only contractual counterparties, on the basis that there was an understanding from the parties' prior dealings that Anchorage New York and Anchorage London were not purchasing the Notes on their own behalf, but were acting as agents on behalf of funds within the group, and that BNPP was content to deal with whichever fund was determined by Anchorage. If that is so, ACMO and AIO would be liable on the contracts, although Anchorage New York and Anchorage London, whose role was known to be merely that of agents, would probably not be.

54. On the other hand, if no decision on allocation had been made when the trades were concluded, it seems to me that there is at least a good arguable case that Anchorage New York incurred personal liability on the Friday contract and that whichever of Anchorage New York and Anchorage London is to be regarded as having concluded the Monday contract likewise incurred personal liability on that contract, at any rate if Anchorage is correct in its submission that there can be no question of agency on behalf of a principal who has not yet been identified, a point which (as it seems to me) should not be determined at this stage but is best left for decision once the full facts are established. As to which of these two entities is to be regarded as having concluded the Monday contract, I accept BNPP's submission that as the contract was in fact concluded as a result of dealings with personnel at Anchorage London, there is a good arguable case that it is that company which should be regarded as having done so. While there is an argument that the option given on the Friday (whether or not legally binding) was given to Anchorage New York as the party with whom the Friday trade had been concluded, so that the exercise of this option on Monday must also have been by Anchorage New York, it is also possible (and in the end seems more plausible) to regard the option as being given on the Friday to whichever Anchorage company would wish to purchase the further Notes.

55. It seems to me that there is also a good arguable case that even if the contracts were not initially concluded with ACMO and AIO because their identity had not yet been determined, the post-contractual exchanges in which BNPP confirmed the purchases (including confirmation of the allocation to ACMO and AIO) had the effect that these funds undertook liability under the contracts, although it would be debatable whether such liability was intended to be instead of or in addition to that of Anchorage New York and Anchorage London who had initially concluded the contracts. However, the parties' submissions did not analyse the position in this way and I do not rest my judgment on this way of viewing the matter.

56. At trial, and when deciding against which if any of the defendants to enter judgment on either contract, final decisions will need to be made about these matters. At this stage, when the issue is one of jurisdiction and the test is that of good arguable case, I consider that there is a sufficient case against each of the overseas defendants to satisfy that test. I conclude, therefore, that there is a good arguable case that (i) Anchorage New York is liable on the Friday contract, either as principal or as agent, (ii) ACMO is liable on the Friday contract as principal, (iii) (if, contrary to BNPP's primary case but as contended by Anchorage, the Monday contract is to be regarded as having been concluded by Anchorage New York) Anchorage New York is also liable on the Monday contract, either as principal or as an agent, and (iv) ACMO and AIO are liable on the Monday contract as principals, each for their respective allocation.

57. It is true that some of these conclusions appear to be mutually exclusive. For example, if Anchorage New York is liable on the Friday contract as a principal, it may be that ACMO could not also be so liable. In such circumstances, if the test of good arguable case means that the claimant must have much the better of the argument on the point, is there any inconsistency in concluding that there is a good arguable case against both defendants? In my judgment there is not. The test of good arguable case is sufficiently flexible to allow for a conclusion that there is a good arguable case that each of two defendants is liable on a contract, even if ultimately only one of them can be. In circumstances where the contractual analysis is not straightforward and depends at least to some extent on facts which are exclusively within the knowledge of the defendants, a rigid application of the test of good arguable case is clearly not appropriate.

The requirements of Article 23

58.  On the basis that there is a good arguable case against each of the overseas defendants that it is liable on one or both of the contracts, it remains to consider whether the requirements of Article 23 of the Brussels Regulation are satisfied. The jurisdiction clause in BNPP's London terms is in writing. As already noted, Anchorage expressly indicated its agreement to that clause (among others) in writing by means of Kathryn Pruess' email of 28 July 2011 which, over a signature reading "Associate General Counsel, Anchorage Capital Group LLC" (ie Anchorage New York) said "we have reviewed and are comfortable with these terms". That satisfied the requirement of agreement to the clause in writing – but agreement by whom?

59.  The issue is whether, in expressing that agreement, Ms Pruess should properly be understood as expressing agreement on behalf of the Anchorage group as a whole or only on behalf of the particular Cayman Islands entity, Anchorage Capital Master Offshore Ltd, which was to be the counterparty in the particular transaction then under consideration. The context in which this issue must be determined is that BNPP was dealing with an investment management company based in New York which managed a number of funds in a number of jurisdictions including offshore jurisdictions, and that BNPP would not necessarily be told at the time of concluding a trade the identity of the Anchorage fund to which the asset in question would be allocated (indeed, on Anchorage's case, that decision might not yet have been made). BNPP would simply deal with Anchorage New York (or London) without needing to inquire on whose behalf the individuals in the New York (or London) office were acting. In the past, moreover, BNPP had been told that consent to classification as an eligible counterparty given by one Anchorage company was also valid for another entity within the group.

60.  In these circumstances, it seems to me to be clear (and at any rate that BNPP has much the better of the argument) that the confirmation given by Ms Pruess is properly to be understood as given on behalf of the Anchorage group as a whole. It would make no sense to read her e-mail as saying that the particular Cayman Islands entity was comfortable with BNPP's London terms including the jurisdiction clause, but that other Anchorage entities were not. Indeed, the absurdity of such a reading can be illustrated by supposing that Anchorage had decided to allocate some of the Notes purchased in the present case to its Cayman Islands fund. It would be a strange outcome if that fund was bound by the jurisdiction clause but other funds to which the remaining Notes were allocated were not. The agreement of an agent to a jurisdiction agreement will bind the principal for the purposes of Article 23 and accordingly Ms Pruess's agreement in her capacity as Associate General Counsel of Anchorage New York was effective to bind ACMO and AIO (see Standard Steamship Owners' Protection & Indemnity Association (Bermuda) Limited v GIE Vision Bail [2004] EWHC 2919 (Comm), [2005] 1 All ER (Comm) 618 at [51]-[55]).

61.  Accordingly I am satisfied that BNPP has the better (or, if different, much the better) of the argument that the court has jurisdiction over each of the overseas defendants under Article 23(1) of the Brussels Regulation – unless, that is, the position at the time of concluding the contract was changed by a subsequent variation whereby the parties agreed to New York law (as to which, see further below).

Applicable law

62.  My conclusions so far have been reached as a result of applying English law. In my judgment that is the applicable law governing these issues, either because of the parties' express choice of English law in BNPP's London terms, or because English law applies pursuant to Article 4(1)(a) of the Rome I Regulation whereby, in the absence of a choice of law made by the parties, a contract for the sale of goods is governed by the law of the country of the seller's habitual residence. The effect of Article 19(2) is that, as the contracts were concluded by BNPP's London branch, London is treated as the place of its habitual residence.

63.  Anchorage contends that the choice of English law in clause 34 of BNPP's London terms applies only to matters dealt with in those terms and does not apply to "Transactions" concluded pursuant to those terms. I reject that distinction as unrealistic. It represents the kind of semantic approach to such clauses which English law has firmly left behind. Anchorage contends also that there was a choice of New York law for the purpose of Article 3 of the Rome I Regulation, so that Article 4 does not apply, but I can see no basis in the evidence for any such contention. Certainly the matters relied on, which essentially

**A-28**

amount to no more than an assertion that it would have been sensible and desirable to agree to apply the law of New York, together with the reference to New York law in Ms Griffiths' draft trade acknowledgment, cannot constitute such a choice.

64. As to Article 4 of the Rome I Regulation, Mr Greenwood for Anchorage accepted that if there was no express choice of law in BNPP's London terms and there was otherwise no choice of law by the parties, Article 4 would apply to the sale of the Notes and would have the effect that English law is the applicable law, unless the primary rule in Article 4(1)(a) can be displaced as a result of Article 4(3). This provides that "where it is clear from all the circumstances of the case that the contract is manifestly more closely connected with a country other than that indicated" by Article 4(1), "the law of that other country shall apply". Anchorage contends that this is such a case and that it is clear that the contracts are manifestly more closely connected with New York than they are with London. I do not agree. Article 4(3) deliberately places a high hurdle in the way of a party seeking to displace the primary rule. The most that can be said in Anchorage's favour is that there are factors pointing in both directions. This comes nowhere near satisfying the test of "clear that the contract is manifestly more closely connected" with New York than with London.

65. Accordingly it is appropriate in my judgment to have approached the questions so far considered as a matter of English law. This means that it is unnecessary for present purposes to consider whether, if New York law applies, the Friday or Monday trades amounted to no more than a "Type II preliminary agreement" giving rise to an obligation to negotiate in good faith, a matter which in any event is in dispute between the parties and on which it would be difficult to reach any conclusions at this stage.

Anchorage's variation theory

66. Anchorage's primary case is that the Friday and the Monday trades did not result in concluded contracts because there were terms which remained to be agreed. I have dealt with that argument above. Alternatively, however, it contends that the draft trade acknowledgment sent to BNPP by Ms Griffiths on 14 December 2012 (which provided for New York law to apply) was accepted by BNPP's sending of the Notes, re-issued in the names of ACMO and AIO, to Anchorage New York together with a demand for payment on 14 February 2013. It contends, therefore, that any contract already concluded on 7 or 10 December 2012 was varied by conduct, not only to provide for New York law, but also to include the representations and warranties to be given by BNPP set out in the draft acknowledgement.

67. I would accept that, if such a variation occurred, its effect would probably have been that the law and jurisdiction clause in BNPP's London terms would no longer apply to this transaction even though Ms Griffiths' draft trade acknowledgment did not expressly refer to jurisdiction as distinct from governing law. The consequence would be that BNPP would no longer be able to rely on Article 23 of the Brussels Regulation. However, I regard the argument that BNPP's conduct on 14 February 2013 was an acceptance of the terms proposed by Ms Griffiths as hopeless. Whether that conduct should be regarded as constituting such an acceptance is a question to be determined objectively. As it is put in *Chitty on Contracts* (31st ed, 2012), vol 1, para. 2-030:

"conduct will amount to acceptance only if it is clear that the offeree did the act of alleged acceptance with the intention (ascertained in accordance with the objective principle) of accepting the offer."

68. No sensible person could have considered that BNPP's conduct on 14 February 2013 was intended to be an acceptance of Ms Griffiths' draft. There had been no reference to her draft for some weeks and it had simply dropped from view. There was no reason to suppose that by causing the Notes to be re-issued in the names of ACMO and AIO BNPP was intending to accept the terms of her draft. On the contrary it had been told on many occasions that these were the funds to which the Notes should be allocated. Moreover, and fatally to Anchorage's argument, Ms Griffiths' draft included a proposed warranty by BNPP that on the Settlement Date there was no default on the Notes, but by 14 February 2013 it was known that there was

such a default as a result of the liquidation of AIB a week earlier. BNPP would have had to be mad to give such a warranty on 14 February and Anchorage cannot reasonably have thought that it was doing so.


Conclusion on Article 23

69.  The conclusions reached so far mean that BNPP succeeds in establishing jurisdiction against all three of the overseas defendants and that those defendants' application challenging the exercise of jurisdiction over them must be dismissed. That being so, I can deal very briefly with the other routes by which if necessary BNPP would seek to establish jurisdiction.


Jurisdiction over Anchorage New York under CPR PD6B

70.  In my judgment BNPP would if necessary succeed in showing a good arguable case against Anchorage New York under each of the "gateways" set out above on which it relies.


71.  Whether the Friday contract was made within the jurisdiction depends on whether Mr Lett's message of 20:36:45 was an offer accepted by Mr Goodwin's response "done thank you". If so, the acceptance was received by Mr Lett in London and the contract, concluded by instantaneous means, was made in London where the acceptance was received: *Entores v Miles Far East Corp [1955] 2 QB 327* . Anchorage accepts this analysis, but submits that Mr Lett's first message was not an offer to sell but an invitation to Mr Goodwin to make an offer in those terms, so that it was his message ("done thank you") which constituted the offer and Mr Lett's response ("this is done – thanks for the trade") received in New York which constituted the acceptance. It would be unfortunate if the important question of jurisdiction should depend on such niceties, but for what it is worth I consider that BNPP has much the better of the argument on this point. There is no doubt that the Monday contract was made in England, so that if (contrary to BNPP's primary case) that was a contract concluded with Anchorage New York, jurisdiction would also be established in respect of the Monday contract under this gateway.


72.  For the reasons already given, both contracts were governed by English law and contained a term to the effect that the English court should have jurisdiction.


73.  Whether a breach of the contracts was committed within the jurisdiction depends on where Anchorage's obligation to pay for the Notes had to be performed. In general, as Anchorage accepted, it is the duty of a debtor to seek out and pay his creditor at the creditor's residence or ordinary place of business. However, Anchorage contends that this rule does not apply for two reasons. The first is that as BNPP was incorporated in France, albeit with a branch in London, payment could be made either in France or in England. I do not accept this. In accordance with the reasoning in the Northern Irish case of *ICS Computing Ltd v Capital One Services Inc [2002] NIQB 2, [2002] NI 76* I would hold (and in any event there is a good arguable case) that the obligation to pay arises at the creditor's place of business and that in a case where the creditor has more than one place of business, the relevant place of business is the place through which the parties' dealings have taken place. Indeed ICS Computing Ltd was a case where there had been dealings through the plaintiff's offices in both England and Northern Ireland, but what mattered was that the office in Northern Ireland was "the main centre of activity" in these dealings. Anchorage's second argument is that when BNPP demanded payment on 14 February 2013, the demand was for payment at a bank account in New York. That is so, but (as Mr Greenwood accepted) such a demand cannot constitute a unilateral variation of the contractual obligation to pay in London. However, Mr Greenwood contends that, as a matter of construction, Anchorage New York was under an obligation to pay at such place as might reasonably be demanded by BNPP, and that what BNPP demanded, perfectly reasonably, was payment in New York. I do not accept that the contracts are to be construed in this way. It is not what they say and there is no need to imply a term that BNPP should be free to demand payment elsewhere than in London. To do so would introduce unnecessary uncertainty as there might be scope for dispute about where it was reasonable to demand payment. BNPP's demand was merely an acceptance by BNPP that if payment was made in accordance with the demand, that would discharge Anchorage's obligation.

74.  Finally, I would accept that Anchorage New York is a necessary or proper party to the claims made against Anchorage London, ACMO and AIO. The issue here is not whether there is a sufficient connection between the various claims, but whether there is a sufficient case either on the merits or as a matter of jurisdiction against the "anchor" defendants to justify exercising jurisdiction over Anchorage New York. As to this, there is and can be no jurisdictional challenge by Anchorage London and, although Mr Greenwood submitted that the claim against Anchorage London is weak, there has been no application to strike it out. For the reasons given above it seems to me that there is a real issue to be tried as between BNPP and Anchorage London and that any strike-out or summary judgment application would be most unlikely to succeed. Accordingly the claim will continue against Anchorage London. Whether ACMO and AIO are also available as "anchor" defendants depends on whether BNPP is able to establish jurisdiction over them under the Brussels Regulation, which I consider further below.

75.  As already indicated, in order to establish jurisdiction under CPR PD6B (and in contrast with the Brussels Regulation) BNPP must also show that there is a serious issue to be tried on the merits (which Anchorage New York does not dispute) and that England is clearly or distinctly the appropriate forum for the trial so that in all the circumstances the court ought to exercise its discretion in favour of English jurisdiction. I return to this after considering the position of the Luxembourg defendants, ACMO and AIO. The question of discretion does not arise in their case, but it seems sensible to address the exercise of discretion in Anchorage New York's case once it is known whether jurisdiction is established against the Luxembourg defendants.

Jurisdiction over ACMO and AIO under the Brussels Regulation

76.  As ACMO and AIO are domiciled in Luxembourg, jurisdiction over them can only be established by reference to the provisions of the Brussels Regulation. I have already concluded that jurisdiction can be founded under Article 23, but jurisdiction can also be founded under other Articles in addition, again applying the test of good arguable case.

77.  For the same reasons as already given in relation to the place of breach as against Anchorage New York, jurisdiction can be founded under Article 5(1) on the basis that the place of performance of the obligation in question is England. This requires a little explanation. For the purposes of the Brussels Regulation, the contracts for sale of the Notes were contracts for the sale of goods (the Notes being negotiable instruments). Thus, *prima facie* , Article 5(1)(b) would apply, such that the place of the performance of the obligation in question would be the place in a Member State where the goods were delivered or should have been delivered. However, the place of delivery of the Notes was New York, and thus there was no place in a Member State where the goods were to be delivered, with the consequence that Article 5(1)(b) does not apply in this case. In that situation, Article 5(1)(c) makes it clear that Article 5(1)(a) applies, such that a claim can be brought in the courts for the place of performance of the obligation in question. The "obligation in question" which is the basis of the action is ACMO and AIO's obligation to pay for the Notes, an obligation which was required to be performed in England as already explained.

78.  In relation to the Monday contract, there is a good arguable case that both ACMO and AIO were represented by their agent, Anchorage London, who negotiated the contract. For the purposes of Article 5(5) of the Brussels Regulation, a contractual dispute is closely connected to the operation of a branch or agency if the contract was negotiated by that branch: *Anton Durbeck GmbH v Den Norske Bank ASA [2003] EWCA Civ 147, [2003] QB 1160* at [40]. Accordingly jurisdiction is also available under Article 5(5) because Anchorage London is established in England.

79.  Finally, under Article 6(1) of the Brussels Regulation, a defendant may be sued in the Member State where a co-defendant is domiciled, provided the claims are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings. In this case, the claims against ACMO and AIO are closely connected with the claims against Anchorage London. Anchorage contends that Article 6(1) is not available because

there is no serious issue to be tried on the merits against Anchorage London as the "anchor" defendant (see *The Xing Su Hai [1995] 2 Lloyd's Rep 15* at 22), but for the reasons already given I do not agree.


Forum conveniens

80.  Questions of *forum conveniens* do not arise if, as I have held, jurisdiction is established against all the overseas defendants under Article 23 of the Brussels Regulation. Further, such questions do not arise as against ACMO and AIO in any event. Nor do they arise if I am right to conclude that Anchorage New York has agreed to the English jurisdiction clause in BNPP's London terms, as there is no reason (let alone any strong reason) why effect should not be given to that clause (see eg Antec International Limited v. Biosafety USA Inc [2006] EWHC 47 (Comm) at [7]; and *Sebastian Holdings Inc v Deutsche Bank [2010] EWCA Civ 998, [2011] 1 Lloyd's Rep 106* at [74] and [78]). If I am wrong about that, the question whether England is clearly or distinctly the appropriate forum for the trial arises only as against Anchorage New York and even then falls to be considered on the basis that, as I have also held, jurisdiction has been established against ACMO and AIO so that the action will proceed against them here as well as against Anchorage London, the English domiciled defendant. On that basis it seems to me to be clear that England is the appropriate forum for a trial against Anchorage New York. Quite apart from the obvious inconvenience (to put it no higher) of having a trial against Anchorage New York in New York and a trial against the other defendants here, this is a case where English law applies to the parties' dealings which on the facts of this case is a matter of real weight. By comparison the matters relied on by Anchorage as pointing towards New York are in my judgment insignificant. In particular, the inconvenience to Anchorage if witnesses are required to attend a trial in London seems to me to be greatly exaggerated. In a case where an objective assessment of the parties' dealings is required and where those dealings are almost entirely in writing, there seems to me to be relatively limited scope for relevant witness evidence.


81.  If necessary, therefore, I would hold that jurisdiction is established over Anchorage New York pursuant to the provisions of CPR PD6B.


BNPP's application for an anti-suit injunction

82.  BNPP applies for an anti-suit injunction against Anchorage New York, on the basis that the New York proceedings are in breach of the jurisdiction clause in BNPP's London terms. Although at this stage BNPP seeks an interim injunction pending trial rather than a final injunction, the question whether the New York proceedings are in breach of the jurisdiction clause is a question of the construction of the clause which has been fully argued and which the parties have invited me to decide. I propose to do so.


83.  For ease of reference, I set out the terms of the clause again:

"This Agreement shall be governed by, and construed in accordance with, English Law and you irrevocably submit to the jurisdiction of the English courts in respect of any matter arising out of this Agreement, or our services to or Transactions with you under this Agreement."


84.  BNPP's case is that this clause is an exclusive jurisdiction clause, while Anchorage contends that even if (as I have held) the clause was incorporated into the Friday and/or Monday contracts, commencement of the New York proceedings was not a breach of the clause because it merely provided for the non-exclusive jurisdiction of the English court, leaving Anchorage at liberty to sue BNPP in New York or, for that matter, in any court anywhere where it can establish jurisdiction over BNPP.


85.  The question whether the jurisdiction clause is exclusive or non-exclusive is the subject of lively debate in the New York proceedings between the English law experts instructed by the parties for the purpose of BNPP's challenge there to

the jurisdiction of the New York court. Lord Collins of Mapesbury, the expert instructed by BNPP, maintains that the clause provides for exclusive jurisdiction, while Professor Adrian Briggs, the expert instructed by Anchorage, maintains the opposite. It is of course hard to think of experts of greater eminence in this field. Their reports discuss such matters as the significance of the word "irrevocably", whether the verb "submit" is used transitively or intransitively and whether that makes any difference, and whether the *"contra proferentem"* rule has any role to play.

86.  While there have no doubt been cases in which these matters have been accorded some weight in determining whether a jurisdiction clause should be regarded as exclusive or non-exclusive, the leading textbooks have not been impressed with the distinction between transitive and intransitive clauses. *Dicey, Morris & Collins on The Conflict of Laws* (15th edition 2012) comments at para 12-105 that the distinction between transitive and intransitive verbs to determine whether a clause is exclusive or non-exclusive "would appear to have practically nothing to recommend it". Professor Briggs is equally scathing:

"The idea that parties submit themselves to the jurisdiction of a court for something *other* than a dispute is surreal. If one were to ask what the parties meant when they agreed to submit, the answer will be that they agreed to submit to trial. It is improbable … that the parties appreciated that there could be a difference between the two forms, and even more improbable that they predicted the consequences which followed from the difference. Most graduates of English universities would be hard put to it to see and explain the difference…" ( *Briggs & Rees, Civil Jurisdiction and Judgments* , 5th ed, 2009, para. 4.45; emphasis in the original).

87.  I must confess that (even with the benefit of a university education) the distinction in the present case between submitting to the jurisdiction in respect of certain matters (intransitive and therefore, so the argument goes, non-exclusive) and submitting disputes in respect of certain matters to the jurisdiction of the court (transitive, and therefore exclusive) is so elusive that it escapes me altogether.

88.  In the end all of these factors are only signposts which may sometimes assist in determining the intention of the parties, while the terms "exclusive" and "non-exclusive" themselves are merely convenient labels. In agreement with *Dicey* at para 12-105 ("the true question is whether on its proper construction the clause <u>obliges</u> the parties to resort to the relevant jurisdiction, irrespective of whether the word 'exclusive' is used"), I prefer to ask the question whether the commencement and pursuit of the foreign proceedings in question are things which a party has promised not to do.

89.  It is clear that the jurisdiction clause in this case constitutes a promise by Anchorage to submit to the jurisdiction of the English court, but there is no equivalent promise by BNPP. BNPP is therefore free, if it wishes, to sue Anchorage elsewhere. In that sense, at least, the clause does not make England the exclusive venue for litigation between the parties and may be regarded as non-exclusive. But the clause does require Anchorage to submit to English jurisdiction, and thus gives BNPP the right to litigate in England, "in respect of any matter arising out of this Agreement, or our services to or Transactions with you under this Agreement" if BNPP chooses to litigate here.

90.  The first question, therefore, is whether Anchorage's New York proceedings are "in respect of" such a matter. In my judgment they clearly are and Anchorage does not contend otherwise. On the contrary it accepts, correctly, that the New York proceedings are in respect of "essentially the same issues" as are raised in these proceedings in England.

91.  Since it is clear that BNPP wishes to exercise its right to litigate these issues in England, the next question is whether by seeking to litigate them in New York Anchorage is in breach of its promise to submit to the jurisdiction of the English court in respect of those matters. That question must be addressed with a measure of common sense. The clause provides that BNPP is entitled to litigate its claim here if it wishes to. It is entitled to require Anchorage to honour its promise to submit to the jurisdiction of the English court. By attempting to litigate in New York, Anchorage is seeking to deprive BNPP of that right

**BNP Paribas SA v Anchorage Capital Europe LLP, 2013 WL 5336632 (2013)**

or, at the least, to render it worthless. Its challenge to the jurisdiction here (contrary to its promise to submit) and its attempt to litigate in New York are two sides of the same coin. Even if, now that its jurisdictional challenge has been rejected, Anchorage does now submit to English jurisdiction as it has promised to do, what is to happen to the New York proceedings? It would make no sense, in my judgment, to construe the clause as permitting Anchorage, so long as it submits to the jurisdiction of the English court, also to bring a claim of its own in New York in respect of essentially the same matters as arise here. It cannot sensibly be supposed that the parties would have regarded such a prospect as acceptable. On the contrary they would rightly have regarded it as a procedural nightmare.

92.   Accordingly I accept BNPP's submission, presented by its junior counsel Mr Patrick Goodall, that the New York proceedings are in breach of the jurisdiction clause in BNPP's London terms. With all due respect to Professor Briggs' views in his capacity as an expert in the New York proceedings, I regard this conclusion as clear.

93.   The principles applicable to the grant of an anti-suit injunction to prevent a breach of a legal right not to be sued in a foreign court are well established and uncontroversial. In short, unless strong reasons to the contrary are shown, the parties should be kept to their contractual bargain. In cases not involving the courts of other member states of the European Union, if proceedings are commenced in a foreign jurisdiction in breach of contract, the English court will ordinarily exercise its discretion to restrain the foreign proceedings: *Donohue v Armco Inc [2001] UKHL 64, [2002] 1 Lloyd's Rep 425* at [24]. No reason is suggested here as to why, if the New York proceedings are in breach of the jurisdiction clause, an injunction should not be granted.

Conclusion

94.   Anchorage's challenge to the jurisdiction is dismissed. The English court has jurisdiction over all the defendants. There will be an injunction pending trial to restrain Anchorage New York from taking any step to pursue the proceedings commenced by it in New York.

Crown copyright

© 2022 Thomson Reuters.

Catlin Syndicate Ltd v Amec Foster Wheeler USA Corp, 2020 WL 05713769 (2020)

# Catlin Syndicate Limited (as the Sole Member of Lloyds Syndicate 2003 for the 2015 Year of Account), Allianz Global Corporate & Specialty SE, Brit Syndicates Limited (In a Representative Capacity for Those Members of Lloyds Syndicate 2987 for the 2015 Year of Account), Markel Capital Limited (as the Sole Member of Lloyds Syndicate 3000 for the 2015 Year of Account), Liberty Managing Agency Limited (In a Representative Capacity for Those Members of Lloyds Syndicate 4472 of the 2015 Year of Account and also Pioneer Underwriting Uspi Consortium Pus 9980), Navigators Underwriting Agency Limited (In Representative Capacity for Those Members of Lloyds Syndicate 1221 for the 2015 Year of Account), Aspen Underwriting Limited (As the Sole Member of Lloyds Syndicate 4711 for the 2015 Year of Account), Starr Syndicate Limited (as the Sole Member of Lloyds Syndicate Cvs 1919 for the 2015 Year of Account), Antares Managing Agency Limited (In a Representative Capacity for Those Members of Lloyds Syndicate 1274 for the 2015 Year of Account), Chubb Underwriting Agencies Limited (In a Representative Capacity for Those Members of Lloyds Syndicate 2488, the Successor of Lloyds Syndicate 1882 for the 2015 Year of Account) v Amec Foster Wheeler USA Corporation, Amec Foster Wheeler Limited

 No Substantial Judicial Treatment

**Court**
Queen's Bench Division (Commercial Court)

**Judgment Date**
24 September 2020

Case No: CL-2020-000427

High Court of Justice Business and Property Courts of England and Wales Queen's Bench Division Commercial Court

**[2020] EWHC 2530 (Comm), 2020 WL 05713769**

Before: Mr Justice Jacobs

Date: 24/09/2020

Hearing dates: 18 September 2020

**Representation**

© 2022 Thomson Reuters.

A-35

Catlin Syndicate Ltd v Amec Foster Wheeler USA Corp, 2020 WL 05713769 (2020)

Mr. Mark Cannon QC and Mr. Iain Quirk (instructed by Clyde & Co LLP ) for the Claimants.
Mr. Roger Stewart QC , Mr. George Spalton and Mr. Mark Cullen (instructed by Pinsent Masons LLP ) for the Defendants.

Mr Justice Jacobs:

Mr Justice Jacobs

1. On Friday 18 September 2020, I heard an application by the Claimants for the continuation of an anti-suit injunction which I had originally granted following a without notice application made on 7 July 2020. Following conclusion of argument, I informed the parties that my decision was that the injunction should continue, and that it should include mandatory provisions requiring the Defendants to withdraw the proceedings in New Jersey which had been commenced in breach of an exclusive jurisdiction agreement in the relevant insurance contract between the parties. These are the reasons for that decision.

A: Factual background

2. The Claimants (referred to herein either as "the Claimants" or "the insurers") are insurers who subscribed to an excess policy of insurance ("the First Excess Policy") pursuant to which certain liabilities of the Defendants were insured. The First Excess Policy contained an express clause which provided for the application of English law and jurisdiction. This clause was set out, in identical terms, in the slip subscribed by the insurers as well as in a "Certificate of Insurance" subsequently produced by the brokers, JLT Specialty Ltd. The clause was as follows:

**Choice of Law and Jurisdiction:** This insurance shall be governed by and construed in accordance with the law of England and Wales. Each party agrees to submit to the exclusive jurisdiction of any competent Court within England and Wales. Any dispute or claim arising out of or in connection with this insurance, its formation or existence or the breach, termination or validity thereof shall be settled in accordance with the law of England and Wales.

3. From around August 2019, the parties engaged in correspondence regarding coverage under the First Excess Policy in relation to defence costs incurred by the Defendants in respect of a very substantial piece of litigation pending in Harris County, Texas. The claim in those Texan proceedings was made by Enterprise Operating LLC ("Enterprise") against the Defendants. The claim related to the construction of a propane dehydrogenation facility at Enterprise's refinery in Mont Belvieu, Texas. In that litigation, Enterprise claims approximately US$ 1.4 billion in losses as a result of the Defendants' alleged conduct, and Enterprise seeks from the Defendants actual and punitive damages equal to or exceeding that sum. The correspondence was conducted on the insurers' side by its legal representatives in London, Clyde & Co LLP ("Clydes") in London (Mr. Richard Moody of that firm). On the Defendants' side, there was correspondence both from individuals within their organisation and also from their legal advisers, McCarter & English, LLP ("McCarter") in Newark, New Jersey (Mr. Anthony Bartell of that firm).

4. The Enterprise claim had been commenced in 2016, and significant sums were expended thereafter by the Defendants on defence costs. However, prior to around August 2019, the coverage provided under the First Excess Policy was not directly engaged. This was because the First Excess Policy provided coverage (of US$ 40 million) above an attachment point of, in effect, US$ 27.5 million. This attachment point reflected a self-insured retention of US$ 7.5 million, and a layer of coverage of US$ 20 million above that. The US$ 20 million coverage layer was provided by three insurers under a policy which was sometimes referred to in the documentation and submissions as the "Master Policy" or the "Primary Policy". I shall refer to it as the "Primary Policy".

5. The Primary Policy contained an English law and jurisdiction agreement which was in materially identical terms to that contained in the First Excess Policy, although (unlike the First Excess Policy) it also contained an express provision for arbitration. The subscribing insurers to the Primary Policy were Allianz Global Corporate & Speciality SE, Zurich Insurance

A-36

PLC (UK branch) and XL Group Insurance. Except for Allianz Corporate & Specialty SE, the subscribing insurers to the First Excess (i.e. the Claimants herein) were different.

6. In addition to the Primary Policy, there was a further "Local Policy" issued in New Jersey, and underwritten by Zurich American Insurance Company, which had a degree of interaction with the Primary Policy. The effect of this interaction is material to the issues which arise on the present application, as further discussed in Section C below. For the purposes of understanding the factual background, however, it is sufficient to note that until August 2019, the Defendants were able to look to the underlying insurance provided by the Primary Policy, or the Local Policy, for payment of their defence costs once the US$ 7.5 million self-insured retention had been paid.

7. By September 2019, the Defendants had contended that, as a result of the significant cost of defending the Enterprise action, the full amount of their self-insured retention had been paid, as had the full US$ 20 million of underlying insurance: underlying insurers had paid this, without the need for any litigation, but under a reservation of rights. The Defendants therefore requested reimbursement of defence costs from the insurers under the First Excess Policy. That request resulted in a lengthy letter from Clydes setting out their position as to the principles which applied to the claim. Clydes requested the Defendants (via the brokers) to provide further information. The conclusion of the letter was that the insurers neither refused nor consented to an indemnity, but instead asked for answers to questions raised in the letter in order to consider how the policy should respond.

8. On 2 October 2019, McCarter responded in a letter which was said to incorporate advice from Mr. Roger Stewart QC (who appeared for the Defendants at the hearing) on English law, although the Defendants did not concede the application of English law to any disputed issues between the parties. The letter explained why, on the Defendants' case, the insurers were liable to pay the defence costs. At the forefront of that argument was a policy provision which was in the Primary Policy and (as is undisputed) incorporated into the First Excess Policy. This is in the following terms:

"Subject to the overall Limit of Indemnity specified in the Schedule, Insurers will pay costs and expenses incurred with the consent (not to be unreasonably withheld or delayed) of the insurers in the investigation or defence or settlement of any allegation or matter or claim which is or may become the subject of indemnity".

9. McCarter's letter concluded by asserting that the insurers' conduct violated both "(a) their express Policy obligation not unreasonably to delay the payment of covered and potentially covered defence costs, and (b) their obligations, implied by law, to act in good faith toward their policyholders". It requested confirmation that the insurers under the First Excess Policy would commence paying the Defendants' defence costs arising from the Enterprise action. Such confirmation was not, however, forthcoming.

10. On 20 January 2020, Mr. Langan, who has made a number of witness statements for the purposes of the hearing, wrote to Clydes. Mr. Langan works for Foster Wheeler Inc., and his title is "Managing Counsel – Complex Litigation". In his letter, he provided Clydes with certain materials which had previously been requested, and he said that "AFW" (i.e. both Defendants) continued to "believe that your clients have acted improperly and in bad faith in conditioning defence cost reimbursement on a contractually and legal-unsupported allocation-of-defence-cost argument and on the provision of information and documents obviously sought for the purpose of developing a coverage defense rather than for the purpose of defending the Enterprise Litigation". The letter asserted that the Defendants believed that they had fully responded to the insurers' "improper" demands for information, and that the insurers had "more than enough information to make a decision on the course they want to take". The letter enclosed a position paper on payment of defence costs.

© 2022 Thomson Reuters.

11.  Mr. Moody of Clydes responded on 25 March 2020. The letter asked various questions. These were principally directed towards potential issues of non-disclosure. As matters have developed, however, the insurers have not to date sought to avoid the First Excess Policy. The central issue between the parties developed in the correspondence, and the evidence for the present application, therefore concerns the extent of coverage for defence costs – although, somewhat belatedly, insurers have raised a related argument concerning the Defendants' alleged failure to seek their prior consent to the defence costs for which coverage is now sought.

12.  The nature of the coverage issues can be seen from the paragraphs at the end of the letter, where Clydes addressed the issue of defence costs.

[6]  On the assumption that satisfactory responses to the questions above can be given, however, First Excess Insurers will now provide their response to the request for an indemnity for defence costs. "

[7]  First, insurers make the following general comments:

(a)  Firstly, they would accept as a general principle that, while there is no basis on which an insurer would be obliged to indemnify defence costs which relate solely to the aspects of the underlying litigation which would not appear to fall to the Master Policy / Excess Layer, common costs which properly relate to the defence of both insured and uninsured exposures would be properly indemnifiable;

(b)  Secondly, however, that not all costs of the litigation would be treated as common costs. Not all of the claims would appear to fall within the scope of cover and not all would attach to the 2015/16 notifications. It does not follow, as appears to be suggested by your letter, that because Amec or Wood must defend all counts and because some of the claims which Enterprise make might (if proven) appear to fall to the policy, when others do not, that all of the defence costs fall to the policy. Nor have you properly understood the issues raised in paragraphs 13, 16 (and possibly 20(b) and 21) of our letter dated 3 September. You are, nevertheless, correct in the more general observation that our clients consider that some of the claims, if proven, would fall for cover; and

(c)  Thirdly, and in the context of the above comment, it would therefore be helpful to have your further explanation of the claims and heads of loss which Enterprise is bringing because these are poorly set out, if set out at all, within the Amended Petition. If Enterprise has not otherwise explained its claims, can further and better particulars not be requested? In the meantime, please could Amec/Wood share with us their own understanding of the claims, which they must surely have undertaken. In the absence of any further explanation from you of this point or any attempt to address the matters raised in our letter of 3 September last year, our insurer clients will make an assessment which will be informed by their own understanding of the claims and what parts of the underlying litigation could and would not fall to the policy.

13.  This response was, as it presently seems to me, consistent with the correct legal approach to the recoverability of defence costs under English law in circumstances where costs are incurred in the defence of both covered and uncovered claims: see e.g. *New Zealand Forest Products Ltd. v New Zealand Insurance Co Ltd. [1997] 1 WLR 1237* . Clydes therefore recognised that "common costs which properly relate to the defence of both insured and uninsured exposures would be properly indemnifiable". The issue raised in this letter, and in Clydes' earlier letter of 3 September 2019, was therefore essentially a factual one; i.e. whether some or all of the costs claimed were in fact to be regarded as "common costs" (or indeed costs exclusively referable to actual or potentially covered claims). It was therefore similar to the factual issue which the Privy Council described in *New Zealand Forest Products* at page 1246. Factual questions would arise potentially in relation to each of the various invoices which formed the subject-matter of the Defendants' claim. Each would need to be resolved in the context of the particular claim which Enterprise had brought, as to which Clydes' letter sought further information.

14.  On 8 April 2020, Mr. Langan responded to the points made, drawing attention to the fact that US$ 13 million of defence costs had been paid, and saying that the First Excess insurers were under "an immediate obligation to pay the outstanding

Catlin Syndicate Ltd v Amec Foster Wheeler USA Corp, 2020 WL 05713769 (2020)

Defence Costs". He asserted that the failure to do so was causing irreparable harm to the Defendants, and that this was "likely" the intention of the insurers. Immediate confirmation was sought that payment would be made.

15.   There was no further material correspondence (or at least none that I was shown at the hearing) prior to the commencement of the proceedings which the insurers now seek to restrain. The immediate confirmation sought on 8 April 2020 was not forthcoming.

16.   On 1 July 2020, without giving any prior notice to the insurers or Clydes (who had been corresponding with the Defendants for over two years at this stage), the Defendants commenced proceedings in New Jersey claiming relief under the First Excess Policy ("the New Jersey proceedings"). On 2 July 2020, the Honorable Michael F. O'Neill, a judge in the Hunterdon County Superior Court in New Jersey ("the New Jersey court") made an order in favour of the Defendants, without prior notice to the insurers. This order required the insurers to "show cause" why the New Jersey court should not issue a preliminary injunction which would require the insurers (i) immediately to pay the Defendants (the plaintiffs in the US proceedings) the full amount of past defence costs in the sum of $ 12.1 million, and (ii) immediately to pay underlying defence counsel directly for all ongoing and future reasonable costs and expenses incurred in defending the Enterprise action. The New Jersey court also ordered immediate relief pending the show cause hearing for the issuance of the preliminary injunction. This required the insurers immediately to pay defence counsel's outstanding invoices in the amount of US$ 3.1 million, and immediately to pay underlying defence counsel "directly for all ongoing and future reasonable costs and expenses incurred in defending" the underlying action.

17.   The application for the injunction was supported by a 34-page brief signed by Mr. Bartell of McCarter. The case for payment of defence costs was advanced exclusively on the basis of New Jersey law, and in particular the principles relating to the duty to defend which apply to insurance policies governed by the law of that state. The court's attention was not drawn to the existence of the clause in the First Excess Policy which provided for English law and jurisdiction. There was no discussion of English law in the brief, and the cases referred to in the table of authorities were exclusively US cases.

18.   There was some debate in the evidence before me as to whether, in making the application in the way that they did, the Defendants attorneys violated New Jersey custom and practice. The evidence of Mr. Koepff, a partner in Clyde & Co. US LLP ("Clydes US") was that Mr. Bartell had failed to do what he would have been expected to do. In particular, Mr. Bartell had failed to put Clydes London on notice of the application; failed to notify all known counsel that he was seeking immediate relief, and failed to provide the moving papers; and failed to draw the attention of the New Jersey court to the existence of the English law and jurisdiction clause in the First Excess Policy. Mr. Bartell disputed this line of argument, indicating in particular that there is no duty of full and frank disclosure in New Jersey which is equivalent or similar to that which applies when without notice applications are made in English proceedings.

19.   It is not necessary for me to resolve this area of dispute between Mr. Koepff and Mr. Bartell in order to determine the issues which arise on the present application. It is well-known that the courts in England and the United States have different procedures, and that different professional standards apply to lawyers in those jurisdictions. It is undesirable for an English judge to embark upon the respective merits of the procedures in different countries, and I do not propose to do so here.

20.   However, I think it right to record that I do not accept Mr. Stewart's submission that the procedures in New Jersey for obtaining prompt monetary relief from insurers, such as that obtained in the present case, "knock" comparable English procedures into a "cocked hat". Mr. Stewart's submission recognised that, in England, the Defendants would not have been able to adopt an equivalent process to that which enabled them to obtain relief in New Jersey: an application, similar to that made in New Jersey, could not have been made in England. This is because of the principle to which Mr. Stewart drew my attention, in the context of his own argument that the insurers' anti-suit application should not have been made without notice.

Catlin Syndicate Ltd v Amec Foster Wheeler USA Corp, 2020 WL 05713769 (2020)

The principle, as stated in *National Commercial Bank of Jamaica v Olint Corpn Ltd. [2009] UKPC 16* , para [13], is that a judge should not entertain an application for an injunction of which no notice has been given unless either giving notice would enable the defendant to take steps to defeat the purpose of the injunction or there has been literally no time to give notice before the injunction is required to prevent the threatened wrongful act.

21. An additional reason why the equivalent process could not have been adopted in England is, of course, the importance which is attached by English courts to the need to make full and frank disclosure on a without notice application. Hence, it would have been obviously impermissible in England to apply without notice for an injunction without drawing the court's attention to a relevant written jurisdiction agreement. Given Mr. Stewart's reliance on both of these principles in order to challenge the anti-suit injunction obtained by insurers, there was some irony in his submission that New Jersey procedures in the present context knocked English procedures into a cocked hat.

22. Irony apart, I do not myself consider that English Commercial Court procedures are inadequate to enable an insured, in an appropriate case, to obtain effective and speedy relief in circumstances where an insurer is wrongly refusing to meet its obligations to pay defence costs in respect of underlying litigation. Procedures exist for applying for summary judgment under CPR Part 24 and obtaining an interim payment under CPR Part 25 in circumstances where the court is satisfied that, if the claim went to trial, the claimant would obtain judgment for a substantial sum of money. Mr. Stewart drew my attention to the decision of Thomas J. in *Poole Harbour Yacht Club Marina Ltd. v Excess Marine Insurance Ltd. [2001] Lloyd's Rep IR 580* , where a successful application was made for an interim payment in respect of defence costs in an insurance context. Furthermore, if sufficiently urgent, the Commercial Court will order an expedited hearing, and will make time available – ahead of when a case would otherwise be listed – so that an urgent application can be heard. Although unusual in the context of insurance claims, an application could also be made for a mandatory injunction, and again the Commercial Court would make time available for such a hearing. Indeed, the present hearing – of the inter partes application for an anti- suit injunction and the Defendants' cross-application for a mandatory injunction – has been allocated 2 full days of court time (including one day pre-reading) and has come on with reasonable speed, bearing in mind that time was required for the parties to prepare and exchange further evidence and submissions. This is in addition to the time that was allocated for the original return date hearing.

23. To revert to the chronology, the New Jersey proceedings resulted in the Claimants applying for an anti-suit injunction as a matter of urgency. No notice of the anti-suit application was given to the Defendants. The application was made on 8 July 2020 and was supported by a witness statement of Mr. Moody of Clydes and a skeleton argument prepared by counsel. I heard the application on the morning of 9 July 2020, when submissions were made by Mr. Scorey QC who then appeared for the insurers. I considered, for reasons which I gave in a brief judgment, that this was an appropriate case for the grant of the relief sought by the insurers. I said that I was satisfied to a high degree of probability that there was a relevant jurisdiction agreement, and that I could see no reason why the injunction should not be granted; and indeed that there was every reason to grant it.

24. The reason why no notice of the application was given was, as the insurers submitted in their skeleton argument on the without notice application, that there was a "high risk" that the Defendants would seek equivalent and opposite anti-suit relief in the New Jersey court designed to stymie the present proceedings. English case-law contains examples of cases where, in the context of competing proceedings in the United States, such equivalent and opposite anti-suit relief had been granted: for a recent such case, see *Hiscox Dedicated Corporate Member Ltd Syndicate 33 At Lloyd's Starr Managing Agents Ltd (t/ a Syndicate CVS 1919) v Weyerhaeuser Company [2019] EWHC 2671 (Comm)* .

25. The Defendants contend that there was no such high risk in the present case. This was because of the "very restrictive approach" taken by the courts in New Jersey to the grant of anti-suit relief. This contrasted with the position in some US states, such as the relevant state in the *Hiscox* case. This is a central argument advanced by the Defendants as to why there was a lack of full and frank disclosure on the without notice application, and it is convenient to deal with that argument here.

© 2022 Thomson Reuters.

A-40

Catlin Syndicate Ltd v Amec Foster Wheeler USA Corp, 2020 WL 05713769 (2020)

26.  I do not consider that the existence of the risk was overstated or misrepresented by the insurers on the without notice application. It was common ground that the New Jersey court had power to grant an anti-suit injunction. In the decision of the US Court of Appeals, Third Circuit in *General Electric Company v Deutz AG 270 F.3d 144* , the court described the competing approaches within different circuits to the grant of anti- suit injunctions, and said:

"By contrast, the Second, Sixth and District of Columbia Circuits use a more restrictive approach, rarely permitting injunctions against foreign proceedings. These courts approve enjoining foreign parallel proceedings only to protect jurisdiction or an important public policy. Vexatiousness and inconvenience to the parties carry far less weight".

27.  The reference in that passage to the protection of jurisdiction would clearly include a case such as the present; i.e. where the jurisdiction of the New Jersey court would be threatened by proceedings elsewhere, namely the present English proceedings for anti-suit relief brought by the insurers.

28.  That this is so is clear from one of the cases cited in General Electric in support of the proposition quoted above: the decision of US Court of Appeals, District of Columbia Circuit, in *Laker Airways v Sabena, Belgian Wd. Airlines 731 F.2d 909* . In that case, the court said that injunctions were most often necessary to protect the jurisdiction of the enjoining court or to prevent the litigant's evasion of the important public policies of the forum. It went on to consider, separately, each category in turn. Under the heading "Protection of Jurisdiction", the court said:

"Courts have a duty to protect their legitimately conferred jurisdiction to the extent necessary to provide full justice to litigants. Thus, when the action of a litigant in another forum threatens to paralyze the jurisdiction of the court, the court may consider the effectiveness and propriety of issuing an injunction against the litigant's participation in the foreign proceedings. (page 927)

…

When the availability of an action in the domestic courts is necessary to a full and fair adjudication of the plaintiff's claims a court should preserve that forum. Thus, where the foreign proceeding is not following a parallel track but attempts to carve out exclusive jurisdiction over concurrent actions, an injunction may be necessary to avoid the possibility of losing validly invoked jurisdiction." (page 929-930)

The court went on to uphold the injunction granted by the lower court in that case on the grounds that the relevant proceedings which were enjoined were English proceedings "solely designed to rob the court of its jurisdiction".

29.  There is therefore no doubt, in my view, that the New Jersey court not only had power to grant an anti-suit injunction, but that this was a paradigm case in which that power could properly be invoked in order to protect its own jurisdiction, notwithstanding the restrictive approach generally taken to anti-suit injunctions in courts on the Third Circuit or the DC Circuit. I reject Mr. Stewart's argument that the *Laker Airways* case simply concerned public policy relating to antitrust (i.e. the importance of preserving competition). The need to protect an important public policy is, as both of these cases show, an <u>additional</u> ground on which anti-suit injunctive relief can be granted; i.e. additional to the ground of protection of jurisdiction. But this is not the only ground, and it was not the only basis for relief in the Sabena case itself.

30.  Reverting again to the chronology: the order for an anti-suit injunction, made on 9 July 2020, provided for a return date in the following week, on Friday 17 July 2020. The order also gave permission to the Claimants to serve the First Defendant out of the jurisdiction, and also to serve by alternative means. Paragraph 15 provided that if either of the Defendants wished to defend the claim, it must acknowledge service within 22 days of being served with the Claim Form. Neither of the Defendants

© 2022 Thomson Reuters.

A-41

has acknowledged service of the proceedings within the time limit. Their position, in substance, is that the jurisdiction of the English court is disputed and that it is the New Jersey court which has jurisdiction in relation to their claims.

31.   When the case came back (again before me) on the return date, directions were given for the service of further evidence and submissions, and a hearing was fixed for the week of 14 September, despite the potential unavailability of Mr. Scorey QC. The injunction granted on 9 July was continued pending the hearing, and the parties agreed that the New Jersey proceedings would be stayed pending the final decision of the English court in respect of the anti-suit injunction claim. A consent order was to be lodged with the New Jersey Court which so provided.

32.   The parties subsequently exchanged evidence and submissions, and the hearing took place on Friday 18 September by Skype. Oral submissions were made by Mr. Cannon QC for the insurers and Mr. Stewart QC for the Defendants. There were some technical problems with the internet connection at Mr. Cannon's home, and in the event most of his submissions were (without objection or any difficulty) made by telephone.

B: Anti-suit injunctions: legal principles

33.   The relevant principles, in relation to the grant of anti-suit relief were recently summarised by Cockerill J. in *Times Trading Corporation v National Bank of Fujairah (Dubai Branch) [2020] EWHC 1078 (Comm)* at paragraph [38]. Those principles were stated in the context of an arbitration agreement, but they are equally applicable to an exclusive jurisdiction clause.

i)   The Court has the power to grant an interim injunction " in all cases in which it appears to the court to be just and convenient to do so ": section 37(1) of the Senior Courts Act 1981 ("SCA 1981"). "Any such order may be made either unconditionally or on such terms and conditions as the court thinks just": section 37(2) .

ii)   The touchstone is what the ends of justice require: *Emmott v Michael Wilson & Partners Ltd [2018] 1 Lloyd's Rep 299* at [36] per Sir Terence Etherton MR.

iii)   The Court has jurisdiction under section 37(1) of the Senior Courts Act 1981 to restrain foreign proceedings when brought or threatened to be brought in breach of a binding agreement to refer disputes to arbitration: *Ust-Kamenogorsk Hydropower Plant JSC v AES Kamenogorsk Hydropower Plant LLP [2013] 1 WLR 1889 (SC)* .

iv)   The jurisdiction to grant an anti-suit injunction must be exercised with caution: *Société Nationale Industrielle Aérospatiale v Lee Kui Jak [1987] UKPC 12, [1987] AC 871* , 892E per Lord Goff.

v)   As to the meaning of "caution" in this context, it has been described thus in *The "Angelic Grace" [1995] 1 Lloyd's Rep 87* at 92:1 per Leggatt LJ: " The exercise of caution does not involve that the Court refrains from taking the action sought, but merely that it does not do so except with circumspection. "

vi)   The Claimant must therefore demonstrate such a negative right not to be sued. The standard of proof is "a high degree of probability that there is an arbitration agreement which governs the dispute in question": *Emmott* at [39]. The test of high degree of probability is one of long standing and boasts an impeccable pedigree going back to Colman J in *Bankers Trust Co v PT Mayora Indah (unreported) 20 January 1999* and *American International Specialty Lines Insurance Co v Abbott Laboratories [2003] 1 Lloyd's Rep 267* and has been recently affirmed on the high authority of Christopher Clarke LJ in *Ecobank v Tanoh [2016] 1 WLR 2231* at 2250.

vii)   The Court will ordinarily exercise its discretion to restrain the pursuit of proceedings brought in breach of an arbitration clause unless the Defendant can show strong reasons to refuse the relief: *The Angelic Grace [1995] 1 Lloyd's Rep 87* ; *The Jay Bola [1997] 2 Lloyd's Rep 279 (CA)* at page 286 per Hobhouse LJ.

viii)   The Defendant bears the burden of proving that there are strong reasons to refuse the relief : *Donohue v Armco Inc [2002] 1 All ER 749* at [24]-[25] per Lord Bingham.'

34.   Initially, there appeared to be no dispute that these were the applicable principles. However, in the course of his oral submissions, Mr. Stewart challenged the correctness of the proposition that there need to be strong reasons to refuse the relief. He submitted that the ordinary principles as to the grant of injunctions, as set out in cases such as *National Commercial Bank*

Catlin Syndicate Ltd v Amec Foster Wheeler USA Corp, 2020 WL 05713769 (2020)

*of Jamaica v Olint Corpn Ltd.* should apply. This involved consideration of the adequacy of damages and the balance of convenience, and did not require strong reasons.

35. I do not accept this submission. The need for strong reasons has been identified in a number of decisions of the Court of Appeal. In addition to those cited by Cockerill J, the Court of Appeal identified this need in *The Epsilon Rosa [2003] EWCA Civ 509* : see paragraph [48] in the judgment of Tuckey LJ, with which the other judges agreed. I should follow these decisions, and I was shown no authority which cast doubt upon them.

36. I also consider that the approach is right. As Mr. Stewart submitted (in the context of the Defendants' cross-application for a mandatory injunction), the starting point is that the court will ordinarily act to protect the integrity of a contractual bargain reached between the parties. This is, in my view, one reason why "strong reasons" are and should be required once the court is satisfied, to a high degree of probability, that there is a valid English jurisdiction clause to which the parties have agreed. Another reason is that where proceedings are started, in breach of contract, in a different jurisdiction to that which the parties have agreed, this will almost inevitably cause irremediable prejudice to the opposing party which cannot be satisfactorily compensated by damages. That party will be put to the expense, which can be considerable, of litigating a case, often over a lengthy period of time, in the different jurisdiction. There is always a serious risk that the result of the litigation will be different from that which would have resulted if the proceedings had been started in the correct forum, particularly so when – as is often the case and is the case here – the other forum is invited to apply a different law to that which would have been applied in the agreed forum. Even if the "incorrect" forum were to be invited to apply correct law, it will often nevertheless be prejudicial to a party for this to happen in a case where the contractually agreed law and forum are the same. This is because it can reasonably be expected that the contractually agreed forum (i.e. England in the present case) will apply the contractually agreed law (English law in the present case) more reliably than the incorrect forum.

C: Application of legal principles

*C1: The existence of an exclusive jurisdiction agreement*

37. The initial important question, on which the parties made opposing submissions, is whether the insurers had established, to a high degree of probability, that there is an exclusive jurisdiction agreement (for English jurisdiction) which governs the dispute in question.

38. I consider that the answer to that question is straightforward and obvious. There is no dispute that the slip signed by the insurers, and the Certificate subsequently issued by the brokers, contained the terms of the contract between the parties. Both the slip and the Certificate contained a clear written agreement which provides for English law and the exclusive jurisdiction of the English court. That clause is plainly applicable to the dispute between the parties as to the recoverability of defence costs: there is no realistic argument that the dispute for some reason falls outside the scope of the clause, and this was not a point taken by the Defendants.

39. In my view, given that there is an agreed express clause in the relevant contract, the Claimants' case has been established to the requisite degree of probability. Indeed, I regard the contrary case as quite unarguable.

40. The Defendants' argument was not that the English law and jurisdiction agreement should be interpreted in a particular way, but rather that it could and should be ignored; because it was, in effect, eviscerated on the true construction of other contractual provisions. I regard this argument as untenable. Applying ordinary English law principles to the construction of the contract, there is no basis for disapplying an express contractual provision. If there is a clearly expressed and unambiguous choice of law and jurisdiction set out in an express term, as here, there is no legitimate process of construction under English law, by reference to provisions which do not address that issue in such clear terms, which can lead to the evisceration of such a term. Rather, the other contractual provisions must be read consistently with the clear express term.

41. I consider that this is sufficient to dispose of the Defendants' argument, but I will nevertheless address it in more detail. The Defendants' argument on this issue started with Condition 7 of the First Excess Policy. This provided as follows:

A-43

"Except as otherwise provided herein this Certificate <u>is subject to the same terms, exclusions, conditions and definitions as the Certificate of the Primary Insurers</u> . No amendment to the Certificate of the Primary Insurers during the period of this Certificate in respect of which the Primary Insurers require an additional premium or a deductible shall be effective in extending the scope of this Certificate until agreed in writing by the Insurers."

42. The argument then focused on the terms of the "Certificate of the Primary Insurers". This Certificate set out the terms of the Primary Policy (sometimes referred to as the "Master Policy"); i.e. the underlying policy which provided cover of US $ 20 million in excess of a self-insured retention of US$ 7.5 million. This Primary Policy also contained an English law and jurisdiction agreement, which was in identical terms to that contained in the First Excess Policy. This would, ordinarily, lead to the conclusion (which in my view is the correct conclusion) that both the Primary Policy and the First Excess Policy were both subject to English law and jurisdiction.

43. However, the Defendants contended that this was not the case, on a true construction of the terms of the Primary Policy. In particular, it was contended that Memorandum 34 in the Primary Policy produced a different result. I consider that the Defendants' analysis of Memorandum 34, described in more detail below, is unsound and does not withstand scrutiny. But in any event, the argument in my view leads nowhere in terms of the analysis of the terms of the First Excess Policy. Even if the Defendants could, via their analysis of Memorandum 34, reach the destination that the Primary Policy did <u>not</u> contain an English law or jurisdiction clause, or that it was subject to New Jersey law, this is of no assistance to them. Assuming, for present purposes, that this destination were reached under the Primary Policy, the opening words of Condition 7 of the First Excess Policy ("Except as otherwise provided herein …") would, on their ordinary construction, be effective to ensure that the express English law and jurisdiction clause in the First Excess Policy prevailed.

44. In my view, however, Memorandum 34 of the Primary Policy does not even enable the Defendants to reach the destination at which they seek to arrive. That provision is in the following terms:

MEMORANDUM 34 - International Program Policies Interlocking Clause

This Certificate is part of an international program. This program arrangement is a compilation of different policies called **International Program Policies** (defined below) which all have one common goal, to cover the Insureds of these **International Program Policies** worldwide on terms, conditions and limitations agreed to by the Insured in the **Master Policy** .

Therefore the Insured of the **Master Policy** (on behalf of all Insureds and of these **International Program Policies** ) has agreed to special clauses regarding terms, conditions, limitations, limits and deductible in the **International Program Policies** with the Insurers of the **International Program Policies** , considering the overall intent of this insurance program. Therefore all these **International Program Policies** must be read in this context.

**International Program Policies** shall mean, collectively:

   (1) the **Master Policy** ; and

   (2) all **Local Policies** .

**Interpretation of clause – Local Policies**

For the avoidance of doubt the scope of coverage under the **Local Policies** (as interpreted under their applicable laws) is deemed to be at least as wide as that under the **Master Policy** (as interpreted under its applicable law), unless the coverage under the **Local Policies** has been specifically limited or restricted by endorsement. As agreed by Insurers the scope of coverage under the **Local Policies** may be broader than that under the **Master Policy** (as interpreted under its applicable law.) This has no effect on those policies' excesses, deductibles, sublimits or limits of indemnity.

**Interpretation of clause – Master Policy**

The **Master Policy** provides coverage (as interpreted under its applicable laws) where conditions and limits of the **Master Policy** are broader than the **Local Policies** , if legally permissible.

© 2022 Thomson Reuters.

(Bold text in the original)

45. The Defendants rely upon the wording under the heading "Interpretation of clause – Local Policies". They say (correctly) that a "Local Policy" was issued in this case. This was a policy issued by Zurich American Insurance Company headed Architects and Engineers Professional Liability Policy. It was issued to AMEC USA Holdings Inc. as Named Insured in New Jersey. Its limit of liability was US$ 20 million in excess of a self-insured retention set out in Endorsement 26 to that policy, and which in essence provided for a retention of US$ 7.5 million. That Local Policy therefore reflected the terms of the Primary Policy. These two policies therefore sat alongside each other.

46. This particular Local Policy issued in New Jersey was one of a number of local policies which the Primary Policy contemplated: Memorandum 34 thus refers to "Local Policies" in the plural. Endorsement 1 of the Primary Policy indicated that such local policies would be issued via local offices of Zurich Insurance (UK) in the following countries: Azerbaijan, China, Canada, India, Indonesia, Malaysia, Japan, United Arab Emirates, United States.

47. The relevant Local Policy issued in New Jersey did not have an English law or jurisdiction agreement: it was silent as to both law and jurisdiction. In that respect, therefore, there was a difference between the relevant Local Policy and the Primary Policy.

48. Having established the existence of this Local Policy, the Defendants then contended that the effect of Memorandum 34 was that if the Local Policy provides broader coverage for a particular claim, then it and not the Primary (or Master) Policy applies to the claim. They argued that, in the present case, the Local Policy is silent on the choice of law and jurisdiction, thereby affording the parties a broader choice of where to commence a claim by comparison with the Master Policy. This meant that, under the terms of the Primary Policy, the Defendants could take the benefit of the Local Policy in the present case pursuant to the "interlocking clause" in Memorandum 34; i.e. to take advantage of the absence of any choice of law or jurisdiction agreement in the Local Policy. This advantage then fed through to the First Excess Policy because of Condition 7 thereof: i.e. the provision of the First Excess Policy which provided that it was subject to the same terms as the Master Policy. It followed that the present coverage dispute is properly governed by the terms of the Local Policy. Given that the Local Policy provides cover in the US, the only sensible construction is that US law applies (and in particular NJ law); and in terms of jurisdiction, there is no reason why the Defendants should not be entitled to bring their claim in the New Jersey courts.

49. I reject these arguments. Memorandum 34 does not in my view make any alteration to the jurisdiction (or arbitration) clauses in the Primary Policy, nor as to the applicable law of the Primary Policy. There is no contractual language which does so. Furthermore, the words "the **Master Policy** ( as interpreted under its applicable law )", which appear twice in the penultimate paragraph of Memorandum 34 (and again, in substance, in the final paragraph) make it clear that the applicable law of the Primary (i.e. Master) Policy is unaffected by the provisions of Memorandum 34. The applicable law of that Primary Policy remains English law, as expressly stated. Memorandum 34 thus makes clear that the applicable laws of the policies (i.e. the Primary Policy and any particular Local Policy) are separate, and that these policies are to be interpreted in accordance with their own laws (and not the other's). A natural consequence is that there is no reason, given the express agreement of English law in the Primary Policy, why the English jurisdiction clause (or indeed the arbitration clause) would be altered. There is nothing Memorandum 34 which, in my view, effects any such alteration to the relevant provisions of the Primary Policy.

50. The insurers therefore submitted, correctly, in my view that Memorandum 34 has nothing to do with the law and jurisdiction clauses of the Primary Policy, still less the First Excess Policy.

51. In fact, as its wording makes clear, Memorandum 34 relates to the "scope of coverage". Its effect is that the coverage under the Local Policies shall be no less (though it may be broader) than the Primary Policy. It does not, as I have said, purport to effect any change to the law and jurisdiction clauses of the policies. What it provides is that (i) the coverage under the Local Policies is deemed to be at least as wide as that under the Primary Policy (though it recognises that the Local Policies may be broader than the Primary Policy); and (ii) the Primary Policy provides coverage where the Primary Policy conditions and limits are broader than the Local Policies. It is therefore possible to have coverage under the Local Policies which is wider than the coverage provided under the Primary Policy, but not narrower. As Mr. Cannon correctly submitted, none of that changes any term of the Primary Policy: its terms and conditions remained the same.

52. Since there is nothing in Memorandum 34 which effects a change to the express choice of English law and jurisdiction (and arbitration) in the Primary Policy, there is no basis for the argument that there was an "upstream" change to the equivalent

clauses in the First Excess Policy. Nor is there any language which purports to effect any such further upstream change to the express choice of English law and jurisdiction in the First Excess Policy. Whilst it is fair to say that the Local Policy issued in New Jersey stood alongside the Primary Policy, there is no local policy which stands alongside the First Excess Policy. Where, therefore, there is a local policy which has been issued, the insured has the potential benefit of the terms of both the local policy and the Primary Policy. But where there is a claim under the First Excess Policy, there is no local policy which stands alongside it and which provides such a benefit.

53.  Mr. Stewart, in his closing submissions, sought to derive assistance from Clause 1 of the First Excess Policy. This provides:

> Liability to pay under this Certificate shall not attach unless and until the Insurers of the Underlying Certificate(s) shall have paid or have admitted liability or have been held liable to pay, the full amount of their indemnity inclusive of costs and expenses

He also referred to Clause 3, which provides:

> If, by reason of the payment of any claim or claims or legal costs and expenses by the Insurers of the Underlying Certificate(s) during the Period of Insurance, the amount of indemnity provided by such Underlying Certificate(s) is:-
>
> (a)  Partially reduced, then this Certificate shall apply in excess of the reduced amount of the Underlying Certificate(s) for the remainder of the Period of Insurance;
>
> (b)  Totally exhausted, then this Certificate shall continue in force as Underlying Certificate until expiry hereof.

54.  In my judgment, neither clause assists the argument that the express jurisdiction and applicable law clause in the First Excess Policy are in some way eviscerated by Memorandum 34 or otherwise. Clause 1 is a provision which is not unusual in excess policies. It is potentially disadvantageous to an insured, where there is a settlement at less than policy limits with the underlying insurer; since it can be argued by the excess insurer that full payment of the underlying policy is required before the excess policy can respond. The full impact of Clause 1 may, perhaps, be mitigated by Clause 3, which concerns the circumstances in which the First Excess Policy can, colloquially, "drop down". But I do not need to discuss these provisions (which were not referred to in the Defendants' lengthy skeleton argument) in detail, because in my view they have no bearing on the present issue.

55.  Ultimately, I return to two straightforward points. First, there is an express English law and jurisdiction clause in the First Excess Policy. Those express terms should be applied, in accordance with their ordinary meaning. There is nothing which, by some process of migration via the Local Policy and the Primary Policy, has the effect of destroying the clear contractual agreement. Secondly, even if (contrary to my views) the Primary Policy were in some way altered by the terms of the Local Policy, so that its jurisdiction (or arbitration) and applicable law provisions were altered, this would have no impact on the terms of the First Excess Policy; not least because of the opening words of Clause 7 ("Except as otherwise provided herein") which maintain the primacy of the express terms of the First Excess Policy where they differ from the terms of the Primary Policy.

*C2: Court or arbitration?*

56.  I will briefly address the question of whether the dispute under the First Excess Policy is subject to the jurisdiction of the English courts or subject to arbitration. The insurers' primary case, as presented at both the without notice hearing and the 18 September inter partes hearing, was that the First Excess Policy provided for English court jurisdiction. English arbitration was their alternative case. The Defendants' case, in the event that I rejected their principal argument as set out above, was that the agreement was for arbitration. They did not dispute the insurers' proposition that this would be arbitration in England.

57.  Mr. Cannon submitted that, for the purposes of the anti-suit relief sought, it was not necessary to come to a final view on the question of whether the parties' agreement in the First Excess Policy was for the English court or English arbitration. Either way, the anti-suit relief in relation to the New Jersey proceedings would be appropriate. Mr. Stewart did not dispute this proposition.

A-46

Catlin Syndicate Ltd v Amec Foster Wheeler USA Corp, 2020 WL 05713769 (2020)

58. Although I do not finally decide this point, I am very strongly inclined to the view (which I expressed at the without notice hearing) that the arbitration clause in the Primary Policy was not incorporated into the First Excess Policy. Accordingly, the insurers' primary case is correct.

59. The relevant incorporating words are those set out in Clause 7:

"Except as otherwise provided herein this Certificate is subject to the same terms, exclusions, conditions and definitions as the Certificate of the Primary Insurers".

60. These words contain no clear reference to the arbitration agreement in the underlying policy. In the absence of clear incorporating words, the usual principle is that an arbitration clause is not incorporated: see e.g. *Habas Sinai v Sometal [2010] EWHC 29 (Comm)* per Christopher Clarke J at [13] and [52].

61. I do not consider that the two decisions of Robin Knowles J., referred to by Mr. Scorey at the without notice hearing and relied upon by Mr. Stewart for the Defendants, have any application to the present wording. The wording in those cases, *Catlin Syndicate Ltd & Ors v Weyerhaeuser Company [2018] EWHC 3609 (Comm)* and *Hiscox Dedicated Corporate Member Ltd Syndicate 33 At Lloyd's Starr Managing Agents Ltd (t/a Syndicate CVS 1919) v Weyerhaeuser Company [2019] EWHC 2671 (Comm)* , contained an express reference which the judge considered to be sufficiently specific to incorporate the arbitration provision. The relevant policies provided that the "Choice of Law and Jurisdiction" was "as per Lead Underlying Policy". There is, however no equivalent, specific, wording in the present case.

62. Accordingly, when considering the remaining arguments on behalf of the Defendants, I shall proceed on the basis that the relevant choice is between the parties' agreement as to the jurisdiction of the English court (rather than arbitration) and the New Jersey proceedings.

*C3: Strong reasons to refuse the relief sought?*

63. In the Defendants' written argument, there was no clear submission that – if there was a valid jurisdiction agreement – there were strong reasons as to why it should not be enforced. The two arguments advanced in opposition to the anti-suit injunction concerned (i) full and frank disclosure, and (ii) the issue, already discussed, concerning the alleged inapplicability of the express jurisdiction agreement contained in the First Excess Policy.

64. In the course of his oral submissions, however, Mr. Stewart submitted that there were strong reasons for declining to enforce the jurisdiction agreement in the present case. The argument sought to elevate some of the points advanced as non-disclosures into strong reasons why the jurisdiction agreement should not be enforced.

65. The central theme of this submission was that the injunction did not simply prevent the Defendants from suing in New Jersey. It also had, and was intended to have, the effect of preventing the immediate payment (ordered in Judge O'Neill's order of 1 July) of the US$ 3.1 million which had been ordered to be paid, as well as the requirement to continue to pay ongoing costs. The anti-suit injunction therefore altered the existing position which resulted from the New Jersey Order for US$ 3.1 million. This was an inappropriate result, in circumstances where, as the Defendants contended, the First Excess Policy clearly obliged the insurers – whether under New Jersey law or under English law – to pay the defence costs which had been incurred. Even assuming the applicability of English law, this was a case where the insurers had sat back and done nothing. It was plain on the evidence that the costs vastly exceeded the US $3.1 million. In those circumstances, the insurers should not be allowed the benefit of the jurisdiction clause. Or, at least, if they were to be allowed its benefit, it should be on terms that they should be required to pay the costs, past and future, which were the defence costs subject of the order in New Jersey.

66. The argument that there was a very strong, indeed unanswerable, claim for payment of the defence costs was at the heart of Mr. Stewart's submissions, and (as it seemed to me) was relied upon in different contexts: as strong reasons not to enforce the agreed jurisdiction clause; as a non-disclosure, on the basis that the insurers should have addressed the merits of the Defendants' arguments under English law (and indeed New Jersey law) in much greater detail than was done at the without notice hearing; and as the basis for an argument that any continuation of the anti-suit injunction should be on terms that the insurers paid the past and ongoing costs.

67. On whatever basis the argument is advanced, I reject it. At the present stage, however, I need consider only the question of whether there are strong reasons not to enforce the parties' contractual bargain for English jurisdiction. The consequence

© 2022 Thomson Reuters.

A-47

of the argument, if accepted, is that the Defendants would be free to pursue proceedings in New Jersey. Such proceedings would then be determined by a court which would, at least if the Defendants' case is accepted, apply New Jersey law to the dispute between the parties. This is, of course, a different applicable law to that which – applying English law as the agreed applicable law of the First Excess Policy – should be applied. The result is, therefore, not only that the insurers would be forced to litigate in a jurisdiction contrary to that which was agreed, but that the issues between the parties will or at least might be decided by the application of a different applicable law to that which was agreed. I do not consider that the alleged strength of the Defendants' case under New Jersey law provides any justification for this result, or that it could possibly provide strong reasons not to enforce the jurisdiction clause by granting anti-suit relief. Indeed, the fact that the Defendants are seeking the application in New Jersey of a law contrary to that agreed between the parties provides a very strong reason indeed why the injunction should be granted, in order to protect the integrity of the parties' bargain.

68. Nor does it make any difference to this analysis whether, as Mr. Stewart sought to persuade me, the Defendants have a very strong or even unanswerable case under English law. This cannot in my view provide any justification, let alone strong reasons, for permitting the Defendants to continue the present proceedings in New Jersey where they are advancing their case under New Jersey law, and intend to continue to do so. If there is, indeed, a strong or unanswerable claim under English law, then that claim should be advanced in England, which is the jurisdiction to which the parties agreed. As I have indicated, if the case is really unanswerable or is of sufficient strength, there are pre-trial remedies available from the English court which will recognise the strength of that case.

69. Nor do I consider that the fact that the Defendants have obtained an order from the New Jersey court provides a strong reason for allowing the case to continue there. That order was made without notice to the insurers and without informing the New Jersey court of the English law and jurisdiction clause in the First Excess Policy. It was an order made as the result of the application, at the behest of the Defendants, of New Jersey law. I see no reason why the Defendants should be permitted to retain the advantage derived from proceedings taken in breach of the parties' agreement as to jurisdiction.

70. This was a point made (in the context of the grant of mandatory injunctions) by HHJ McGonigal sitting in the High Court in paragraph [42] – [43] of his judgment in *Comet Group PLC v Unika Computer SA [2004] I. L. Pr 1* :

> 42. … In my view courts should preserve the value of exclusive jurisdiction clauses and uphold the autonomy of the parties not merely by preventing future breaches by a restraining injunction but also by taking appropriate steps to remove any advantage gained by the party in breach.

> 43. One of the cases where an interlocutory mandatory injunction is appropriate is to remove a benefit obtained by a defendant stealing a march on the claimant.

In support of the latter proposition, the judge cited *Van Joel v Hornsey [1895] 2 Ch 774* .

71. I consider that HHJ McGonigal's analysis is sound, and readily applicable to the benefit obtained by the Defendants as a result of starting proceedings in New Jersey. This analysis is not undermined by the decision of the Court of Appeal in *The Epsilon Rose [2003] EWCA Civ 938* , on which the Defendants relied in support of their argument that they should be allowed to retain the benefit of the order made by Judge O'Neill and that this was a strong reason not to grant an anti-suit injunction. In *The Epsilon Rose* , the Court of Appeal was concerned with an anti-suit injunction, obtained by shipowners, in aid of a claim subject to English arbitration. The anti-suit injunction restrained the cargo owner from continuing proceedings in Poland. One possible consequence of the injunction was that the cargo owner might lose the benefit of security which had previously been obtained for its cargo claim, after the vessel had been arrested in Portugal. There was no suggestion in the case that the arrest in Portugal, which had apparently been simply in order to obtain security, was a breach of the arbitration agreement. The reason that the security might be lost was that the cargo owner had not commenced the (contractually agreed) English arbitration proceedings within 60 days of the order made by the Portuguese court. The Court of Appeal accepted that the loss of security could amount to a strong reason for not granting an injunction. But the court held that it did not do so in that case because the cargo owners had brought things on themselves. Had they made proper enquiries, they could and should have started arbitration proceedings in time and if so "this whole dispute would have been resolved ages ago".

72. This case, in my view, provides no assistance to the Defendants in the present context. First, this was not a case where the cargo owners were seeking to retain security which had been granted in consequence of proceedings taken in breach of the arbitration agreement. The proceedings in breach of the arbitration agreement were in Poland. The proceedings where security had been obtained were in Portugal, and it was not alleged that such proceedings had been in breach of the arbitration agreement. Secondly, the Defendants in the present case have not obtained security which they will potentially lose as a result

of the anti-suit injunction: they have not obtained any security at all. They stand to lose the benefit of an order for payment of certain costs. That is not the same as security. It is an order for payment of money, and the Defendants can seek pre-trial relief for such payment of money in due course in England, as discussed in the following paragraph.

73.  In any event, even leaving aside the fact that the New Jersey order represents the fruits of action taken in breach of the parties' agreement, I see no reason why the loss of the New Jersey order provides a strong reason for declining to enforce the parties' jurisdiction agreement. The Defendants have potential remedies of summary judgment or interim payment available in England, and they can make an application for such remedies if so advised. Mr. Stewart submitted that this would take time, and he referred me to evidence in the New Jersey proceedings as to the cash-flow and related harm being suffered in consequence of the insurers' failure to pay defence costs hitherto. However, it seems to me that (as in the *Epsilon Rose* ) the Defendants only have themselves to blame. They could have started proceedings in England in the last quarter of 2019 for the summary or other remedies which they now contend are, or should be available, in support of their claim. Even if the commencement of proceedings at that time might have been premature, on the basis that the Defendants were seeking to discuss matters with Clydes on behalf of the insurers, proceedings could have been started in early 2020. By that time, as described above, Mr. Langan was accusing the insurers of acting improperly and in bad faith. By April, that allegation had been ratcheted up further: the insurers were accused of intentionally causing the Defendants irreparable harm. Had proceedings been started in England in early 2020, applications for summary judgment or interim payment could have been determined by now, even without expedition.

74.  I have not hitherto expressed any views as to the strength of the Defendants' case under English law. The fact is that the Defendants have chosen not to sue in England, even though there has been ample time to do so since it first became apparent in October 2019 that the insurers were not promptly paying the defence costs sought. They have instead sued in New Jersey under New Jersey law, making no reference to the English law and jurisdiction agreement, and without therefore advancing a case in New Jersey that English law would produce the same result as New Jersey law. These matters, together with the Defendants' decision not to acknowledge service of the present proceedings, all tend to suggest that a claim under English law may not be quite as straightforward as indicated in Mr. Stewart's submissions. But whatever the strength or otherwise of the Defendants' case, I do not consider that it provides a strong reason for declining to enforce the parties' jurisdiction agreement.

75.  I do not consider it necessary to discuss the strength of the Defendants' case under English law in order to resolve the key issues which arise on the application. I also consider it undesirable to do so, in circumstances where there may (if the Defendants decide to accept the jurisdiction of the English courts) be applications under CPR Part 24 and/or Part 25 in due course. It suffices to say that I can see that an application under CPR Part 25 might possibly succeed, just as it did in the *Poole Harbour* case, bearing in mind that: (i) the insurers accept that there would be a liability for defence costs relating to the defence of those parts of Enterprise's claim which are potentially covered, and (ii) the Defendants may perhaps be able to prove – to the requisite standard – that all or the majority of the defence costs cannot be said to be exclusively referable to claims which are uncovered. Ultimately, the success of the application will of course depend upon the judge's assessment of the strength of the evidence, and the points which are ultimately relied upon by the insurers.

76.  I do not consider, however, that such arguments as to the strength of the case under English law can or should be resolved within the context of the present application. This is for the simple reason that the existence of a strong argument under English law cannot justify the continuation by the Defendants of proceedings in New Jersey with the avowed intention of seeking the resolution of the parties' dispute under New Jersey law. It is therefore unsurprising that I was shown no authority in which the court's decision, as to whether or not to enforce a jurisdiction or arbitration agreement, depended upon an evaluation of the merits of the claim that a party would be required to bring in England (if the jurisdiction or arbitration agreement were to be enforced), in circumstances where that party had declined to bring such proceedings and was seeking to litigate elsewhere. I also consider it inherently undesirable for an application to enforce a jurisdiction or arbitration agreement by an anti-suit injunction to be transformed into a quasi-hearing of an application for summary judgment or an interim payment which the enjoined party, who seeks to sue elsewhere and under a different applicable law, has not actually made. The straightforward position is that the court should consider whether there are strong reasons not to enforce the jurisdiction agreement. If not, then the injunction should be granted and the enjoined party can then bring proper applications, in accordance with the CPR , for summary judgment or an interim payment.

77.  Accordingly, I consider that there are no strong reasons not to enforce the parties' bargain in this case. Subject, therefore, to the issues of full and frank disclosure, this is an appropriate case to continue the injunction previously granted and to grant mandatory relief (as to which, see: *Mobile Telecommunications Co Ltd v HRH Prince Hussam Bin Saudi Bin Abdulaziz Al Saud [2018] EWHC 1469 (Comm)* , at [19])

© 2022 Thomson Reuters.

D: Full and frank disclosure

*D1: Legal principles*

78.  The duty of full and frank disclosure that without notice applications imply was summarised by Lawrence Collins J. *in Konamaneni v Rolls Royce Industrial Power (India) Ltd [2002] 1 WLR 1269* , at [180] as follows:

> "On an application without notice the duty of the applicant is to make a full and fair disclosure of all the material facts, i.e. those which it is material (in the objective sense) for the judge to know in dealing with the application as made: materiality is to be decided by the court and not by the assessment of the applicant or his legal advisers; the duty is a strict one and includes not merely material facts known to the applicant but also additional facts which he would have known if he had made proper enquiries: *Brink's Mat Ltd v Elcombe [1988] 1 WLR 1350* , 1356-1357. But an applicant does not have a duty to disclose points against him which have not been raised by the other side and in respect of which there is no reason to anticipate that the other side would raise such points if it were present."

79.  Materiality therefore depends in every case on the nature of the application and the matters relevant to be known by the judge when hearing it: see Toulson J in *MRG (Japan) Ltd v Engelhard Metals Japan Ltd [2003] EWHC 3418 (Comm)* , at [25].

80.  If the duty is found to have been breached, the Court retains a discretion to continue or re-grant the order if it is just to do so. This is most likely to be exercised if the non-disclosure is non-culpable. Thus, in *OJSC ANK Yugraneft v Sibir Energy [2008] EWHC 2614 (Ch)* , Christopher Clarke J. said at [106]:

> "As with all discretionary considerations, much depends on the facts…The stronger the case for the order sought and the less serious or culpable the non-disclosure, the more likely it is that the court may be persuaded to continue or re-grant the order originally obtained. In complicated cases it may be just to allow some margin of error. It is often easier to spot what should have been disclosed in retrospect, and after argument from those alleging non-disclosure, than it was at the time when the question of disclosure first arose."

*D2: Application to the facts*

81.  The Defendants rely upon six failures to disclose material facts on the without notice application. I have to some extent dealt with them, in other contexts, in earlier passages in my judgment. I consider that there is no substance in any of the points raised.

82.  *(1) New Jersey anti-suit injunction* . The Defendants contend that the insurers should have given notice of the application for the anti-suit injunction, because it was wrong for the insurers to contend that there was a high risk or a real risk that the Defendants would seek further injunctive relief. This was because the granting of such relief would not be consistent with the restrictive approach to anti-suit injunctions taken by New Jersey courts, and would likely be viewed as a serious breach of international comity.

83.  I reject this argument for the reasons given in paragraphs [26] – [29] above. The argument is unsustainable in the light of the principles set out in the *General Electric* and *Laker Airways* cases.

84.  A related allegation of non-disclosure concerned a statement made by Mr. Moody in support of the application; viz, that McCarters were known to be aggressive litigators, who would if they saw fit be prepared to seek further without notice injunctive relief. I do not see how this statement can form the basis of an allegation of non-disclosure, separate from the foregoing argument concerning the risk of anti-suit relief. I did not understand Mr. Stewart to contend that it did.

85.  In so far as this point was advanced as a separate allegation of non-disclosure, I reject it. Mr. Koepff (who was the source of Mr. Moody's statement in that regard) had a reasonable factual basis for this description, based upon his prior experience as well as the way in which the 2 July order had been obtained without prior notice and without reference to the English law and jurisdiction clause. It may be that there is disagreement as to whether McCarter is known to be an aggressive litigation firm – although it is not entirely clear that Mr. Bartell dislikes that description. But even if there is a factual disagreement as to whether or not McCarter warrants this description, it is not a disagreement which can be elevated into an allegation of non- disclosure. It is simply a factual dispute, which cannot and need not be resolved.

86.  In any event, the important question on the without notice application concerned risk of anti-suit relief being granted in New Jersey. The case-law supports the availability of relief. In circumstances where McCarter had already obtained a powerful order from the New Jersey court, they could reasonably have been expected to obtain a further powerful order if given notice of the intended application in England.

87.  *(2) The merits of the Defendants' case on the insurers' duty to defence and failure to pay defence costs.* The Defendants make a variety of points in this context, the substance of which is that the application should have addressed the merits of the Defendants' claim for reimbursement of defence costs in far greater detail both as a matter of New Jersey law and English law. They should also have explained that the Defendants were alleging that the insurers were acting in bad faith in the stance that they were taking in the correspondence.

88.  I agree with the insurers that these matters were not relevant or material to the without notice application.

89.  The question before the court on that application was, principally, whether the policies were subject to the jurisdiction of the English court. No complaint is made as to an unfair presentation of the Defendants' arguments in that regard. I expressed the same view in my judgment as I have now reached, after more detailed consideration, as set out in Section C above.

90.  The next question was whether there were, applying the principles in *Times Trading* , strong reasons not to grant the injunction sought. I said that I saw no reason why the injunction should not be granted, and that it "seems to me there is every reason to grant it". I was shown some of the correspondence between the parties, and in particular the letter dated 20 January from Mr. Langan. It was apparent from the materials that there was a coverage dispute between the parties. The nature of that dispute, and the precise arguments being advanced by each party in support of their respective positions, was not in my view material to the application. Had Mr. Scorey QC embarked upon the process of explaining in more detail the parties' respective arguments on the merits, I would have been puzzled as to why this was appropriate and would likely have stopped him from doing so.

91.  For reasons explained in Section C3 above, I do not consider that the merits of the Defendants' potential arguments in England could provide a strong reason why they should be permitted to continue in New Jersey, where a different applicable law was being relied upon (as was explained at the without notice application). Accordingly, there was no reason for the Defendants to have explored the merits of the parties' respective arguments under English law.

92.  I have also explained in Section C3 that the strength of the Defendants' arguments under New Jersey law could equally not provide a strong reason. Indeed, the very fact that the Defendants were seeking to sue in New Jersey, under a law which was not the applicable law, provided a strong reason for granting the injunction. I should add that it was obvious from the materials which I was shown, and from the order made by Judge O'Neill, that the Defendants had a strong case under New Jersey law.

93.  The fact that the Defendants were asserting that the insurers had acted in bad faith was also, in my view, immaterial to the application. If the merits of the parties arguments on the coverage issues under both New Jersey law and English law were immaterial to the application (as I have concluded), then I fail to see why an allegation that the insurers were acting in bad faith in the points that they were taking was material. In any event, if that allegation of bad faith were to be made, it was an allegation which should be made (and made good) in the parties' agreed forum. The fact that an allegation of bad faith was being made could not provide a strong reason for permitting the proceedings to continue in New Jersey.

94.  *(3) Inconsistency between Insurers' stance as to jurisdiction and arbitration in England and Wales and in the United States.* This point requires a little explanation. Mr. Scorey QC explained at the without notice hearing that it was his clients' intention to remove the New Jersey State court proceedings (before Judge O'Neill) to the New Jersey Federal Court under the Federal Arbitration Act. In order to do so, the insurers would need to rely upon the arbitration provision in the Primary Policy. Mr. Scorey said that this might later be said to be inconsistent with their primary case (as argued before me) that the First Excess Policy was subject to English (court) jurisdiction, not arbitration.

95.  The Defendants argue that the Claimants should have clearly told the court that: (i) they were not relying on the arbitration agreement in the alternative in the US; (ii) the Claimants could not remove the action to the Federal Court under the Federal Arbitration Act unless they contended that there was a valid and binding arbitration agreement which governed the dispute; and (iii) insurers' stance <u>was</u> inconsistent in the United States and in England and Wales. It was therefore not sufficient for the Claimants to say that they needed to rely on the arbitration agreement in the US and this may "later to be said to be inconsistent ″ .

© 2022 Thomson Reuters.

**A-51**

Catlin Syndicate Ltd v Amec Foster Wheeler USA Corp, 2020 WL 05713769 (2020)

96.  I do not see how this point can be said to amount to a non-disclosure. Mr. Scorey told me clearly what his clients' intentions were. I did not consider then (and still do not consider now) that it had any effect on the decision to grant an anti-suit injunction. That injunction was justified on the basis of the Claimants' primary case; i.e. that there was an English (court) jurisdiction agreement, and no strong reason not to enforce it. The injunction was equally justifiable on the basis of the Claimants' alternative case based on arbitration. The stance which the Claimants were proposing to take in relation to removal in the United States did not therefore affect the English law analysis, and in any event the stance was explained. Whether or not it was permissible, under New Jersey law and practice, to take that stance (in circumstances where arbitration was only their alternative case) is not an issue which I needed or need to resolve, then or now.

97.  *(4) Removal of the New Jersey proceedings to the Federal Court and expiry of the order.* The Defendants allege that the Claimants failed to draw the Court's attention to the fact that once the New Jersey Court granted an injunction which was removed to the New Jersey Federal Court, that order remained in effect but would expire automatically no later than 14 days after removal unless the Defendants moved to continue it, potentially giving rise to considerable prejudice to the Defendants.

98.  I do not accept this argument. The transcript records Mr. Scorey saying:

"if we issued the remand this afternoon on the basis of the arbitration clause, then the case is removed from the State Court and, as I understand it, the orders will then fall away and it will go before the Federal Court. So, we are de facto, if we pursue that route, going to obtain relief from the New Jersey court order by dint of the remand."

99.  The position was therefore explained, including the consequence of the removal from the State Court.

100.  *(5) Risk of the Defendants losing the benefit of the New Jersey order.* The Defendants contend that Insurers failed to draw to the Court's attention the authorities concerning the risks to the Defendants of losing the benefit of the New Jersey relief and the fact that such a risk militates against granting anti-suit relief. They referred to the decision in *The Epsilon Rosa* , and the Court of Appeal's statement that the loss of security in foreign proceedings "could amount to a strong reason for not granting an [anti-suit] injunction".

101.  I have already addressed the decision in *The Epsilon Rosa* , which is of no assistance to the Defendants. In any event, as the insurers submitted, it was obvious that if the anti-suit injunction was granted, the Defendants would lose the benefit of the New Jersey order. That was the essence of the application, because that order had been obtained in breach of the English jurisdiction clause.

102.  *(6) Consequences of delay.* The Defendants contend that the court's attention was not drawn specifically to the serious consequences to the Defendants of delay in the payment of defence costs, as it should have been, and in particular to the evidence of Mr Collis which had been filed in support of the application in New Jersey.

103.  I do not accept that this was material to the application. For reasons already given, I agree with the Claimants that issues related to the underlying coverage dispute between the parties, including the purported consequences of the delay in payment of defence costs, were of no relevance and remain of no relevance to the proper grant of an anti-suit injunction to prevent the Defendants from breaching the exclusive jurisdiction clause in the First Excess Policy.

*D3: Discretion*

104.  Had I considered that there was any substance to any of the non-disclosure arguments, I would nevertheless have continued the injunction. The reason is straightforward. This is a case where the Claimants have a contractual right to be sued in England, not New Jersey, and there are no strong reasons to permit the continuation of the proceedings in New Jersey. I would not have regarded any of the alleged non- disclosures as being sufficiently culpable to warrant depriving the Claimants of their contractual entitlement.

105.  In the course of his oral submissions, Mr. Stewart submitted (whilst maintaining all of the non-disclosures alleged) that his principal arguments were the first two which are set out above. Focusing particularly on those, I would not have come to the conclusion that there was any culpable non-disclosure.

A-52

106.  In relation to the first argument, it is on any view a reasonable reading of the *General Electric* decision, when read together with the *Laker Airways* case, that anti-suit relief could have been granted by a New Jersey court. Indeed, in my view it is the only reasonable reading.

107.  In relation to the second argument, which principally concerned the strength of the Defendants' case under English law: I do not consider that it would reasonably have occurred to the insurers that the Defendants would seek to argue that the strength of their case under English law somehow justified the continuation of the New Jersey proceedings, where English law was not being relied upon and had not even been mentioned to the judge. A party is not guilty of culpable non-disclosure because he fails to anticipate every argument that an imaginative counsel might subsequently make; particularly when the argument has, as in this case, no merit in terms of providing a strong reason for not granting anti-suit relief.

E: Continuation of the injunction on terms

108.  Mr. Stewart submitted that, if the injunction were to be continued, it should be continued on terms that the insurers meet (what the Defendants contend to be) their obligations to pay the defence costs. This case was advanced, originally, on two alternative bases; (i) as part of the general exercise of discretion in the grant of any injunction, and (ii) because a mandatory injunction should be granted.

109.  The latter argument gave rise to questions as to the basis on which this court could or should grant mandatory injunctive relief to the Defendants, who had neither issued a claim form seeking such relief nor acknowledged service of the proceedings commenced by the insurers, but rather had declined to accept the jurisdiction of the English court. Recognising these difficulties, Mr. Stewart accepted that if he did not succeed in his argument based on the general exercise of discretion, his argument on mandatory injunction did not take matters any further.

110.  I accept that the court does have a general discretion to grant an anti-suit injunction on terms, and that this could include an order for payment of defence costs. I consider it inappropriate to make such an order in this case. On the one side, the grounds for obtaining anti-suit relief have, for the reasons given, been made out by the Insurers. On the other side, the Defendants have (wrongly in my view) maintained, and continue to maintain that this court has no jurisdiction, but wish to continue proceedings in New Jersey. This is not a promising start for the exercise of a discretion in their favour. More generally, however, I consider that if the merits of the case are to be investigated, so as to require prompt payment to the Defendants, that should be done as part of a properly formulated application (by a party who acknowledges jurisdiction) for summary judgment or an interim payment. If there is any real urgency, an application should be made for expedition. It is in my view no answer that such an application may take some time: the Defendants could, as I have said, have made such an application months ago when the parties' dispute clearly emerged in correspondence. Indeed, the Defendants could have spent the time and money since July 2020, when the anti-suit injunction was granted, formulating the application rather than taking a series of bad points in opposition to the anti-suit injunction. If there is a sufficiently strong case for summary judgment or an interim payment, the Defendants will receive payment. If there is no sufficiently strong case, then I do not presently consider that there is any reason– in litigation involving large corporations – to benefit the Defendants' cash flow at the expense of that of the Claimants.

F: Conclusion

111.  I will therefore continue the existing injunction, and will grant a mandatory injunction. I dismiss the cross-applications made by the Defendants. I will hear counsel as to the appropriate form of order and matters consequential on this judgment.

Crown copyright

© 2022 Thomson Reuters.

A-53

Eastern Pacific Chartering Inc v Pola Maritime Ltd, [2021] 1 W.L.R. 5475 (2021)

# *5475* Eastern Pacific Chartering Inc v Pola Maritime Ltd

 **No Substantial Judicial Treatment**

**Court**
Queen's Bench Division (Commercial Court)

**Judgment Date**
28 June 2021

**Report Citation**
[2021] EWHC 1707 (Comm)
[2021] 1 W.L.R. 5475



Queen's Bench Division

Patricia Robertson QC sitting as a deputy High Court judge

2021 June 14; 28

*Conflict of laws—Jurisdiction under European Convention—Exclusive jurisdiction—Jurisdiction clause in charterparty subjecting any dispute "arising out of or in connection with" charter to exclusive jurisdiction of English courts—Vessel owner bringing arrest claim in Gibraltar courts relating to charterer's vessel in order to secure claims under charter for balance of hire—Charterer bringing tort claim in English courts for wrongful arrest of vessel—Whether English court having jurisdiction—Whether tort claim "in connection with" charter—Whether English court required to decline jurisdiction in favour of first seised Gibraltar courts—Whether arrest and tort claims involving same cause of action or same object—Whether risk of irreconcilable judgments— Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters 1968, arts 17 , 21, 22*

*Ships' names—Pola Devora*

The claimant owners of a vessel entered into a time charterparty with the defendant. The charterparty contained a jurisdiction clause which provided that any dispute "arising out of or in connection with" the charter would be subject to the exclusive jurisdiction of the English courts. Following redelivery of the vessel, a dispute emerged as to whether the defendant was liable for the balance of the hire under the charterparty. In order to secure its claims the claimant arrested a different vessel in Gibraltar, whose beneficial owner it believed to be the defendant, by lodging a claim form with the Gibraltar court. Whilst the Gibraltar proceedings were ongoing, the claimant also commenced proceedings before the English court for the balance of hire. The defendant defended the claim and advanced a number of counterclaims, including claims in tort for damages for the wrongful arrest of the vessel. The claimant applied for dismissal and strike-out of the tort counterclaims, arguing that the English court had no jurisdiction or should decline jurisdiction in favour of the Gibraltar courts in relation to those claims. The defendant contended: (i) that the tort counterclaims fell within the scope of the exclusive jurisdiction clause in the charterparty and therefore, pursuant to article 17 of the governing Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters 1968 [1] , to which the state of the domicile of the defendant but not of the claimant was a party, the English court had jurisdiction; and (ii) that the English court was not required to decline jurisdiction in favour of the Gibraltar courts by reason of articles 21 or 22 of the Brussels Convention .

On the claimant's application—

**A-54**

*Held*, dismissing the application, (1) that a tort claim might be said to arise "in connection with" a charter not only where there were parallel claims in tort and contract, or where there was a factual overlap or linkage between the tort and contractual claims, but also where the claim arose solely in tort and was in a meaningful sense causatively connected with the relationship created by the charter and the rights and obligations arising therefrom; that, as such, where there was an issue between the parties as to whether damages were recoverable for an allegedly wrongful arrest made in seeking security for claims under the parties' charterparty, that was a claim "in connection with" the charter; and that, accordingly, the defendant's tort counterclaims were within the scope of the jurisdiction clause in the *5476* charterparty and the English court had jurisdiction by operation of article 17 of the Brussels Convention (post, paras 37–39, 44–54).

*Fiona Trust and Holding Corpn v Privalov [2007] Bus LR 1719*, HL(E) applied.

*Astro Vencedor Cia Naviera SA of Panama v Mabanaft GmbH (The Damianos) [1971] 2 QB 588*, CA, *Empresa Exportadora de Azucar v Industria Azucarera Nacional SA (The Playa Larga) [1983] 2 Lloyd's Rep 171*, CA and *Aggeliki Charis Cia Maritima SA v Pagnan SpA (The Angelic Grace) [1995] 1 Lloyd's Rep 87*, CA considered.

(2) That since the claimant's arrest claim plainly did not involve either the same cause of action or the same object as the defendant's tort counterclaims, article 21 of the Brussels Convention did not apply and it was not mandatory for the English court to decline jurisdiction under that article in favour of the first-seised Gibraltar court; that, when determining whether article 22 of the Brussels Convention was engaged, the correct approach was to determine whether there was a risk of irreconcilable judgments before moving on to consider whether the court should exercise its discretion to grant a stay in favour of the first-seised court; that the existence of factors that might be said to mitigate the risk of irreconcilable judgments in any particular case went to discretion, not to whether article 22 was engaged in the first place; that, in relation to discretion it was also relevant to take into account whether the matter in question came (or arguably came) within the scope of a jurisdiction clause that gave jurisdiction to the court second seised; that, in the present case, there was a risk of irreconcilable judgments by the two courts on the facts, and overlap in the issues before each, such that the proceedings were "related" for the purposes of article 22 ; that, however, the countervailing factors, including the exclusive jurisdiction clause that conferred jurisdiction on the English court so as to engage article 17 , outweighed any initial presumption in favour of a stay or declining jurisdiction; and that, accordingly, the court would exercise its discretion under article 22 so as to refuse to decline jurisdiction or to stay the tort claims (post, paras 70–72, 76–87).

*Starlight Shipping Co v Allianz Marine & Aviation Versicherungs AG (The Alexandros T) [2014] Bus LR 873*, SC(E) applied.

Dicta of the Court of Appeal in *Research in Motion UK Ltd v Visto Corpn [2008] 2 All ER (Comm) 560, para 37*, CA not applied.

The following cases are referred to in the judgment:

*Aggeliki Charis Cia Maritima SA v Pagnan SpA (The Angelic Grace) [1995] 1 Lloyd's Rep 87*, CA
*Astro Vencedor Cia Naviera SA of Panama v Mabanaft GmbH (The Damianos) [1971] 2 QB 588; [1971] 3 WLR 24; [1971] 2 All ER 1301; [1971] 1 Lloyd's Rep 502*, CA
*BB Energy (Gulf) DMCC v Al Amoudi [2018] EWHC 2595 (Comm)*
*BNP Paribas SA v Trattamento Rifiuti Metropolitani SpA [2019] EWCA Civ 768; [2020] 1 All ER 762; [2019] 2 All ER (Comm) 992; [2019] 2 Lloyd's Rep 1*, CA
*Chimimport plc v G d'Alesio SAS (The Paolo d'Alesio) [1994] 2 Lloyd's Rep 366*
*Coventry and Solihull Waste Disposal Co Ltd v Russell [1999] 1 WLR 2093; [2000] 1 All ER 97*, HL(E)

© 2022 Thomson Reuters.

A-55

*Empresa Exportadora de Azucar v Industria Azucarera Nacional SA (The Playa Larga) [1983] 2 Lloyd's Rep 171* , CA
*Evangelismos, The (1858) 12 Moo PC 352* , PC
*Fiona Trust and Holding Corpn v Privalov [2007] UKHL 40; [2007] Bus LR 1719; [2007] 4 All ER 951; [2007] 2 All ER (Comm) 1053; [2008] 1 Lloyd's Rep 254* , HL(E)
*Global Multimedia International Ltd v ARA Media Services [2006] EWHC 3612 (Ch); [2007] 1 All ER Comm 1160*
*Kallang Shipping SA Panama v Axa Assurances Senegal (The Kallang) (No 2) [2008] EWHC 2761 (Comm); [2009] 1 Lloyd's Rep 124* *5477
*Mike Trading and Transport Ltd v R Pagnan & Fratelli (The Lisboa) [1980] 2 Lloyd's Rep 546* , CA
*New Media Distribution Co Sezc Ltd v Kagalovsky [2018] EWHC 2742 (Ch)*
*Owens Bank Ltd v Bracco (Case C-129/92) EU:C:1994:13; [1994] QB 509; [1994] 2 WLR 759; [1994] 1 All ER 336; [1994] ECR I-117* , ECJ
*Research in Motion UK Ltd v Visto Corpn [2007] EWHC 900 (Ch)* ; *[2008] EWCA Civ 153; [2008] 2 All ER (Comm) 560* , CA
*Ross v Attanta Ltd [2021] EWHC 503 (Comm)*
*Ryanair Ltd v Esso Italiana Srl [2013] EWCA Civ 1450; [2015] 1 All ER (Comm) 152* , CA
*Spitzley v Sommer Exploitation SA (Case 48/84) EU:C:1985:105; [1985] ECR 787* , ECJ
*Starlight Shipping Co v Allianz Marine & Aviation Versicherungs AG (The Alexandros T) [2013] UKSC 70; [2014] Bus LR 873; [2014] 1 All ER 590; [2014] 1 All ER (Comm) 337; [2014] 1 Lloyd's Rep 223* , SC(E)
*Tatry, Owners of cargo lately laden on board the ship v Owners of the ship Maciej Rataj (The Tatry)* (Case C-406/92) *EU:C:1994:400; [1999] QB 515; [1999] 2 WLR 181; [1995] All ER (EC) 229; [1995] 1 Lloyd's Rep 302; [1994] ECR I-5439* , ECJ

The following additional cases were cited in argument or referred to in the skeleton arguments:

*ENE Kos 1 Ltd v Petroleo Brasileiro SA (The Kos) (No 2) [2009] EWHC 1843 (Comm); [2010] 1 All ER (Comm) 669; [2010] 1 Lloyd's Rep 87*
*Hoddinott v Persimmon Homes (Wessex) Ltd [2007] EWCA Civ 1203; [2008] 1 WLR 806* , CA
*Microsoft Mobile OY (Ltd) v Sony Europe Ltd [2017] EWHC 374 (Ch); [2018] 1 All ER (Comm) 419; [2017] 2 Lloyd's Rep 119*

**APPLICATION** for summary judgment

By a claim form dated 4 August 2020, the claimant, Eastern Pacific Chartering Inc, which owned the vessel the *Divinegate* , commenced proceedings before the English court for the balance of hire (US$99,982.79) said to be due from the defendant charterer, Pola Maritime Ltd, under a charterparty dated 18 September 2019. By a defence and counterclaim dated 10 November 2020, the defendant counterclaimed, inter alia, for damages in the sum of US$54,400 in respect of losses alleged to have been suffered as a result of the claimant's alleged wrongful arrest of the *Pola Devora* in Gibraltar, by means of a claim form lodged in the Supreme Court of Gibraltar on 2 July 2020, in order to secure its claims under the charterparty. The defendant's counterclaim was made on the bases, in the alternative, of breach of the Torts (Interference with Goods) Act 1977 , tortious interference with use of the *Pola Devora* , conversion of the *Pola Devora* , and a tortious inducement of a breach of contract (the time charter of the *Pola Devora* ).

By an application notice dated 15 December 2020, the claimant applied under CPR rr 11.1 and 3.4(2) to dismiss and strike out that part of the defendant's counterclaim which sought to advance claims in tort based on the alleged wrongful arrest of the *Pola Devora* , on the ground that, by reason of articles 17 , 21 and 22 of the Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters 1968 , the English court had no jurisdiction or should decline jurisdiction in favour of the Supreme Court of Gibraltar.

The facts are stated in the judgment, post, paras 2–17. *5478

*David Semark* (instructed by *Wikborg Rein LLP* ) for the claimant.

*Thomas Steward* (instructed by *MFB Solicitors* ) for the defendant.

The court took time for consideration.

28 June 2021. PATRICIA ROBERTSON QC

© 2022 Thomson Reuters.

A-56

handed down the following judgment.

Introduction

1. This is the claimant's application to dismiss and strike out that part of the defendant's counterclaim which seeks to advance claims in tort based on the alleged wrongful arrest of the *Pola Devora* in Gibraltar in July 2020. The application is brought under CPR rr 11.1 and 3.4(2) . In essence the claimant submits that this court has no jurisdiction to try the defendant's tort claims and should decline jurisdiction in favour of the Supreme Court of Gibraltar. I am not today concerned with determining such other issues as may in due course arise as regards the merits of the proposed tort claims.

Factual background

2. The claimant, as owners, and defendant, as time charterers, entered into a time charterparty for the *Divinegate* , dated 18 September 2019 ("the Charterparty").

3. The Charterparty contains an exclusive jurisdiction clause which provides as follows:

"Clause 93 Dispute Resolution Clause

"This Charter Party shall be governed by English law and any dispute arising out of or in connection with this Charter shall be submitted to the exclusive jurisdiction of the high court of justice in England and Wales …"

4. The defendant took delivery of the vessel on 21 September 2019 and redelivered it on 3 November 2019. Following redelivery of the vessel, a dispute emerged as to whether the defendant was liable for the balance of the hire, since the defendant asserted the right to set off various costs and expenses it claimed to have incurred during the course of the charter .

5. In order to secure its claims, the claimant arrested a different vessel, the *Pola Devora* , in Gibraltar on 2 July 2020, by a claim form lodged on that date in the Supreme Court of Gibraltar. The claimant's position is that it did so on the basis of a *Lloyd's List Intelligence* report which described the defendant as the beneficial owner of the *Pola Devora* . The defendant's position is that it was merely the time charterer of the *Pola Devora* , the owner being Pola Rise OOO. The claimant released the vessel on 6 July 2020 following provision of a copy of a time charter between the defendant and Pola Rise OOO for the vessel but does not concede that the defendant is not the beneficial owner or that the arrest was wrongful.

6. The witness statement in support of the application stated that the claimant intended to apply for a stay of the Gibraltar proceedings under section 19 of the Civil Jurisdiction and Judgment Act 1993 [2] [3] , and further to *5479* apply that the vessel remain detained, or that adequate security be provided, pending resolution of the dispute under the Charterparty, which would be resolved in London in accordance with the relevant dispute resolution and jurisdiction clauses contained in the Charterparty.

7. That reference to section 19, and the explanation given as to the claimant's intention, made clear that the purpose of the arrest was to serve as security for claims under the Charterparty that were to be brought in London, consistently with the exclusive jurisdiction clause. That accords with article 24 of the Brussels Convention of 27 September 1968 on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters ("the Brussels Convention"), which permits a party to apply for provisional or protective measures in one contracting state even where another contracting state has jurisdiction over the substance of the matter.

8. The defendant entered an acknowledgement of service in the Gibraltar proceedings on 31 July 2020. The defendant ticked both the box stating "I intend to defend all of this claim" and the box stating "I intend to contest jurisdiction". The claimant relies on that as establishing the jurisdiction of the Gibraltar court in respect of the tort claims now sought to be brought here.

9. On 4 August 2020, the claimant brought proceedings in this court for the balance of hire (US$99,982·79) said to be due from the defendant under the Charterparty.

© 2022 Thomson Reuters.

A-57

**Eastern Pacific Chartering Inc v Pola Maritime Ltd, [2021] 1 W.L.R. 5475 (2021)**

10. There was then a hiatus whilst attempts were made at settling the dispute. The proceedings in both jurisdictions were stayed with express reference to that purpose. However, the order made in Gibraltar was expressed to stay the proceedings there until further order, whereas that made in these proceedings was expressed such that the stay automatically lifted if no settlement had been achieved by 11 September 2020, as transpired to be the case.

11. On 16 October 2020, although the Gibraltar proceedings remained stayed, Pola Rise OOO entered an acknowledgement of service in those proceedings stating an intention to defend.

12. On 10 November 2020 the defendant served a defence and counterclaim in the proceedings in this jurisdiction. This advanced a number of counterclaims relating to costs incurred during the charter and alleged under-performance of the vessel, which it is common ground come within the scope of the exclusive jurisdiction clause and will, along with the claimant's claim for the balance of hire, be litigated here. Those counterclaims total US$139,377.44 or alternatively US$97,474.76. However, the defendant also counterclaims for damages in the sum of US$54,400 in respect of losses alleged to have been suffered as a result of the alleged wrongful arrest of the *Pola Devora* in Gibraltar. Whilst of course I do not diminish the significance of this litigation for the parties, it will be immediately apparent from those figures that these sums (particularly if the conclusion at the end of the day is that they fall to be netted off) are relatively modest by comparison with the likely costs of litigation in this court, never mind litigation in two different jurisdictions.

13. The counterclaim for damages in respect of the arrest is advanced on a number of alternative bases, all of them under English law: breach of the Torts (Interference with Goods) Act 1977 , tortious interference with use of *5480* the *Pola Devora* , conversion of the *Pola Devora* and a tortious inducement of a breach of contract (i e the time charter of the *Pola Devora* ).

14. At first blush that is difficult to reconcile with article 6 of the 1952 International Convention Relating to the Arrest of Sea -Going Ships ("the Arrest Convention") which provides that:

> "All questions whether in any case the claimant is liable in damages for the arrest of a ship or for the costs of the bail or other security furnished to release or prevent the arrest of a ship, shall be determined by the law of the contracting state in whose jurisdiction the arrest was made or applied for."

15. Furthermore, the claimant contends that *The Evangelismos (1858) 12 Moo PC 352* established that it is necessary to prove malice or gross negligence in order to recover damages for wrongful arrest. I do not read the counterclaim as making any such allegation, as presently drafted.

16. These, however, will all be matters to be litigated out in whatever is determined to be the appropriate jurisdiction, since the application before me is advanced solely on the basis of jurisdiction and not on the basis that these counterclaims disclose no reasonable grounds for a claim.

17. The claimant sought an extension of time for service of its reply and defence to counterclaim. The first indication that the claimant intended to challenge the jurisdiction as regards the tort claims came by way of the reply and defence to counterclaim, which was served 35 days after the defence and counterclaim. The defendant contends that, by not contesting the jurisdiction within the timeframe of 28 days ( CPR r 11.1(4) as amended by CPR r 58.7(2) ) and by in the meantime seeking an extension of time, the claimant submitted to the jurisdiction in respect of the tort claims.

The expert evidence

18. Both parties sought to rely on expert evidence from Gibraltarian lawyers. Neither had sought permission to do so. There had therefore been no case management directed to ensuring the evidence was appropriately focused and limited to matters relevant to jurisdiction (and it was not). Moreover, whilst the defendant lodged an application on 2 June 2021 indicating that it wished either to be able to cross-examine or for the claimant's evidence to be excluded, the practical reality (as Mr Steward sensibly accepted) was that this was a moot point by the time we came to the hearing, since it was all too late.

19. It seems to me that, just as in *BB Energy (Gulf) DMCC v Al Amoudi [2018] EWHC 2595 (Comm) at [49]* , it is fair to express this as an "even-handed criticism of both sides", regardless of who fired the first salvo in the exchange of expert evidence. In general, CPR Pt 35 applies where a party seeks to adduce expert evidence on an interlocutory application, at least unless the court

© 2022 Thomson Reuters.

A-58

**Eastern Pacific Chartering Inc v Pola Maritime Ltd, [2021] 1 W.L.R. 5475 (2021)**

is merely being asked to take into account the existence of issues which the court is not being asked to decide at that stage: *New Media Distribution Co Sezc Ltd v Kagalovsky [2018] EWHC 2742 (Ch)* , *Ross v Attanta Ltd [2021] EWHC 503 (Comm) at [7]* .

20.  Had I considered that the outcome of the claimant's application depended on the expert evidence, this omission to grapple sooner with appropriate directions in respect of the expert evidence might have been problematic. However, that evidence seems to me to be of very limited  *\*5481*  relevance to jurisdiction—and certainly nothing significant turns on points on which the experts disagree.

The issues for determination

21.  It is common ground between the parties that matters of jurisdiction as between this court and the Supreme Court of Gibraltar are governed by the Brussels Convention and that this remains the case notwithstanding Brexit. That results from the Civil Jurisdiction and Judgments Act 1982 (Gibraltar) Order 1997 (SI 1997/2602) , which applies Schedule 1 to the Civil Jurisdiction and Judgments Act 1982 (i e the Brussels Convention) as if England and Gibraltar had been separate contracting states to the 1968 Convention.

22.  This is therefore one of the rare cases in which the court still has to look to the Brussels Convention, rather than any of its successors.

23.  The defendant is domiciled in Cyprus, a contracting state, whereas the claimant's domicile is not in a contracting state. That has an impact on which articles of the Brussels Convention apply.

24.  The first question is whether the tort claims fall within the scope of the exclusive jurisdiction clause in the Charterparty in favour of this court, on the footing that whether or not they are claims "arising out of" the Charterparty, they are at least claims "in connection with" the Charterparty. If so, then article 17 of the Brussels Convention would apply and this court has jurisdiction over the tort claims.

25.  If they do not come within the scope of clause 93, then it becomes necessary to consider whether this court can and should assume jurisdiction on some other basis.

26.  If this court does not have jurisdiction in respect of the tort claims, that is an end of the matter, but if this court does have jurisdiction it is then necessary to consider whether the court is nevertheless obliged to, or should, decline jurisdiction in favour of the Supreme Court of Gibraltar. That involves determining:

(a)  Whether there are "proceedings involving the same cause of action and between the same parties" here and in Gibraltar, such that this court is obliged to decline jurisdiction in favour of the Supreme Court of Gibraltar as the court first seised, pursuant to article 21 .
(b)  If not, whether these are related actions within the meaning of article 22 and if so whether, as the court second seised, this court should as a matter of discretion decline jurisdiction over the tort claims (and more broadly, the issue of forum non conveniens).

The legal framework governing jurisdiction

27.  The following provisions of the Brussels Convention are relevant:

"Article 4

"If the defendant is not domiciled in a contracting state, the jurisdiction of the courts of each contracting state shall, subject to the provisions of article 16 , be determined by the law of that state …"

Article 4 applies to the claimant, which is not domiciled in a contracting state, in its capacity as defendant to the counterclaim. It is common ground that article 16 , which confers exclusive jurisdiction, regardless of domicile, in respect of certain types of claim, is not engaged.  *\*5482*

© 2022 Thomson Reuters.

**A-59**

Eastern Pacific Chartering Inc v Pola Maritime Ltd, [2021] 1 W.L.R. 5475 (2021)

"Article 17

"If the parties, one or more of whom is domiciled in a contracting state, have agreed that a court or the courts of a contracting state are to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, that court or those courts shall have exclusive jurisdiction …"

That applies, since the defendant is domiciled in a contracting state, namely Cyprus.

"Article 18

"Apart from jurisdiction derived from other provisions of this Convention , a court of a contracting state before whom a defendant enters an appearance shall have jurisdiction. This rule shall not apply where appearance was entered solely to contest the jurisdiction, or where another court has exclusive jurisdiction by virtue of article 16 ."

There are issues between the parties, which I address below, as to whether article 18 is engaged. As noted above, article 16 does not apply.

"Article 21

"Where proceedings involving the same cause of action and between the same parties are brought in the courts of different contracting states, any court other than the court first seised shall of its own motion decline jurisdiction in favour of that court.

"A court which would be required to decline jurisdiction may stay its proceedings if the jurisdiction of the other court is contested."

The claimant submitted that the tort claims sought to be raised in these proceedings are the same claims as those of which the Supreme Court of Gibraltar is seised.

"Article 22

"Where related actions are brought in the courts of different contracting states, any court other than the court first seised may, while the actions are pending at first instance, stay its proceedings.

"A court other than the court first seised may also, on the application of one of the parties, decline jurisdiction if the law of that court permits the consolidation of related actions and the court first seised has jurisdiction over both actions.

"For the purposes of this article, actions are deemed to be related where they are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings."

The claimant's fallback position was that the two sets of proceedings are related claims and this court should exercise its discretion in favour of the tort claims being resolved in Gibraltar.

"Article 24

"Application may be made to the courts of a contracting state for such provisional, including protective, measures as may be available under the *5483 law of that state, even if, under this Convention , the courts of another contracting state have jurisdiction as to the substance of the matter."

As I will come to, this permits a limited derogation from article 17.

© 2022 Thomson Reuters.

A-60

**Eastern Pacific Chartering Inc v Pola Maritime Ltd, [2021] 1 W.L.R. 5475 (2021)**

28.  It is worth noting that article 5(3) , which confers jurisdiction in matters relating to tort, delict or quasi-delict, in the courts for "the place where the harmful event occurred", does not apply in this case because the tort claims relating to the alleged wrongful arrest are brought against a party, the claimant, who is not domiciled in a contracting state.

29.  The following provisions of the Arrest Convention are also relevant here:

(a) Article 4 provides that: "A ship may only be arrested under the authority of a court or of the appropriate judicial authority of the contracting state in which the arrest is made." That confers exclusive jurisdiction on the Supreme Court of Gibraltar as regards giving authority to arrest a ship for a maritime claim.

(b) Article 6 , as noted above, makes provision, inter alia, as to which law is to govern liability in damages for wrongful arrest, namely the law of the jurisdiction where the arrest was made, but does not specify that only the court with jurisdiction to make the arrest in the first place should determine any claim for consequential damages. That is plainly not the case, as is illustrated for example by *Astro Vencedor Cia Naviera SA of Panama v Mabanaft GmbH (The Damianos) [1971] 2 QB 588* , discussed below.

(c)  Article 7 : (i) This gives the courts where the arrest was made jurisdiction to determine "the case" upon its merits if the domestic law of the country in which the arrest is made gives jurisdiction to such courts, or in a number of specified cases (none of which are applicable here). Where the arresting court does not have jurisdiction over the merits, the "bail or other security given in accordance with article 5 to procure the release of the ship shall specifically provide that it is given as security for the satisfaction of any judgment which may eventually be pronounced by a court having jurisdiction so to decide". (ii) That latter provision is consistent with the policy behind article 24 of the Brussels Convention , in allowing protective measures in jurisdictions that do not have jurisdiction over the substantive claim. (iii) Here, the arrest was sought expressly on the footing that the merits of the owner's claims were a matter for the English court, by virtue of article 17 , and the arrest was being applied for solely by way of security.

30.  The Arrest Convention does not itself make provision in respect of lis alibi pendens but falls to be read together with the Brussels Convention in that respect: *Owners of cargo lately laden on board the ship Tatry v Owners of the ship Maciej Rataj (The Tatry)* (Case C-406/92) *[1999] QB 515* .

31.  The effect of these provisions is that the obtaining of security, by way of an arrest, can (by virtue of article 4 of the Arrest Convention) only be done by applying to the court where the ship sought to be arrested is located (in this case, Gibraltar). However, it does not follow that that court also has exclusive jurisdiction as regards whether the claimant is liable in tort as a consequence of having taken that step in Gibraltar (albeit establishing the wrongfulness of the arrest as a matter of Gibraltarian law is a necessary component in any such cause of action). The Arrest Convention leaves that question open.  *\*5484*

32.  The defendant's primary case is that, on the facts of this case, article 17 applies to confer jurisdiction on this court, because the exclusive jurisdiction clause is broad enough to cover the tort claims. The defendant's fallback position is that, if that is wrong, the court nevertheless has jurisdiction in respect of its counterclaims, either because that necessarily follows from the claimant's decision to litigate its own claims here, or because the claimant has taken steps since service of the defence and counterclaim which waived any right to object to jurisdiction in respect of the counterclaims.

The scope of the exclusive jurisdiction clause

33.  The defendant relied on *Coventry and Solihull Waste Disposal Co Ltd v Russell [1999] 1 WLR 2093 (at p 2103)* for the proposition that I should interpret the phrase "in connection with" as "having something to do with". However, as Lord Hope of Craighead observed in that case, it is a "protean" phrase and therefore I do not gain much assistance from how it has been interpreted in that very different legal context of a statutory scheme for calculating rateable values (and in any event the actual decision in that case was that that was not an adequate meaning to give those words in that context, even if it might be the right interpretation in some other contexts).

34.  I was not referred to any case that had considered the phrase in the context with which we are concerned. I therefore approach the question on the footing I must simply apply the principles of construction articulated in *Fiona Trust and Holding Corpn v Privalov [2007] Bus LR 1719* .

35.  The House of Lords in *Fiona Trust* laid down the principles to be applied in construing exclusive jurisdiction clauses. The court should (per Lord Hoffmann at para 13) "start from the assumption that the parties, as rational businessmen, are likely to have intended any dispute arising out of the relationship into which they have entered or purported to enter to be decided by the

**A-61**

**Eastern Pacific Chartering Inc v Pola Maritime Ltd, [2021] 1 W.L.R. 5475 (2021)**

same tribunal". In that case, the issue was whether a claim that the charter was invalid (on the basis that it had been procured by bribery) was a dispute "arising under this charter ", within the meaning of the clause referring disputes to arbitration. It was held that it was.

36.   Whereas some of the previous cases had drawn fine distinctions according to whether a clause used the words "arising under" or "arising out of", Lord Hoffman declared there to be a need for a "fresh start" (at para 12) and Lord Hope deprecated such "fussy distinctions" (at para 27), thereby consigning those distinctions to the legal dustbin. That said, had the clause in question instead been worded so as to refer any claims "in connection with" the charter , it seems that would have been recognised, even before *Fiona Trust* was decided (and all the more so in light of that decision), as referring to a wider class of claims than just those regarding the rights and obligations under the contract itself (see at para 11).

37.   The language "in connection with" is naturally to be read as, if anything, wider than "arising under", or variants on that phrase. Taking a broad and common sense approach to construing the clause, as I am enjoined in *Fiona Trust* to do, a tort claim may be said to arise "in connection with" the charter not only where there are parallel claims in tort and contract (as, for example, for breach of a duty of care) but also where the claim arises solely in tort but is in a meaningful sense causatively   ***\*5485***   connected with the relationship created by the charter and the rights and obligations arising therefrom.

38.   The connection here lies in the fact that steps taken by the claimant specifically in order to secure its claims under this charter are alleged to have been tortious and to have caused the defendant loss. The claimant took those steps in express reliance on its rights under the charter and, but for the relationship created by the charter , no arrest would have taken place. The alleged flaw in the arrest is that the vessel arrested could not properly be made the subject to an in rem claim because it was not beneficially owned by the party who is liable to the claimant in personam under the charter .

39.   It was in general terms foreseeable by the parties that, in the event of a dispute arising, steps might be taken in other jurisdictions to enforce their respective rights and obligations under the charter , and it would be consistent with a "one-stop" approach to all disputes arising from the relationship created by the Charter ( *Fiona Trust* at para 27) for any damages claims arising from such steps to enforce those rights to be dealt with alongside the substantive dispute, in this court. That allows a single accounting, as regards the overall financial position of the parties as a result of the legal relationship created between them by the charter , and their dispute about what rights and obligations properly flow from that legal relationship.

40.   That seems to me to be the view which could plausibly be attributed to rational businessmen, viewing the matter *prospectively* at the time of contracting. It is not a matter of construing the clause by reference to subsequent events: cf *BNP Paribas SA v Trattamento Rifiuti Metropolitani SpA [2020] 1 All ER 762, para 61* . None of the authorities relied on by the claimant dictates a different answer.

41.   In this respect, this case is distinguishable from *Ryanair Ltd v Esso Italiana Srl [2015] 1 All ER (Comm) 152* . That case was concerned with a jurisdiction clause which referred disputes "under this Agreement" to the English court (in itself, a narrower form of clause). The agreement was for the supply of fuel. The issue was whether the jurisdiction clause covered a claim for breach of statutory duty on the basis that the supplier had participated in a price-fixing cartel. At first instance the court had interpreted a particular clause in the contract as giving rise to an overlapping contractual claim and on that basis found the claims to be "closely knitted together on the facts" (applying *Empresa Exportadora de Azucar v Industria Azucarera Nacional SA (The Playa Larga) [1983] 2 Lloyd's Rep 171* ). However, that argument was rejected by Rix LJ in the Court of Appeal, who disagreed with that interpretation of the contract and found there was no contractual claim available. The claim for breach of statutory duty lay against all participants in the cartel and the fact that, out of all of the possible defendants, the claimant had chosen to sue the counterparty to the supply contract did not create a connection with the sales contract, so as to bring the statutory duty claim within the scope of the contractual jurisdiction clause (see at pp 165–166).

42.   That was therefore a case where the statutory duty claim arose wholly independently of the existence of the contract and, moreover, where the jurisdiction clause was in narrower terms. In contrast, on the present facts, there is a clear causal connection, which seems to be sufficient for the purposes of a clause worded "in connection with".   ***\*5486***

43.   Likewise, this case is distinguishable from *Chimimport plc v G d'Alesio SAS (The Paolo d'Alesio) [1994] 2 Lloyd's Rep 366* . There the issue was whether claims that the settlement of a dispute under the charterparty had been procured by duress (in the form, inter alia, of a wrongful and malicious arrest) came within the scope of a clause referring to arbitration disputes "arising under" the bill of lading. Again, "in connection with" seems naturally broader in scope. Furthermore, the reasoning at pp 371–372 of Rix J's judgment appears both to be obiter (since, as appears from the passage at the foot of the left hand column

**A-62**

**Eastern Pacific Chartering Inc v Pola Maritime Ltd, [2021] 1 W.L.R. 5475 (2021)**

---

on p 371, he had accepted that the arbitrator lacked jurisdiction irrespective of whether or not the tort claims in question came within the scope of the relevant clause) and may now be questionable in light of *Fiona Trust and Holding Corpn v Privalov [2007] Bus LR 1719* , since it seems to be exactly the sort of fine distinction there deprecated.

44. I acknowledge that the tort claims here are not overlapping or factually interlinked with the contract in the same manner as was the case in *The Playa Larga* (where a claim in conversion was factually bound up with a contractual claim for breach of a warranty of quiet possession of the goods). However, I do not think that case (decided as it was before *Fiona Trust* mandated a "fresh start" and on the basis of a different jurisdiction clause) can be taken to be laying down as a universal requirement that there must always be an overlap with the factual issues in the contractual claim, or that it prevents me from taking the common sense view I have outlined above as to the nature of the connection that suffices for the purposes of the particular clause that is before me.

45. The same can be said of *Aggeliki Charis Cia Maritima SA v Pagnan SpA (The Angelic Grace) [1995] 1 Lloyd's Rep 87* , where again the contractual claims and tortious claims arose out of the same incident (a collision between ships during the course of the charter whilst in Italian waters) and that factual overlap justified treating the tort claims as "arising out of" the contract, such that the London arbitrators had jurisdiction and Italian proceedings in relation to the collision were restrained, though that would otherwise have been the natural forum.

46. Whilst both of those cases involved a connection based on overlapping facts, which were common to the contractual and tortious claims, it does not follow from them that nothing less than that will suffice when one is considering whether a claim for damages for wrongful arrest that arises solely in tort can be said to arise "in connection with" the charter .

47. The present case seems to me closest to *Astro Vencedor Cia Naviera SA of Panama v Mabanaft GmbH (The Damianos) [1971] 2 QB 588* , where the Court of Appeal held that a claim for damages for wrongful arrest fell within the scope of an arbitrator's jurisdiction. Lord Denning MR there took a robust approach to a clause conferring jurisdiction on London arbitrators of "any dispute arising during execution of this Charterparty", treating it as covering claims in respect of two arrests, one of which had post-dated the charter by some months.

48. The owners of the *Damianos* having stopped discharge of the cargo, the charterers had arrested the ship (in Amsterdam) and then, some months after the end of the charter , they had arrested the ship again (in Rotterdam). The owners claimed damages in the arbitration, inter alia on the basis that  *5487*  the arrests had been wrongful. The charterers contended that the arrests fell outside the scope of the arbitration clause on the footing that the tort claims were entirely separate from the contract. Lord Denning MR rejected that saying (at p 595D):

> "The arrest of the ship was the direct consequence of the charterers' claim for damages against the shipowners. The charterers arrested the ship so as to enforce their claim. Their claim—that the shipowners had wrongfully stopped discharging the oil—was certainly a claim which arose out of the contract during the execution of it. It was plainly within the arbitration clause. It had necessarily to be decided by the arbitrator. The arrest was simply the follow up to that claim. It was so closely connected with it that the rightness or wrongness of the arrest is also within the scope of the arbitration."

That part of the judgment is equally applicable to the facts before me.

49. Lord Denning MR then went on to refer (p 595F) to the fact that the charterers' claim had been held to be "bad" and that therefore the lawfulness or otherwise of the arrests was "so much part and parcel of the inquiry that they come within the broad scope of the arbitration clause". Sir Gordon Willmer likewise noted (at p 596D) that the arbitrator could not decide whether the arrest was wrongful without considering the terms of the charterparty as a whole. The claimant relies on those passages as showing that what was essential to the decision was that this was a case where the substantive contractual claim in respect of which security had been sought by way of an arrest was alleged to be spurious and hence the issue of the wrongfulness of the arrest overlapped with the issues in the contractual claim.

50. Whilst that element of overlap in the factual issues made the conclusion reached in *The Damianos* an "a fortiori" case, it does not seem to me to follow that such an overlap is an essential element. The point that the arrest was a direct consequence of a contractual claim and therefore closely connected to the contract and the legal relationship there created, remains good whether or not the ground for attacking the validity of the arrest in the given case is that the contractual claim is "bad" or, as here, the contention that there simply is no contractual claim to found the arrest because (as the defendant alleges) the claimant has misidentified who is the owner of the arrested ship.

---

© 2022 Thomson Reuters.

**A-63**

51.  I draw some further support for that approach from *London Arbitration 8/04* ((2004) LMLN 637, 14 April 2004). That was a decision of an ad hoc arbitration panel on whether claims for losses caused by alleged wrongful arrests fell within the scope of a clause referring to arbitration any disputes between the parties to the charter . The charterers argued that there were no issues of fact in common, but the panel took a broad view, holding that the owner's claims formed part "if not of a seamless web, then at least of a thread that was sufficiently continuous". The High Court refused leave to appeal, on the footing that that decision was not wrong, let alone obviously wrong. Whilst the case was not concerned with the application of the Brussels Convention, it nonetheless is of some relevance as supporting a generous interpretation of a broadly drafted jurisdiction clause.

52.  In conclusion, it seems to me more consistent with *Fiona Trust and Holding Corpn v Privalov [2007] Bus LR 1719* that I should take a broad  *\*5488*  view of clause 93, such that where there is an issue between the parties as to whether damages are recoverable for an allegedly wrongful arrest made in seeking security for claims under the charter , that is a claim "in connection with" the charter and therefore this court has jurisdiction pursuant to article 17 of the Brussels Convention .

53.  The exclusive jurisdiction conferred on this court by article 17 is, however, qualified to this extent: it is well established that steps taken in another jurisdiction in order to obtain security for a claim do not amount to a breach of an exclusive jurisdiction clause in favour of this court: *Kallang Shipping SA Panama v Axa Assurances Senegal (The Kallang) (No 2) [2009] 1 Lloyd's Rep 124, para 75* ; *Mike Trading and Transport Ltd v R Pagnan & Fratelli (The Lisboa) [1980] 2 Lloyd's Rep 546* .

54.  It is a non-sequitur, however, to contend (as the claimant sought to argue) that just because article 24 allows this strictly limited carve-out, so as to prevent the act of obtaining security for a claim from being treated, in itself, as a breach of article 17 , that it therefore follows that a substantive claim for damages for tortious conduct in connection with obtaining security cannot fall within the scope of article 17 . *Astro Vencedor Cia Naviera SA of Panama v Mabanaft GmbH (The Damianos) [1971] 2 QB 588* and *London Arbitration 8/04* are examples where such claims were held to come within the scope of a jurisdiction clause and, had either of those been a Convention case, it would have followed from that finding that article 17 was engaged.

55.  Moreover, it is one thing to say that article 24 may afford an alternative forum, in that a claim for damages consequent on the obtaining of provisional relief might in principle be brought in the court which granted that relief, without that involving a breach of article 17 , and quite another to treat article 24 as mandatorily depriving a party of the option of bringing such a claim in the court the parties have otherwise chosen, pursuant to article 17 .

56.  Given that the Supreme Court of Gibraltar is seised of the arrest proceedings, the question becomes what consequences flow from that, in terms of the operation of articles 21 and 22 .

57.  The defendant asserts it would not have standing under Gibraltarian law, as a time charterer, to bring a claim for wrongful arrest in Gibraltar. I need not determine that point of expert evidence for present purposes (although one may expect it will feature in due course in debate between the parties as to whether English tort law can be relied upon to circumvent that problem). Assuming that the tort claims could in principle have been advanced either in the Supreme Court of Gibraltar (pursuant to article 24 ) or in this jurisdiction (pursuant to article 17 , albeit on a non-exclusive basis, due to the interaction with article 24 ), the fact is that the defendant has chosen *not* to advance those claims in Gibraltar. For the reasons I develop below, the tort claims are not the "same" as the arrest claim. The mere fact of indicating an intention to defend the arrest claim does not result in the Supreme Court of Gibraltar being seised of the tort claims, the nature of the defence being irrelevant for these purposes ( *Starlight Shipping Co v Allianz Marine & Aviation Versicherungs AG (The Alexandros T) [2014] Bus LR 873* , 887F) and the tort claims in any event involving, as they do, matters that go beyond any such defence. Still less is that the case, given the express reference to contesting the jurisdiction.  *\*5489*

Is there any alternative basis for jurisdiction?

58.  Before I turn in more detail to articles 21 and 22 , however, I should address the alternative arguments the defendant relies upon for founding the jurisdiction of this court, in case I am wrong in my conclusion that jurisdiction can be founded on article 17 .

59.  Article 4 of the Brussels Convention permits jurisdiction to be established, as against a party not domiciled in a contracting state, such as the claimant, in accordance with English law. That includes the principle that this court will have jurisdiction where a party has submitted to the jurisdiction of this court.

**A-64**

**Eastern Pacific Chartering Inc v Pola Maritime Ltd, [2021] 1 W.L.R. 5475 (2021)**

60.   Article 18 is directed, specifically, to submission by "entering an appearance". In this context, argument before me was directed to whether it was somehow incumbent on the claimant to file an acknowledgment of service contesting the jurisdiction within 28 days of service of the defence and counterclaim, despite the absence of any such express provision in the CPR , and whether the claimant had waived its right to object to jurisdiction in respect of the counterclaim because it had sought an extension of time for the reply and defence to counterclaim. As regards the latter point: (a) I do not consider there would in any event have been a waiver (if that is a relevant question). An extension of time was necessary to enable the claimant to have the time it needed to prepare its pleading in response to those counterclaims which it is common ground this court has jurisdiction to hear. Unlike *Global Multimedia International Ltd v ARA Media Services [2007] 1 All ER Comm 1160* (on which the defendant relied in this respect) those steps are perfectly well explained in the eyes of the putative disinterested observer by the necessity to defend the other counterclaims, as opposed to being explicable only on the assumption that jurisdiction in respect of the tort claims was conceded. Seeking time for that legitimate purpose and then putting in a reply and defence to counterclaim which addresses the other counterclaims on their merits, but which contests jurisdiction on the tort claims (without engaging in the merits), would not amount, objectively, to a submission to the jurisdiction (if that issue did depend on how the claimant has responded to the counterclaim). (b) In those circumstances, the court would have discretion to extend time, if it were necessary to do so, and the mere fact that 35 days, rather than 28, had passed by the time that pleading was served would not, of itself, be a sufficient reason to deny the claimant opportunity to contest the jurisdiction, in circumstances where there was no suggestion of any prejudice having resulted from that delay.

61.   However, it is not clear that, *as against a party not domiciled in a contracting state* , it is always necessary to bring the case within the scope of article 18 (treating the counterclaim as if it was an originating claim) if the position under domestic law is that jurisdiction can instead be founded on article 4 alone.

62.   The claimant relied on *Spitzley v Sommer Exploitation SA (Case 48/84) [1985] ECR 787* . That related to a situation where both parties were domiciled in contracting states and the question as formulated for the ECJ was specifically whether the claimant, who had chosen to commence proceedings in the defendant's domicile rather than in the jurisdiction designated in the contract, had "entered an appearance", within the meaning of article 18 , so as to be precluded from contesting jurisdiction in respect of a *\*5490* set off, unrelated to the claim, on the basis of article 17 . It was held that the claimant had entered an appearance in the requisite sense by submitting arguments as to the merits of the defendant's claim for a set off without contesting the jurisdiction of the court in respect of those claims. If, therefore, the correct question is whether the claimant has "entered an appearance" within the meaning of article 18 , *Spitzley* would lead to the conclusion that jurisdiction cannot be founded on that article.

63.   *Dicey, Morris & Collins on the Conflict of Laws* , 15th ed (2018) suggests, however, that English domestic law takes a broader approach as to whether jurisdiction is established in respect of a counterclaim against a claimant not domiciled in a contracting state. The defendant relied on the following passage, vol 1, para 11–126 (footnotes omitted):

> "A person who begins proceedings in general gives the court jurisdiction to entertain a counterclaim against him which may extend to cases in which, if separate proceedings were to be brought, permission to serve process under CPR r 6.36 and Practice Direction 6B, para 3.1, i e rule 34, might not be obtainable. Although it is sometimes said that it is not necessary that the counterclaim be related to the claim, the true principle is that a counterclaim is allowed so that justice can be done as between the parties. In English law this principle is given effect by the rule that the court may require a counterclaim to be disposed of separately."

64.   I was not taken to any of the (numerous) cases referred to in footnotes to that paragraph. I can see that there might be an argument that English law treats the commencement of proceedings here as a submission by the claimant to the jurisdiction as regards any counterclaim which the court considers ought, in justice, to be heard together with the claim. On that footing, there could on that basis be jurisdiction for the purposes of article 4 without the court having to engage in a rather strained application of rules relating to acknowledgement of service and so forth in order also to bring the matter with article 18 . A claimant wishing to contest whether there was jurisdiction on that basis would put in issue by its reply and defence to counterclaim whether the court should decline jurisdiction on the footing the particular counterclaim was not one which justice required to be tried with the claim and, on the contrary, that another forum was more appropriate for it.

65.   Brussels 1 (Parliament and Council Regulation (EU) No 1215/2012 ) introduced a specific article dealing with jurisdiction in respect of counterclaims ( article 8(2) ) which is not to be found in the Brussels Convention. Article 8(2) provides that as against a party domiciled in a contracting state there will be jurisdiction in respect of "a counterclaim arising from the same

© 2022 Thomson Reuters.

**A-65**

contract or facts on which the original claim was based, in the court in which the original claim is pending". That is plainly far narrower than the broad approach which, according to *Dicey* , applies as against a party not domiciled in a contracting state. However, the very fact that article is limited to parties domiciled in a contracting state is significant.

66.  Be that as it may, it seems to me that this possibility was insufficiently explored in submissions for me to form a definitive view. As I say, I was not referred to the cases *Dicey* cites in support of it and there is the obvious difficulty (on which the claimant relies) of whether this can be satisfactorily *\*5491* reconciled with *Spitzley* . I therefore base my conclusions on jurisdiction on my analysis of the application of article 17 , above, and leave this issue to be determined in a case where it necessarily arises. I am not convinced it would make a practical difference to the outcome, in any event, in that if it were right that jurisdiction could in principle be founded on the alternate ground identified by *Dicey* , then it seems to me that the claimant is correct in the submission that the question would then become whether as a matter of discretion the court should decline jurisdiction on grounds of: (i) comity and/or (ii) forum non conveniens, and/or (iii) case management. That would to a significant degree (although I accept not completely) overlap with the matters that in any event fall to be considered in the context of article 22 , below.

Article 21

67.  I can deal quite shortly with the argument under article 21 .

68.  For the purpose of determining whether the proceedings before the Supreme Court of Gibraltar and before this court involve the same claims and the same object, I must focus on the causes of action involved: *The Alexandros T [2014] Bus LR 873, at para 51* . The Supreme Court of Gibraltar is seised of the claimant's claim to arrest the *Pola Devora* . The technical notion (common to Gibraltarian law and English law) that an arrest involves a claim in rem and a claim in personam is for these purposes a distraction, since it is necessary to adopt an independent and autonomous interpretation: *The Alexandros T* at p 887B.

69.  Identity of cause means having the same facts and rules of law relied on as the basis for the action. Identity of object means having the same end in view (loc cit). The factual and legal foundation of the arrest claim is the assertion that the claimant has a contractual claim for unpaid hire against the beneficial owner of the *Pola Devora* . The object of the arrest claim is (expressly) solely to obtain security for the substantive contractual claims, which the claimant advances only in this jurisdiction.

70.  The arrest claim plainly does not involve either the same cause of action or the same object as the defendant's tort claims seeking to recover damages for wrongful arrest, which are advanced solely by way of counterclaim in this jurisdiction. The factual and legal foundation for that counterclaim needs, on any view, to travel substantially beyond the matters the claimant relies on for its own cause of action and the object of the counterclaim is to recover damages.

71.  It is not sufficient for these purposes that a common issue might arise as regards whether the arrest was wrongful: *The Alexandros T [2014] Bus LR 873* , 887H. That issue would, in any event, arise by virtue of the defence to the arrest (which is not relevant for the purposes of article 21 , although certainly relevant when one comes to article 22 ). In any event, the wrongfulness of the arrest (which must on any view be a matter of Gibraltarian law) is, even if established, not in and of itself determinative of the claim for damages in tort, whether that damages claim is also governed by Gibraltarian law and involves establishing malice or gross misconduct, or whether (as pleaded) it is governed by English law and requires proof of the additional elements involved in the various torts on which the defendant relies. *\*5492*

72.  It follows that, although the Supreme Court of Gibraltar was seised in respect of the arrest claim before any proceedings were commenced in this court, article 21 does not apply and it is not mandatory for this court to decline jurisdiction over the counterclaim in favour of the Supreme Court of Gibraltar.

73.  By the same token, an acknowledgment of service in the Gibraltar arrest proceedings does not amount to a submission to that jurisdiction which would preclude the defendant from raising its distinct tort claims here (contrary to the claimant's submissions). The defendant in any event took the precaution of ticking the box indicating an intention to contest the jurisdiction as well as an intention to defend. The submission of that form made the defendant a party to the claimant's cause, in the form of the claim for an arrest by way solely of security, so that one of the three requirements for article 21 is satisfied (i e identity of parties), but that is irrelevant if the other two requirements are not.

Article 22

74.  Neither skeleton argument had referred to article 22 of the Brussels Convention , but the claimant specifically sought to rely on article 22 at the hearing, as a fallback from its position on article 21 . Whilst the claimant's skeleton argument had put forward arguments based on forum non conveniens, in the event the court did have jurisdiction, contrary to the claimant's case, the claimant had not sought, specifically, to develop a case based upon article 22 . It was only in oral submissions that the claimant first developed the argument that the proceedings in Gibraltar are a related action within the meaning of that article. To that end, the claimant, at the beginning of the hearing, added to the already substantial number of authorities before the court, *Research in Motion UK Ltd v Visto Corpn* (both at first instance *[2007] EWHC 900 (Ch)* and on appeal *[2008] 2 All ER (Comm) 560* ) and, following the short adjournment, *The Alexandros T* (the latter in fact also being relevant, as noted above, to article 21 ).

75.  This development evidently took the defendant rather by surprise. That is understandable since the claimant's primary case had appeared from the skeleton argument to be focused on the construction of clause 93 and arguments as to forum non conveniens, with only a passing reference to article 21 and none to article 22 . That said, the argument based on article 22 is properly open to the claimant and in practical terms might be said to serve as a hook from which to hang the proposition that this court has a discretion which it should exercise to decline jurisdiction, an argument which the claimant was in any event already making on the broad ground of forum non conveniens.

76.  Article 22 requires comparison of the two sets of proceedings. The first question is whether that comparison shows them to be "so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings". If so, the second question, given that as between the two sets of proceedings in question this court is on any view second seised, is whether as a matter of discretion (the language of article 22 , in contrast to article 21 , is "may")  *\*5493*  this court should stay the tort claims or decline jurisdiction in respect of them.

77.  There is, in principle, a risk of irreconcilable judgments on the issue as to whether the defendant was the beneficial owner of the *Pola Devora* and hence whether the arrest was wrongful as a matter of Gibraltarian law, issues which would (but for the stay) fall to be determined in the proceedings before the Supreme Court of Gibraltar and which are also the necessary (albeit not sufficient) foundation of the tort claims advanced in the counterclaim in these proceedings. The stay of the Gibraltarian proceedings for the purpose of ADR does not alter the fact that the Supreme Court of Gibraltar remains, for these purposes, seised of those proceedings, which have not been finally concluded: see by way of analogy *The Alexandros T [2014] Bus LR 873, at paras 78 and 81* .

78.  That overlap in the issues does make the actions "related", even if there are factors that substantially mitigate that risk in this particular case. Such mitigatory factors come into account as part of determining how to exercise the discretion under article 22 , rather than as a basis for saying that article is not engaged. That is clear from authorities which have addressed the correct approach to the equivalent article in the Brussels Regulation, article 28.

79.  The Court of Appeal in *Research in Motion UK Ltd v Visto Corpn [2008] 2 All ER (Comm) 560* had said (at para 37) that:

"the article leaves it open to a court to acknowledge a connection, or a risk of inconsistent judgments, but to say that the connection is not sufficiently close, or the risk is not sufficiently great, to make the actions related for the purposes of the article."

However, that does not appear to be a correct approach, for reasons I develop below. *Visto* is a case which was otherwise preoccupied with the question of which court was first seised, which was complicated on the facts of *Visto* and is straightforward on the facts before me. Whether one takes this action as a whole or focuses on the counterclaim as if it was a separate action, either way this court is second seised.

80.  The Supreme Court has since explained, in *The Alexandros T* at para 92 (citing the opinion of the Advocate General in *Owens Bank Ltd v Bracco (Case C-129/92) [1994] QB 509; [1994] ECR I-117* ) that such factors go to how the discretion under the article should be exercised, rather than pre-empting the need to exercise it. Lord Clarke of Stone-cum-Ebony JSC there summarised the factors relevant to the exercise of the discretion in these terms:

"The circumstances of each case are of particular importance but the aim of article 28 is to avoid parallel proceedings and conflicting decisions. In a case of doubt it would be appropriate to grant a stay. Indeed, he [the Advocate General]

Eastern Pacific Chartering Inc v Pola Maritime Ltd, [2021] 1 W.L.R. 5475 (2021)

appears to have approved the proposition that there is a strong presumption in favour of a stay. However, he identified three particular factors as being of importance: (1) the extent of the relatedness between the actions and the risk of mutually irreconcilable decisions; (2) the stage reached in each set of proceedings; and (3) the proximity of the courts to the subject matter of the case. In conclusion the Advocate General said at para 79 that it goes without saying that in the exercise of **\*5494** the discretion regard may be had to the question of which court is in the best position to decide a given question."

81. Furthermore, it is clear that it is relevant to take into account whether the matter in question comes (or arguably comes) within the scope of a jurisdiction clause that gives jurisdiction to the court second seised: *The Alexandros T [2014] Bus LR 873, at para 95* .

82. I take that guidance to apply with equal force to article 22 of the Brussels Convention .

83. It seems to me that the countervailing factors outweigh any initial presumption in favour of a stay or declining jurisdiction:

(a) The overlap in the issues is of limited scope;

(b) The proceedings in Gibraltar have barely got out of the starting blocks, having been stayed before any steps had been taken beyond the defendant having acknowledged service (with the reservation described above);

(c) As matters stood at the hearing, there appeared to be only a limited risk, in practical terms, of the proceedings in Gibraltar being reanimated in such a way as to produce an inconsistent finding, in the event that this court assumes jurisdiction (I elaborate on this point below);

(d) Whilst the Supreme Court of Gibraltar had exclusive jurisdiction in respect of authorising the arrest, the arrest has been lifted. Whilst technically the in personam claims remain in being, the substance of the claimant's claims is being litigated here, in circumstances where the action in Gibraltar was expressly brought solely for the purpose of obtaining security. In those circumstances, it does not seem to me that the Supreme Court of Gibraltar should be regarded as more "proximate" to the subject matter of the case, even though of course the issue of the wrongfulness of the arrest is governed by Gibraltarian Admiralty law and evidence as to the usual practice in that court for evidencing ownership may be relevant;

(e) For the reasons developed above, the tort claims come within the scope of the clause designating this court as the forum for resolving the substantive disputes between these parties in connection with the charter . Even if the exclusivity of that clause is tempered by article 24 , such that Gibraltar would also have been an available alternative forum for the tort claims, the defendant has not elected to bring them there. It is more consistent with the underlying policy of respecting choice of jurisdiction whilst avoiding a proliferation of parallel proceedings that all live matters should now be consolidated here;

(f) As regards which court is better placed to decide the issues raised by the tort claims, whilst that will include determining some issues of Gibraltarian law, those can be addressed by way of expert evidence. If the defendant is correct in its assertion that the relevant torts are governed by English law (as to which I express no view) then the scope for Gibraltarian law will be quite limited. Even supposing the issues of Gibraltarian law may be more extensive than that, that factor is still of limited weight considering matters as a whole. Moreover, it is common ground between the experts that Gibraltarian Admiralty law mirrors English law.

84. That analysis largely also covers the matters that were relied on by the claimant as grounds in respect of forum non conveniens. In that respect, the claimant also contended that as a matter of case management this action **\*5495** should not be complicated and rendered more expensive by the addition of the tort claims. That submission, however, overlooks the fact that the court is concerned with deciding in which of the two possible jurisdictions those claims should be determined, not that they should not have to be determined at all. If not determined here, and brought in Gibraltar instead, costs would be incurred in respect of legal teams, disclosure exercises and eventual trials in two jurisdictions. Even accepting that consolidating the live issues here necessitates expert evidence, and will expand the issues and the scope of disclosure in this litigation, a one-stop approach is likely to be more efficient.

85. I should say a little more about the risk of mutually irreconcilable judgments. As matters stood at the time of the hearing, it appeared to me that risk was in practice low. It was improbable that the defendant, who is fighting to bring its tort claims here, would if successful in that objective then do a u-turn and seek to lift the stay in Gibraltar. Nor did it seem to me that I should proceed on the basis that the claimant, if unsuccessful in its application before me, would then choose to lift the stay and unnecessarily incur the cost of fighting overlapping issues in two jurisdictions. It seemed probable that the defendant and Pola Rise OOO are related companies (although Mr Steward seemed unprepared to confirm that in court). At all events, it seemed likely that the latter was likely to have no continuing interest in the active pursuit of the Gibraltar proceedings now that the arrest has been lifted. That, however, was the area of residual risk, such as it was.

© 2022 Thomson Reuters.

A-68

86.  At the conclusion of and since the hearing, the defendant has sought to eliminate any residual risk in that respect by offering an undertaking through its solicitors, on behalf of both the defendant and Pola Rise OOO, not to challenge the arrest of the *Pola Devora* in the Supreme Court of Gibraltar if this court assumes jurisdiction in respect of the tort claims. That undertaking was expressed to be contingent on that being the outcome of this application (which would include the outcome of any appeal) but otherwise irrevocable. The precise wording will be recorded in the order disposing of the application. That undertaking is helpful in removing any possible element of residual risk from the equation, although as I say it seemed reasonable to consider that risk to be quite limited in any event. The late emergence of the argument on article 22 explains why the question, specifically, as to whether there was a residual risk of irreconcilable judgments was not focused upon any earlier (and did not feature in the claimant's list of factors bearing on forum non conveniens). Had it been raised, that undertaking might perhaps have been offered sooner. As it is, I do not regard the undertaking as being entirely transformative of the case.

Conclusion

87.  I conclude that, for all these reasons this court has a discretion, under article 22 of the Brussels Convention , which in the particular circumstances of this case, including but not limited to the fact that the tort claims come within the scope of a clause conferring jurisdiction on this court so as to engage article 17 , it is appropriate to exercise so as to refuse to decline jurisdiction or to stay the tort claims, even though this is the court second seised, as between the two sets of related proceedings. I therefore dismiss the claimant's application. I will give directions as to the further conduct of this matter, which the parties are invited to seek to agree.  *5496*

   Hannah Wilson, Barrister  *5497*

*Order accordingly.*


### Footnotes

| | |
|---|---|
| 1 | Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters 1968, arts 17 , 21, 22 : see post, para 27. |
| 2 | The relevant section provides as follows: "19 *Security in Admiralty proceedings in Gibraltar* "(1) Where in Gibraltar a court stays or dismisses Admiralty proceedings on the ground that the dispute in question should be submitted to arbitration or to the determination of the courts of an overseas country, the court may, if in those proceedings [i e the proceedings in Gibraltar] property has been arrested or bail or other security has been given to prevent or obtain release from arrest— (a) order that the property arrested be retained as security for the satisfaction of any award or judgment which (i) is given in respect of the dispute in the arbitration or legal proceedings in favour of which those proceedings are stayed or dismissed; and |

© 2022 Thomson Reuters.

**Eastern Pacific Chartering Inc v Pola Maritime Ltd, [2021] 1 W.L.R. 5475 (2021)**

(ii) is enforceable in Gibraltar; or (b) order that the stay or dismissal of those proceedings be conditional on the provision of equivalent security for the satisfaction of any such award or judgment. "(2) Where a court makes an order under subsection (1), it may attach such conditions to the order as it thinks fit, in particular, conditions with respect to the institution or prosecution of the relevant arbitration or legal proceedings. "(3) Subject to any provision made by rules of court and to any necessary modifications, the same law and practice shall apply in relation to property retained in pursuance of an order made by a court under subsection (1) as would apply if it were held for the purposes of proceedings in that court."

3   *Reporter's note* . The superior figure in the text refers to a note which can be found at the end of the judgment, on p 5496.

(c) Incorporated Council of Law Reporting for England & Wales

© 2022 Thomson Reuters.

A-70